UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case Nos.  06-44387 (CEC) |
| VICTORY MEMORIAL HOSPITAL, et al., | : | 06-44388 (CEC) |
| | : | 06-44389 (CEC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

----------------------------------------------------------------X

# SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE SECOND AMENDED PLAN OF REORGANIZATION OF VICTORY MEMORIAL HOSPITAL

## July 3, 2008

**DLA PIPER US LLP**
Timothy W. Walsh (TW-7409)
Jeremy R. Johnson (JJ-9269)
1251 Avenue of the Americas
New York, New York 10020-1104

Attorneys for Debtors and Debtors in Possession

(this page has been intentionally left blank)

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 4

II.     BACKGROUND INFORMATION ............................................................... 15

III.    SIGNIFICANT EVENTS IN THESE CHAPTER 11 CASES.................... 18

IV.     THE PLAN OF REORGANIZATION........................................................ 41

V.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN
        OF REORGANIZATION .............................................................................. 64

VI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.......... 69

VII.    EFFECTS OF PLAN CONFIRMATION .................................................. 73

VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
        THE PLAN ..................................................................................................... 77

IX.     CONCLUSION AND RECOMMENDATIONS......................................... 79

## EXHIBITS

Exhibit 1      Second Amended Plan of Reorganization of Victory Memorial Hospital, dated July 3, 2008

Exhibit 2      Distribution Analysis

Exhibit 3      Liquidation Analysis

Exhibit 4      Potential Preference Action List

(this page has been intentionally left blank)

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE DEBTOR URGES YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTOR, ITS PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTOR BELIEVES AND HAS MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN

CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE DEBTOR'S STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTOR AND ITS PROFESSIONALS. ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTOR CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTOR RECOMMENDS THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTOR THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

# I.  INTRODUCTION

## A.  General.

The following introduction is qualified by the Second Amended Plan of Reorganization of Victory Memorial Hospital, dated July 3, 2008 (the "Plan"),[1] which is attached hereto as **Exhibit 1**, and the more detailed information and financial statements contained elsewhere in this document.  The Plan is the product of negotiations between Victory Memorial Hospital, debtor and debtor in possession (the "Debtor"), the Committee and certain of the Debtor's creditor constituencies.  The Debtor believes that confirmation and implementation of the Plan is in the best interest of creditors and that the Plan provides the best available alternative to creditors.

This disclosure statement ("Disclosure Statement") and the other documents described herein are being furnished by the Debtor to holders of Claims in the Debtor's Chapter 11 case pending before the United States Bankruptcy Court for the Eastern District of New York (the "Court").

In addition to this Disclosure Statement and attached exhibits, the Debtor is also transmitting: (a) a notice of the dates set for objections and the hearing on confirmation of the Plan (the "Confirmation Notice"); and (b) the order approving the Disclosure Statement and the Confirmation Notice, dated July 7, 2008 (the "Order"), ballots, and voting instructions.  The Order and Confirmation Notice set forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan.  Each holder of a Claim should read this Disclosure Statement, Plan, Order and Confirmation Notice in their entirety.

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

Under the Bankruptcy Code, only holders of Claims and interests that are "impaired" are entitled to vote to accept or reject the Plan. The Bankruptcy Code further provides that a Class that is left unimpaired under the Plan is deemed to have accepted the Plan and a Class that receives no distribution under the Plan is deemed to have rejected the Plan. To become effective, the Plan must be accepted by certain Classes of Claims and confirmed by the Court.

If you have questions about the packet of materials that you received, please contact William Coleman, DLA Piper US LLP, 1251 Avenue of the Americas, New York, New York 10020-1104, telephone number (212) 776-3745, or william.coleman@dlapiper.com.

**B.**     **Classification and Treatment of Claims Under the Plan.**

Class 6 is the only impaired Class under the Plan that is entitled to vote. The Debtor is seeking votes to accept the Plan from holders of Claims in Class 6. For a description of the Classes of Claims and their treatment under the Plan, see Article III of the Plan – Classification and Treatment of Claims.

Estimated Claim amounts for certain Classes are based upon a preliminary analysis by the Debtor and its Professionals of Claims filed in the Debtor's Chapter 11 case. There can be no assurance that these estimates are correct. The following treatments are possible only if the Plan is approved and the Debtor's estimate of the Claims is determined to be valid by the Court. The timing of distributions under the Plan, if any, is subject to conditions and determinations described in later sections of this Disclosure Statement.

Each Class of Claims, except Administrative Claims, Priority Tax Claims and Trustee Fees are placed in the following Classes and will receive the following treatment under the Plan:

Summary of Classification
and Treatment of Claims Under the Plan

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| **Class 1 – Secured Tax Claims** | **$0** | No | This Class consists of all Allowed Secured Tax Claims for federal, state and local taxes. Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Claim in this Class shall receive Cash payments totaling the Allowed Claim on the later of (a) the third (3rd) Business Day after the Effective Date; or (b) the date on which there is a Final Order allowing such Claim. |
| **Class 2 – DASNY Bond Claim** | **$21,000,000**[2] | No | This Class consists of the amount of the Allowed DASNY Bond Claim as of the DASNY Payoff Date. On the DASNY Payoff Date, the Allowed DASNY Bond Claim shall be satisfied and paid in Cash in full by the Debtor or the Plan Administrator. The Debtor estimates that the Allowed DASNY Bond Claim will be approximately $21,000,000[3] on the Effective Date, unless such DASNY Bond Claim has been paid in Cash in full prior to the occurrence of the Effective Date. |

---

[2] The precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted.

[3] The precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted.

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| **Class 3 – Secured Lender Claims** | **$12,650,000** | No | This Class consists of all Allowed Secured Lender Claims, including, but not limited to, the Resmac Claim, MIMO Claim, PBGC Claim and Union/Funds Claims, to the extent they are Allowed as Secured Claims. Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Secured Lender Claim will be satisfied by payment in Cash in full by the Plan Administrator on the later of (a) the third (3rd) Business Day after the Effective Date; or (b) the date on which there is a Final Order allowing such Claim. To the extent the DASNY DIP Claim is not paid in Cash in full on the Effective Date as an Administrative Claim, the DASNY DIP Claim will also constitute an Allowed Secured Lender Claim. |
| **Class 4 – Other Secured Claims** | **$0** | No | This Class consists of all Allowed Secured Claims, other than Secured Lender Claims and DASNY DIP Claim, and includes, but is not limited to, obligations to capital equipment lessors or other holders of Secured Claims. Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Claim in this Class will be satisfied by: (a) the return of the property subject to the senior, perfected and indefeasible lien or security interest; or (b) the payment of any amounts owed by Dervaal as assignee pursuant to the Primary Asset Sale. Any difference with respect to the amount of a Class 4 Claim and the fair market value of the equipment shall constitute an Unsecured Deficiency Claim, which Claim shall be classified as a Class 6 Claim. |
| **Class 5 – Unsecured Priority Claims** | **$200,000** | No | This Class consists of all Allowed Unsecured Priority Claims that are specified as having priority in Bankruptcy Code sections 507(a)(4) and 507(a)(5), if any such Allowed Claims still exist as of the Effective Date. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each Allowed Claim under Bankruptcy Code sections 507(a)(4) and |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | 507(a)(5), which has not been satisfied as of the Effective Date, shall be paid in full in Cash on the later of: (a) the third (3rd) Business Day after the Effective Date or such other date the Plan Administrator deems appropriate; or (b) the date on which there is a Final Order allowing such Claim. |
| **Class 6 – Unsecured Claims** | **$49,768,000** | Yes | This Class consists of all Allowed Unsecured Claims, including, without limitation, Allowed Unsecured Claims arising from the rejection of executory contracts and unexpired leases and any Unsecured Deficiency Claims. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Unsecured Claim shall be entitled to receive Cash equal to such holder's pro rata share of Available Cash after the payment of (or after an adequate reserve having been made for the payment of) Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and the costs for administering the Plan (including all professional fees and expenses payable under the Plan), on the later of: (a) the third (3rd) Business Day after the Effective Date or as a soon as reasonably practicable thereafter as determined by the Plan Administrator; and (b) the date on which there is a Final Order allowing such Claim. |
| **Class 7 –Subordinated Claims** | **$0** | Yes | This Class consists of subordinated Claims under Bankruptcy Code section 510 against the Debtor. Subordinated Claims holders under Bankruptcy Code section 510 shall receive no distribution on account of such claims. |

## C.   Plan Overview.

The following is a brief overview of the Plan.  It is qualified by reference to the Plan.  In addition, for a more detailed description of the terms and provisions of the Plan, see Article IV - The Plan of Reorganization.

The Plan is the result of negotiations by and among the Debtor, certain significant creditor constituencies and the Committee. The Plan contemplates the liquidation of several substantial assets, some of which shall be completed after to the Confirmation Hearing on the Plan, including:

(a)    <u>Primary Asset Sale</u>. The Debtor has agreed to sell the Main Campus and Acquired Business (consisting of the Debtor's skilled nursing facility and long term home health program) to Dervaal for a purchase price of $44.9 million. Upon the Primary Asset Sale Closing Date, a portion of the proceeds of the Primary Asset Sale shall be used to satisfy the Allowed DASNY Bond Claim, to the extent it has not already been satisfied. The Debtor believes the Primary Asset Sale Closing will occur no later than September 30, 2008, but the timing is subject to approval of the sale by the NYDOH. In any event, it is anticipated that the Primary Asset Sale Closing Date shall occur after confirmation of the Plan. The net proceeds of the Primary Asset Sale shall be used for distributions pursuant to the Plan.

(b)    <u>Sale of Ancillary Real Estate</u>. The Debtor is currently marketing the Ancillary Real Estate for sale to the highest bidder. The auction is scheduled to occur in or around August 2008 and, subject to Court approval, the sale of the Ancillary Real Estate should close shortly afterwards. In any event, it is anticipated that the sale of the Ancillary Real Estate shall occur after the confirmation of the Plan. The net proceeds of the sale of the Ancillary Real Estate are expected to be approximately $5-8 million and shall be used for distributions pursuant to the Plan.

(c)    <u>HEAL IV Award</u>. The NYDOH has committed to provide the Debtor with a $25 million HEAL IV Award to finance the Debtor's closure pursuant to the Berger Recommendations. The proceeds of the HEAL IV Award will first be used to satisfy the Allowed DASNY Bond Claim, to the extent it has not already been satisfied. In the event the Allowed DASNY Bond Claim has been paid in full, the proceeds shall be used for distributions pursuant to the Plan. The Debtor has also requested a supplemental loan from the NYDOH of $6 million, which request has not been formerly denied. However, the NYDOH has told the Debtor that it is unlikely that the Debtor will receive additional HEAL IV funds above the $25 million already awarded. At this time, it is unknown when the NYDOH will provide the Debtor with the HEAL IV Award.

(d)    <u>Avoidance and Other Actions</u>.  The Debtor possesses the right to pursue Avoidance and Other Actions.  At this time, approximately $14 million in potential Avoidance and Other Action Claims exist without analysis of any defenses.  On the Effective Date, the Plan Administrator and Committee shall have the exclusive right to commence and to continue the prosecution of all Avoidance and Other Actions; <u>provided</u>, <u>however</u>, that, notwithstanding anything to the contrary in the Plan, the Committee shall continue to prosecute the Resmac Adversary Proceeding.  The Plan Administrator and the Committee shall not prosecute the same Avoidance and Other Actions.  The Plan Administrator and the Committee shall coordinate their efforts with respect to the prosecution of Avoidance and Other Actions so as to avoid any duplication of effort.  The proceeds of the Avoidance and Other Actions will be available for the Plan Administrator for distribution pursuant to the Plan.  A list of transfers made by the Debtor within ninety (90) days prior to the Petition Date and the recipients thereof is attached hereto as Exhibit 4.  The Debtor hereby expressly reserves its right to bring Avoidance and Other Actions, including, but not limited to actions pursuant to Bankruptcy Code section 547, against those parties listed on Exhibit 4.  The recipients of these transfers may have defenses to Bankruptcy Code section 547 actions.

(e)    <u>Accounts Receivable</u>.  The proceeds of the Debtor's Accounts Receivable (with a book value of approximately $8.3 million as of April 4, 2008) will be available for the Plan Administrator for distribution pursuant to the Plan.  Estimates of the potential realization rates on the Accounts Receivable are provided on Exhbit 2.

The Plan provides for the payment and full satisfaction of all Allowed Secured Claims and Allowed Unsecured Priority Claims.  The Plan also provides that the holders of Allowed Unsecured Claims will each receive Cash equal to their <u>pro rata</u> share of Available Cash after the payment of (or after an adequate reserve having been made for the payment of) Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and the costs for administering the Plan (including all professional fees and expenses payable under the Plan).  Based upon the Distribution Analysis attached hereto as **Exhibit 2**, it is

estimated that the holders of Allowed Unsecured Claims will potentially receive up to a 49% distribution.

The potential recoveries provided on the Distribution Analysis are only estimates and the actual recovery will either increase or decrease depending upon the occurrence or non-occurrence of numerous factors, including, but not limited to the risk factors discussed in Article IV of this Disclosure Statement.

D.     **Summary of Confirmation Requirements.**

Under the Bankruptcy Code, only classes of claims that are "impaired" are entitled to vote to accept or reject the Plan. The Bankruptcy Code requires, as a condition to confirmation of a consensual plan of reorganization, that each impaired class of claims accepts the Plan. A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount, and more than one-half in number, of those creditors that actually cast ballots, vote to accept such plan.

Liabilities incurred in the ordinary course of business by the Debtor since the Petition Date that are described in the Plan as Allowed Administrative Claims will be paid on the later of: (1) the third (3rd) Business Day after the Effective Date; (2) the date on which such Person becomes the holder of an Allowed Administrative Claim; or (3) the date or dates on which that Claim is payable by its terms, consistent with past practice and in accordance with past terms. Holders of Administrative Claims will not be entitled to vote on the Plan.

Any Claims arising from the rejection of executory contracts and unexpired leases are treated under the Bankruptcy Code as if they arose before the filing of the Chapter 11 petition.

Any Claim in an impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has

obtained an order of the Court temporarily allowing the Claim for the purpose of voting on the Plan.

## E. Voting Instructions and Deadline.

The Debtor has prepared this Disclosure Statement as required by Bankruptcy Code section 1125 and Bankruptcy Rule 3016(c). It is being distributed to holders of Claims against the Debtor to assist such holders in evaluating the feasibility of the Plan, the manner in which their Claims are treated and in determining that the Plan satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129. A copy of the Plan is attached hereto as **Exhibit 1**. The purpose of this Disclosure Statement is to assist those entitled to vote on the Plan to make an informed judgment in voting to accept or reject the Plan.

The Court approved this Disclosure Statement on July 7, 2008, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan.

**THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

This Disclosure Statement describes the background of the Debtor and Other Debtors and the significant events leading up to and following the filing of the Chapter 11 case on the Petition Date. It summarizes the major events that have taken place during the Debtor's Chapter 11 case

and describes the Plan, which divides creditor Claims into Classes and provides for the treatment of Allowed Claims.

1.      <u>General Information</u>.  Under the Bankruptcy Code, certain Classes of creditors are deemed to accept or reject the Plan and the vote of these Classes will not be solicited.

2.      <u>Unimpaired Classes Are Deemed to Accept the Plan and Do Not Vote</u>.  If a Creditor holds a Claim included within a Class that is not impaired under the Plan, under Bankruptcy Code section 1126(f), the Creditor is deemed to have accepted the Plan with respect to such Claim and its vote of such Claim will not be solicited.  Classes 1 through 5 are unimpaired Classes under the Plan.

3.      <u>Certain Classes Are Deemed to Reject the Plan and Do Not Vote</u>.  Under Bankruptcy Code section 1126(g), Class 7, consisting of the holders of subordinated Claims under Bankruptcy Code section 510 against the Debtor, will receive no distributions on account of such Claims.  Thus, Class 7 is deemed not to have rejected the Plan and the vote of holders of such Claims in this Class will not be solicited.

4.      <u>Claims Which Are Not Allowed</u>.  The Bankruptcy Code provides that only the holders of Allowed Claims are entitled to vote on the Plan.  A Claim to which an objection has been filed is not an Allowed Claim unless and until the Court rules on the objection and allows the Claim.  In addition, parties listed on the Debtor's schedules as disputed, contingent or unliquidated who failed to timely file a proof of claim shall not be entitled to vote on the Plan. If the Court has not ruled on the objection or status of such a Claim, but the holder of a Claim wishes to vote, the holder of the Claim may petition the Court to estimate its claim for voting purposes under Bankruptcy Rule 3018(a).  Consequently, although holders of such Claims may

receive ballots, their votes will not be counted unless the Court, prior to the Voting Deadline, rules on the objection and allows the Claim or, on proper request under Bankruptcy Rule 3018(a) prior to the hearing on Confirmation, temporarily allows the Claim in an amount that the Court deems proper for the purpose of voting on the Plan.

     5.    <u>Voting and Record Date</u>.  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and filed on time.  The record date for determining which creditors may vote on the Plan is July 1, 2008.

    a.    How to Vote.  IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED BY THE VOTING DEADLINE BY THE BALLOTING AGENT AS SET FORTH ON THE BALLOT.

    b.    Ballots.  Creditors must use only the ballot or ballots sent to them with this Disclosure Statement.  If a Creditor has Claims in more than one Class, it should receive multiple ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

**IF A CREDITOR IS A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT FOR SUCH CLASS, OR IF SUCH BALLOT IS DAMAGED OR LOST, OR IF A CREDITOR HAS ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT:**

    William Coleman
    DLA Piper US LLP
    1251 Avenue of the Americas
    New York, New York 10020-1104
    Tel:  (212) 776-3745
    Email:  william.coleman@dlapiper.com

**F.    <u>The Confirmation Hearing.</u>**

The Court has scheduled a hearing to consider confirmation of the Plan on August 14, 2008 at 3:00 p.m., before the Honorable Carla E. Craig, at the United States Bankruptcy Court,

Eastern District of New York, 271 Cadman Plaza East, Suite 1595, Brooklyn, NY 11201-1800. The Court has ordered that objections, if any, to confirmation of the Plan be filed and served within the time and in the manner described in the Confirmation Notice and Order that accompany this Disclosure Statement. The date of the Confirmation Hearing may be continued at such later time(s) as the Court may announce during the Confirmation Hearing or any continued hearing without further notice.

If the Plan is confirmed by the Court, it will be binding on all Claim holders regardless of whether an individual Claim holder has supported or opposed the Plan.

      **G.**     **Definitions.**

          1.     <u>Defined Terms</u>. As used in this Disclosure Statement, terms defined in the Plan annexed hereto and not otherwise specifically defined herein will have the meanings attributed to them in the Plan.

          2.     <u>Interpretation of Terms</u>. Each definition in this Disclosure Statement and in the Plan includes both the singular and the plural, and references in this Disclosure Statement include the masculine and feminine where appropriate. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

## II.    BACKGROUND INFORMATION

**A.**     **Significant Events Preceding Commencement of the Bankruptcy Case.**

Victory Memorial Hospital is a not-for profit, voluntary hospital located in Bay Ridge, Brooklyn. Victory Memorial Hospital is a full service acute care hospital with approximately 241 beds and a skilled nursing unit with 150 beds. Victory Memorial Hospital has been providing a full range of medical services with a focus on community care and a program of community outreach to the Brooklyn community since approximately 1900. Victory Memorial

Ambulance Services, Inc. is a for-profit subsidiary of Victory Memorial Hospital and provides Victory Memorial Hospital with ambulance services. Victory Memorial Ambulance Services, Inc. has no employees and minimal assets. Victory Memorial Pharmacy, Inc. is a for-profit subsidiary of Victory Memorial Hospital without any employees or assets. Victory Memorial Ambulance Services, Inc. and Victory Memorial Pharmacy, Inc. are referred to collectively herein as the "Other Debtors".

The Debtor's Chapter 11 filing was precipitated by, among other things, reduced patient census and discharge levels and a corresponding decrease in revenue. In addition, the Debtor's gradual accumulation of substantial unsecured debt, combined with their inability to pay such debt on a current basis, restricted the Debtor's trade credit and created substantial cash flow issues.

**B.**     **Principal Liabilities of the Debtor as of the Petition Date.**[4]

1.     Secured Claims. The Debtor's significant Secured Claims include, but are not limited to, the following:

a.     DASNY Bond Claim – This Claim was approximately $24,000,000 as of the Petition Date and will be approximately $21,000,000[5] on the Effective Date. This Claim is not disputed by the Debtor. The DASNY Bond Claim will be Allowed pursuant to the Plan.

b.     DASNY DIP Claim – This Claim is approximately $9 million plus interest and is not disputed by the Debtor. The DASNY DIP Claim will be Allowed pursuant to the Plan.

---

[4] The descriptions set forth in this section do not constitute agreement with respect to the amount of the Claim in question and in no way constitute the Debtor's admission of the amount or secured status of these Claims. These Claims may be subject to dispute by the Debtor. Accordingly, to the extent the validity of any such Claim has not been previously acknowledged by the Debtor pursuant to order of the Bankruptcy Court, the Debtor reserves the right to object to these Claims.

[5] The precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted.

c.      PBGC Claim – The PBGC asserted a Secured Claim in the amount of approximately $28.5 million plus unliquidated interest, which Claim was disputed by the Debtor. Pursuant to a settlement reached by the Debtor and PBGC, this Claim will be Allowed pursuant to the Plan in the amount of $5.8 million, which settlement is subject to Court approval.

d.      Resmac Claim –Resmac 2 LLC, as assignee of Madison Realty Capital, L.P., has asserted a Secured Claim in the approximate amount of $5.7 million which is disputed by the Debtor and the Committee. This Claim is the subject of a pending adversary proceeding commenced by the Committee that will continue to be prosecuted by the Committee after the Effective Date.

e.      MIMO Claim – Maimonides Medical Center has asserted a Secured Claim in the approximate amount of $5.25 million. The Debtor is reviewing this Claim to determine possible defenses. The Committee and Debtor believe that the lien securing $1 million of this Claim may be avoidable pursuant to section 547 of the Bankruptcy Code. Maimonides contends that no such defenses exist and no portion of its lien is avoidable. The parties are in discussions to resolve such secured claim.

f.      Union/Funds Claims – The Union and/or Funds have asserted a Secured Claim in the approximate amount of $4.1 million. The Debtor and the Committee believe that all or part of the mortgage securing these Claims may be avoidable pursuant to section 547 of the Bankruptcy Code.

2.      <u>Unsecured Priority Claims</u>. The Debtor's significant Unsecured Priority Claims include, but are not limited to, the following:

a.      Accrued Salary, Vacation Pay, Related Taxes and Expenses – The Debtor is currently reviewing the Unsecured Claims of their Union and non-Union employees to determine which Claims would qualify for priority under Bankruptcy Code sections 507(a)(4) and (5). The Debtor estimates the Allowed Claims will be approximately $200,000.

b.      Taxes – The Debtor is currently reviewing Claims from taxing authorities. At this time, it is unknown what the amount of Claims from taxing authorities will qualify as Unsecured Priority Claims.

3.      <u>Unsecured Claims</u>. The Debtor's significant Unsecured Claims include, but are not limited to, the following:

a. Trade Claims – The Debtor is currently reconciling its books and records against the filed Claims by trade creditors in an attempt to determine the estimated amount of Allowed Claims. At this time, the Debtor estimates that the Allowed Claims will be approximately $25 million.

b. Litigation Claims – The Debtor is currently reconciling its books and records against the filed Claims by creditors with litigation or personal injury claims in an attempt to determine the estimated amount of Allowed Claims. The Debtor has obtained Court approval for a mandatory mediation program which will allow the Debtors to liquidate the litigation claims. The order approving the mandatory mediation program was entered by the Court on or around July 2, 2008. At this time, the Debtor estimates that the Allowed Claims will be approximately $5.6 million.

## III.  SIGNIFICANT EVENTS IN THESE CHAPTER 11 CASES

### A.  The Filing of the Chapter 11 Petitions and First Day Motions.

On November 15, 2006 the Debtor and the Other Debtors each filed their individual Chapter 11 petitions. Since that time, the Debtor and the Other Debtors have continued in the management and operation of their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. On or directly following the Petition Date, the Debtor and the Other Debtors also filed the following motions and applications:

1. Motion for Order Directing Joint Administration;

2. Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing Continued Use of the Debtors' (I) Bank Accounts; (II) Cash Management System; and (III) Business Forms;

3. Motion for Order (I) Authorizing Payment of Prepetition Wages, Employee Benefits and Expense Reimbursement, (II) Authorizing and Directing Banks to Honor Checks with Respect Thereto, and (III) Approving Payment of Postpetition Wages and Benefits;

4.      Motion Pursuant to Sections 105(a) and 366 of the Bankruptcy Code for an Order (a) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment;

5.      Motion for (I) Interim Orders (a) Authorizing Debtors to Obtain Secured Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code and Bankruptcy Code Rule 4001, (b) Authorizing Debtors to Enter into Cash Collateral Stipulation, and (c) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001 and (II) Final Orders (a) Authorizing the Debtors to Obtain Secured Postpetition Financing on a Final Basis, and (b) Authorizing the Debtors to Enter into a Cash Collateral Stipulation on a Final Basis;

6.      Motion for an Order Pursuant to Bankruptcy Rule 1007(a)(4) and Local Rule 1007-1 Granting an Extension of Time for Filing Schedules;

7.      Motion for an Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 2002 Establishing Notice Procedures; and

8.      Application to Employ and Retain DLA Piper US LLP as Counsel for Debtors and Debtors in Possession.

Each of the above motions was subsequently approved by the Court.  In addition, although not filed on the Petition Date, the Debtor and the Other Debtors filed Schedules and Statements of Financial Affairs.

**B.      <u>Formation of the Committee.</u>**

On November 28, 2006, the Office of the United States Trustee appointed a seven (7) member Committee.

The Committee members are as follows:

1.      1199SEIU United Health Care Workers East;

2.      The Royal Care, Inc.;

3.      Special Touch Home Care;

4.      Medtronic, Inc.;

5.      Health Resources Optimization, Inc.;

6.      Best Choice Home Health Care, Inc.; and

7.      Modern Medical, Inc.

On January 4, 2007, the Court authorized the employment of Alston & Bird LLP as counsel to the Committee and Weiser LLP as financial advisor to the Committee.

**C.      Debtors' Retention of Other Professionals.**

The Debtor and the Other Debtors received authority from the Court to retain: (1) The Groom Law Group Chartered as pension and benefits counsel; (2) J.H. Cohn LLP as accountants and financial advisors, (3) Cadwalader, Wickersham & Taft LLP as regulatory counsel; (4) Donlin, Recano & Company, Inc. as claims, noticing and balloting agent; (5) Petrocelli & Christy as medical malpractice counsel, (6) BDO Seidman, LLP as auditors; (7) CIT Capital USA Inc. ("CIT") as real estate consultant, advisor and transaction service agent (CIT was retained jointly by the Debtors and the Committee); (8) Martin Clearwater & Bell LLP as medical malpractice counsel; and (9) Franklin, Gringer & Cohen P.C. as labor and employment counsel.

**D.      Debtors' Motions to Extend Their Exclusive Periods.**

The Debtor and the Other Debtors sought multiple extensions of the exclusive periods to file the Plan and to solicit acceptances of the Plan, which were granted.  The Debtor's and Other

Debtors' exclusive period in which to file the Plan expired on May 15, 2008 and the exclusive period to solicit acceptances of the Plan expires on July 14, 2008.

### E. Prepetition Claims Bar Date.

The last day for filing proofs of claim against the Debtor for Claims that arose prior to the Petition Date was July 20, 2007.

### F. Debtors' Motion to Approve Insurance Premium Financing Agreements.

The Debtor and the Other Debtors filed two motions seeking authorization to permit Victory Memorial Hospital to enter into premium financing agreements (the "Finance Agreements") with First Funding Corporation of New York with respect to the renewal of the Debtors' various insurance policies, including general liability, property, commercial automobile (both ambulance and non-ambulance), umbrella, workers' compensation, professional liability, directors and officers and crime. The aggregate amount of the premiums financed through the Finance Agreements was $3,076,036.02. The Court approved the proposed Finance Agreements by orders dated November 9, 2007 and January 4, 2008.

### G. Debtors' Motion For Payment Of Prepetition Wages For Independent Contractors.

The Debtor and Other Debtors filed a motion ("Independent Physicians Motion") seeking authority under Bankruptcy Code sections 105(a) and 363(b) to pay prepetition wage claims of fifty-four (54) various physicians (the "Independent Physicians") that are independent contractors. The Debtor seeks to pay the claims allegedly due and owing by the Debtor to the Independent Physicians for the 180 day period prior to the Filing Date, up to the maximum of $10,950.00, as set forth in Bankruptcy Code section 507(a)(4)(A). The aggregate amount owed to the Independent Physicians is $384,653.00. The maximum amount that would be paid to the

Independent Physicians, in light of the $10,950.00 cap on prepetition wages, is approximately $308,223.00.

The United States Trustee and the Committee objected to the Independent Physicians Motion alleging that the Debtor: (i) failed to establish that the Independent Physicians are entitled to assert wage claims against the Estate; and (ii) failed to establish that the payment of these claims is necessary for the Debtor's continued operations. The motion has been adjourned and is currently on the Debtor's and the Other Debtors' calendar of motions.

**H.     <u>Motions to Lift the Automatic Stay.</u>**

The Debtor has received several motions (the "<u>Lift Stay Motions</u>") from personal injury plaintiffs seeking to lift or modify the automatic stay provided by Bankruptcy Code section 362 to continue medical malpractice actions against the Debtor and other codefendants. The Debtor and Other Debtors have filed objections to the Lift Stay Motions or, in cases where the movants agreed to waive Claims against the Debtor, the Debtor has reached settlements and consented to relief from the automatic stay.

After reviewing the filed Claims against the Estate, the Debtor has proposed the implementation of a Mandatory Mediation Program (discussed <u>infra</u>), which motion was approved by the Court by an order dated July 2, 2008. In light of the Mandatory Mediation Program, the Court denied the pending Lift Stay Motions.

**I.     <u>Debtors' Motion to Sell Certain Accounts Receivable.</u>**

The Debtor and the Other filed a motion (the "<u>A/R Sale Motion</u>") seeking approval to sell certain of the Debtor's charged-off accounts to Ashley Phosphates, LLC (the "<u>Purchaser</u>"). The face value of the charged-off accounts was approximately $27,850,645, which accounts were non-Medicare, private pay accounts covering the time period until August 30, 2007 and were

deemed uncollectible by the Debtor. The Purchaser paid $374,869 for the charged off accounts, representing approximately 1.346% of the aggregate amount of the charged off accounts. The Court entered an order authorizing and approving the A/R Sale Motion on August 28, 2007.

J.      **DASNY DIP Financing.**

On November 16, 2006, the Debtor and Other Debtors filed a motion (the "Initial DIP Financing Motion") for the entry of orders (i) authorizing the Debtor to obtain secured postpetition financing from DASNY ("DASNY Financing") pursuant to section 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001; and (ii) authorizing the Debtor to enter into a cash collateral stipulation (the "Cash Collateral Stipulation") with DASNY. As set forth above, DASNY is one of the Debtor's primary secured creditors and the holder of a first lien on the Debtor's Main Campus (the "DASNY First Lien").

In the Initial DIP Financing Motion, the Debtor sought to obtain financing from DASNY in an amount not to exceed an aggregate principal amount of $2,000,000 (the "DASNY DIP Loan") with an initial funding of $880,000, pursuant to a loan agreement with DASNY (the "DASNY DIP Loan Agreement"). The DASNY DIP Loan Agreement further provided that the DASNY DIP Loan was to be secured (subject to a "Carve Out")[6] by (1) fully perfected junior priority liens under Bankruptcy Code section 364(c)(3) on the Main Campus and the Ancillary Real Estate; (2) fully perfected junior priority liens under Bankruptcy Code sections 364(c)(2); and (3) on all of the Debtor's intangible property (including, but not limited to, gross receipts and

---

[6]      Carve Out means: (i) payment of fees to the United States Trustee pursuant to 28 U.S.C. § 1930 and (ii) the fees and expenses of the professionals retained by the Debtor, the Other Debtors and the Committee that are allowed by the Court prior to any termination of the use of Cash Collateral and after termination of the use of Cash Collateral, if so terminated, any unpaid fees and expenses of such professionals, which are allowed by the Court in an amount not to exceed $400,000 in the aggregate.

accounts receivable (collectively, the "DASNY DIP Collateral")), provided, however, that in both instances the liens associated with the DASNY DIP Collateral are junior only to valid liens and encumbrances perfected and in existence as of the Petition Date. The postpetition liens granted to DASNY under the DASNY DIP Loan Agreement do not extend to the Avoidance and Other Actions or proceeds thereof.

Finally, all obligations under the DASNY DIP Loan Agreement are entitled to superpriority administrative expense status under Bankruptcy Code section 364(c)(1), with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the Carve-Out, and any fees of a Chapter 7 trustee, if appointed.

On November 21, 2006, the Court entered an interim order authorizing the Debtor to borrow an initial amount of $880,000 (the "Interim Amount") pursuant to the DASNY DIP Loan Agreement (the "Interim DIP Financing Order"). On or about November 21, 2006, the Debtors drew down the Interim Amount pursuant to the Interim DIP Financing Order. On or about November 17, 2006, the Court entered the Cash Collateral Stipulation.

On December 13, 2006, the Court entered an order authorizing the Debtor to borrow the aggregate sum of $1,350,000 (inclusive of the Interim Amount) under the DASNY DIP Loan Agreement (the "Final DIP Financing Order"). On or about December 13, 2006, the Court entered the Final DIP Financing Order.[7] Thereafter, the Debtor drew down the remaining $470,000 balance of the DASNY Financing authorized by the Final DIP Financing Order.

---

[7]    The Final DIP Financing Order also amended certain provisions of the DASNY DIP Loan Agreement, including certain conditions precedent. The Final DIP Financing Order also provided that the Debtor was not permitted to use any of the funds from the DIP Financing to repay HUD for a loan made by it to the Debtor, one day prior to the Petition Date.

On or about August 23, 2007, DASNY agreed to make available to the Debtor the full $2,000,000 under the DASNY DIP Financing Agreement, subject to the Court's approval. On September 26, 2007, after a hearing on appropriate motion made to the Court (the "Second DIP Financing Motion"), the Court entered an order permitting the Debtor to borrow the remaining $650,000.00 pursuant to the DASNY DIP Loan Agreement.[8]

On or about November 5, 2007, the Debtor filed a Motion for an Order Authorizing Amendment to the DASNY DIP Loan Agreement and Authorizing the Debtors to borrow additional amounts thereunder (the "Third DIP Financing Motion"). Pursuant to the Third DIP Financing Motion, the Debtor sought an additional $7 million in DIP financing (for an aggregate of $9 million under the DASNY DIP Loan Agreement, as amended), from the Health Care Facility Restructuring Pool, as to permit a systematic and orderly "winding down" of the Debtor.

On November 14, 2007, the Court entered an interim order authorizing the Debtors to borrow $2,941,570 on an interim basis and on November 19, 2007, entered a Order authorizing the Debtors to borrow the entire $7 million on a final basis (again, raising the total amount of Court authorized DIP financing to $9 million).

The Debtor recently requested an increase to the borrowing limits under the DASNY DIP Loan in order to obtain up to $3 million in additional capital to assist in funding operations up to and through the closing of the Debtor's facilities pursuant to the Berger Recommendations. The Debtor is currently awaiting DASNY's response to their request for additional funding.

---

[8]     Pursuant to the Second DIP Financing Motion, the Debtor sought to borrow an additional $650,000.00 (the "Additional Funding") pursuant to the DASNY DIP Financing Agreement. The Debtor proposed that all other terms of the Final DIP Financing Order and the DASNY DIP Financing Agreement remain in place, except those which the Debtor sought to have modified by Second DIP Financing Motion. The relief sought by the Debtor did not involve a new loan agreement; rather the Debtors sought to borrow the full amount available under the

Neither the First, Second nor Third DIP Financing Motion sought to have any postpetition liens obtained by DASNY prime any valid and existing liens on any of DASNY's collateral on the Petition Date.

### K.    Debtor's Postpetition Financial Performance

The Debtor has accumulated unpaid administrative expenses and experienced operational losses postpeititon.    As of April 30, 2008, the Debtor had accumulated approximately $12,058,254 in unpaid administrative expenses, not including restructuring fees.   Approximately $7,551,227 of these administrative expenses is fees of Professionals that have accrued from the Petition Date through April 30, 2008.   The Debtor anticipates approximately $2,800,000 will accrue during the period from May 1, 2008 through September 30, 2008.   The Debtor estimates that it will accrue an additional $9,709,934 in administrative expenses for the period from May 1, 2008 through September 30, 2008.   Additionally, the Debtor has sustained a total of $22,384,886 in operating losses from the Petition Date through April 30, 2008.   The Debtor projects that they will sustain a total of $6,379,393 in operational losses for the period from May 1, 2008 through September 30, 2008.[9]

### L.    Motion by Modern Medical Health Specialties, LLC for Payment of Administrative Claim.

Modern Medical Health Specialties, LLC ("MMHS") filed a motion (the "MMHS Motion") seeking entry of an order compelling payment of its administrative claim relating to MMHS's share of certain postpetition hyperbaric receipts in the amount of $236,000 and related

---

DASNY DIP Financing Agreement and to remove the limitation on borrowing imposed by the Final Financing Order.

[9] The Debtor anticipates that for the months of May, June, July August and September, these losses will total $2,130,560, $2,458,558, $663,654, $563,654, and $562,966, respectively.

relief, including compelling the Debtor to assume or reject the underlying contract. After substantial negotiations, the Debtor and MMHS negotiated a resolution and a stipulation between MMHS and the Debtor was approved by the Court on November 20, 2007. The stipulation provided for full payment of outstanding administrative claims, but does not require assumption or rejection of the underlying contract.

### M. Union Employees and Collective Bargaining Agreements.

The Debtor is party to two collective bargaining agreements (the "CBAs") with 1199SEIU United Healthcare Workers East (the "Union") on behalf of certain of the Debtors' employees (the "Union Employees"). Pending the negotiations with the union, the Debtor may move to reject one or both of the CBAs. If Dervaal agrees to assume one or both of the CBAs, it will pay the cure costs. If one or both of the CBAs are rejected, substantial rejection Claims against the Estate may arise

The Fund has asserted various prepetition Claims under the CBAs including, but not limited to Secured Claims and unsecured Claims, pursuant to a judgment lien, a confession of judgment, and the mortgage, for unpaid contributions to various employee benefit funds. The Union has asserted claims for severance and vacation pay. The Debtor are currently reviewing the Claims of the Union in an effort to determine their priority and potential exposure and how these claims may be adjusted in the event that Dervaal assumes the CBAs or the Debtor rejects the CBAs.

### N. Claims Objections Process.

Approximately 1800 proofs of claims had been filed with Donlin Recano & Company, Inc. ("Donlin Recano"), the Debtor's claims agent. The Debtor and its professional advisors are in the process of conducting a comprehensive review and reconciliation of these claims. This

process includes identifying particular categories of proofs of claims that might be targeted for disallowance. To avoid possible double or improper recovery by claimants and to reduce or eliminate invalid claims, the Debtor intends to file a series of objections to a variety of claims over the course of the next several months.

On November 1, 2007, the Debtor filed its first omnibus objection (the "First Omnibus Objection") to claims, which sought to disallow and expunge a total of forty (40) claims that were filed in an aggregate face amount of approximately $38,203,934.32. These claims were duplicative and superseded claims. On February 19, 2008, the Court entered an order granting the First Omnibus Objection in part, and only one claim has been adjourned for further resolution, and the amount of that claim is unknown.

Also, on November 1, 2007, the Debtor filed its second omnibus objection (the "Second Omnibus Objection"), which sought to disallow and expunge a total of nine (9) claims that were filed in the aggregate face amount of approximately $247,889.96. These claims represent proofs of claims that were filed subsequent to July 20, 2007 (the "Claims Bar Date"). On February 11, 2008, the Court entered an order approving the Second Omnibus Objection in part, and the balance of the claims that are pending further resolution total $197,186.97

Prior to confirmation, the Debtor anticipates filing additional objections to certain Claims filed against the Debtor and its Estate. Pursuant to the Plan, the deadline for the Debtors, the Plan Administrator and the Committee to object to any Claim is one hundred and eighty (180) days after the Effective Date. The foregoing deadline may be extended by the Court upon request of the Plan Administrator or Committee. The objections will seek to either reduce or expunge certain Claims. The grounds for the objections may include, but are not limited to: (a) Claims filed after the Claims Bar Date; (b) duplicate Claims; (c) Claims that do not match the

Debtor's books and records; and (d) Claims that should be reclassified. The objections to Claims will be litigated throughout these Cases, as well as after Confirmation of the Plan in the event the Plan is approved by the Court. The Debtor estimates that the Claims will be significantly reduced through the Claims objection process and the approval of agreements and settlements contemplated by the Plan, but the total amount is unknown.

### O.     Debtors' Motion to Establish Mandatory Mediation Program.

As of the Bar Date, the Debtor had been named as either defendant or co-defendant in at least (70) lawsuits based on personal injuries (the "Injury Claims"). The aggregate dollar amount sought against the Debtors in the Injury Claims exceeds $100 million. Because the Injury Claims arose during periods in which the Debtors had no insurance, the holders of the Injury Claims ("Injury Claimants") do not have the option to proceed against the proceeds of applicable insurance policies. Thus, the Debtor proposed to institute a claims resolution process for the timely filed Injury Claims, pursuant to which the Debtor and the Injury Claimants would first attempt to settle, rather than litigate, the Injury Claims through a Court-imposed mediation process discussed below. The claims resolution process would enable the Debtor and the Injury Claimants to mediate and likely liquidate the Injury Claims as soon as practicable. The Court approved the Mandatory Mediation Program by order dated July 2, 2008.

### P.     Debtors' Motion to Approve Medicare Reimbursement Settlement With Secretary of Health and Human Services.

The Debtor was plaintiffs in one of approximately 300 civil actions that were filed on behalf of over 650 hospitals in the United States District Court for the District of Columbia in late 2002 and early 2003. Given that the hospitals presented a common, core issue in each of these cases, the court consolidated them into a single action, which was captioned In re Medicare Reimbursement Litigation, Misc. No. 03-0090 (D.D.C.)(PLF).

The lawsuit was based upon Medicare's allegedly erroneous calculation of the hospitals' Medicare disproportionate share hospital ("DSH") adjustments and the hospitals sought to revise the payments for specified fiscal years. The adjustment is given to hospitals that serve a disproportionate share of low income patients and is designed to compensate hospitals for the higher operating costs they incur in treating a large share of low-income patients.

The litigation was ultimately settled on a global basis. Pursuant to the settlement, the Debtor was allocated a total of $3,390,096.50 (the "Settlement Payment") for its four fiscal years in the litigation (FYs 1991, 1992, 1993, and 1994). The Court entered an order approving the Settlement Payment on January 10, 2008. The Settlement Payment, less the relevant contingency fee for plaintiffs' counsel, has been received by the Debtor.

**Q.      Berger Recommendations.**

On January 1, 2007, the Berger Recommendations became law. The Berger Recommendations require the closure of the Debtor's acute-care facility by June 30, 2008 and a continuation of the Debtor's skilled nursing, ambulatory, home health care and certain other programs.

Pursuant to the Berger Recommendations, the Debtor has submitted multiple draft closure plans to the NYDOH that contemplate closure of the Debtors' acute-care facility by June 30, 2008 or earlier. The NYDOH's approval of the closure plan will allow the Debtors to comply with the Berger Recommendations.

**R.      Heal IV Award.**

On May 17, 2007, the NYDOH initiated the process for allocating the nearly $550 million in funding (the "HEAL IV Funds") related to the implementation of the Berger Recommendations, which applications were due on July 16, 2007. The Debtor submitted an

application seeking approximately $67,000,000 in HEAL IV Funds (the "Initial HEAL Application") to obtain its allocable share of the HEAL IV Funds on July 16, 2007.

In the fall of 2007, the NYDOH allocated approximately $362 million of the available $550 million in HEAL IV Funds to twenty-three hospitals and seven nursing homes, and advised the Debtor that it would receive $25 million in HEAL IV Funds from this distribution (the "HEAL IV Award"). Based on discussions with the NYDOH, the Debtors understood that they could expect additional HEAL IV Funds. On January 10, 2008, the Debtor submitted an additional application for HEAL IV Funds (the "Supplemental HEAL Application") in the amount of $44.5 million.

On January 17, 2008, the NYDOH allocated an additional $160 million in HEAL IV Funds, but none of these funds were earmarked for the Debtor. The Debtor believes there are approximately $16 million in HEAL IV Funds remaining to be allocated to implement the Berger Recommendations. The Debtor timely filed a complete additional application for HEAL IV Funds (the "Second Supplemental HEAL Application") in the amount of $6 million. The NYDOH has informed the Debtor that the Second Supplemental HEAL Application was denied. The NYDOH has not articulated a reason for denying the Second Supplemental HEAL Application.

### S. Debtors' Motion to Approve Primary Asset Sale.

In an effort to comply with the Berger Recommendations, the Debtors and the Committee jointly retained CIT. CIT worked with the Debtor and the Committee to develop a process to solicit proposals from various entities, including hospitals and health care providers, real estate developers and operators, local businesses and other companies, regarding the use of the Debtor's property. A request for proposal was prepared by CIT (the "CIT RFP") and circulated

to approximately 160 potential parties in interest with responses to this process due June 29, 2007.

CIT received written responses and/or expressions of interest from approximately 15 different parties. During July and August 2007, CIT secured initial bids and negotiated with the bidders in an effort to clarify, improve and refine the proposals. After several rounds of negotiations with bidders, there were four bids for substantially all of the Debtor's assets that met with the Debtor's and Committee's goals. All of the four "all Asset bids" provided for some form of continued health care services at the Debtor's Main Campus. CIT further negotiated improvements to the bids and clarified certain terms with bidders.

During August 2007, the Debtor, CIT, and the Committee met with the NYDOH multiple times, both in Person and via teleconference, to discuss the CIT RFP process and the Debtor's efforts to date with respect to the marketing of the Primary Assets. The Debtor submitted the alternative proposals to the NYDOH as requested on August 27, 2007. On November 16, 2007, the NYDOH advised the Debtor that it would not require an emergency room and acute care beds to service the emergency room at the Debtor's facility. On November 19, 2007, the Debtors' board of directors met with CIT to review the remaining bids and narrowed the field of potential stalking horse bidders. Since that meeting, the Debtor negotiated with potential stalking horse bidders, including one additional "all Asset" bidder, participated in due diligence, and attempted to finalize term sheets. On January 30, 2008, the Debtor selected SJHSC to serve as the stalking horse bidder and executed a term sheet.

On February 6, 2008, the Debtor filed the Sale Motion with the Court seeking approval of the process and procedures set forth below (the "Bid Procedures") through which the Debtors, in consultation with the Committee, would determine the highest, best or otherwise financially

superior offer for the Assets and approval of the sale of the Assets by the Court. On March 10, 2008, the Court entered its order (the "Bid Procedures Order"), which, among other things, approved the Bid Procedures.

In early 2008, after extensive marketing efforts on the part of the Debtor and their Professionals, the Debtor received three "all Asset bids" prior to the Bid Deadline (as defined in the Bid Procedures Order) that were Qualified All Asset Bids (as defined in the Bid Procedures Order). The Qualified Bidders were: (1) Victory Center of New York LLC ("VCNY"); (2) Dervaal; and (3) SJHSC (collectively, the "Participating Bidders").

The Debtor conducted an auction (the "Auction") to determine the highest or best bid with respect to the Primary Asset Sale. The Auction took place on March 31, 2008, at the offices of DLA Piper US LLP, 1251 Avenue of the Americas, New York, New York 10020 at 10:30 a.m. (prevailing Eastern Time) and all bidders were present and took part in the Auction.

After a competitive bidding process, VCNY submitted the highest bid of $45,000,000 (the "Successful Bid") and Dervaal submitted the next best or highest bid in the amount of $44,900,000 (the "Back-up Bid"). At a meeting of the Debtor's Board of Directors held on the evening of March 31, 2008, the Debtors selected VCNY's all asset Bid for $45,000,000 as the Successful Bid, making VCNY the successful bidder and Dervaal's all asset Bid for $44,900,000 as the Back-up Bid.

After further investigation, it became apparent that VCNY would likely be unable to obtain NYDOH approval. Accordingly, the Debtor determined that Dervaal's Back-up Bid provided the best and highest offer and proceeded to finalize the asset purchase agreement (the "Dervaal APA") with Dervaal. The Dervaal APA was negotiated and executed on April 18, 2008.

Subsequent to the selection of Dervaal as the successful bid for the Main Campus and Acquired Business, the Debtors, CIT and Dervaal participated in several meetings with the NYDOH in an attempt to negotiate the regulatory approval of the Debtor's sale to Dervaal and discuss alternatives. As a result of these meetings, the Dervaal APA is being modified to streamline the regulatory approval process, which includes transferring the Debtors' skilled nursing facility and long term home health care licenses to an established healthcare provider as part of the sale of the Main Campus and Acquired Business. Dervaal has selected Chaim Sieger, on behalf of a new limited liability company to be formed by him, as its operator of the skilled nursing facility and long term home health care program and the Dervaal APA has been amended to incorporate these changes. At this time, based on preliminary indications and conversations between the relevant parties, the Debtor is relatively certain that all required regulatory approvals will be obtained from NYDOH although there can be no certainty on timing. If for any reason the necessary regulatory approvals are not obtained or the Primary Asset Sale Closing Date does not occur, the Debtor will pursue a similar transaction with, among others the next-highest Participating Bidder.

The sale hearing has been concluded and the Court approved the Primary Asset Sale. The order approving the Primary Asset Sale was entered by the Court on July 2, 2008.

**T.**   **Dervaal DIP Loan.**

Subsequent to executing the Dervaal APA, but prior to closing, the Debtor will require additional capital to finance operations until the Court approves the Dervaal APA and the closing can occur. The Debtors are negotiating with Dervaal for $2,000,000 in unsecured postpetition financing from Dervaal (the "DIP Loan") to allow the Debtors to pay expenses, including payroll

obligations, working capital requirements and other Court-approved expenses, while the Debtor proceeds as a going concern until and through the closing of the Dervaal APA.

**U.** **Motion to Approve Stipulation with PBGC.**

The Pension Benefit Guaranty Corporation ("PBGC") has asserted a secured claim against the Estate in the amount $28,522,639.35 plus unliquidated interest. The PBGC Claim arises out of an Agreement dated June 29, 2006 between the Debtor and the PBGC (as amended, the "PBGC Agreement") pursuant to which the Debtor agreed to make certain payments to the PBGC over a period of twenty (20) years.

The PBGC Agreement provides for two types of payments from the Debtors: (a) monthly payments under a Twenty Year Promissory Note dated June 29, 2006 in the principal amount of $4,643,350.00 (as amended, the "Promissory Note"); and (b) annual payments based on a percentage of the Debtors' net operating income (the "NOI Payments"). The PBGC Agreement does not identify any minimum NOI Payments. It does, however, provide that the aggregate amount of the NOI Payments shall not exceed $24,155,738.00. The Debtor ceased making payments upon reaching a settlement with PBGC. The Debtor has not, however, made any NOI Payments because they have not reached the income threshold for NOI Payments provided for in the PBGC Agreement. The Debtor's payment obligations under the PBGC Agreement are allegedly secured by a Mortgage Agreement dated June 29, 2006 (the "Mortgage") encumbering the Main Campus.

The Debtor and the PBGC have agreed to settle the PBGC Claim by providing the PBGC an Allowed Secured Claim in the amount of $5.8 million and are negotiating a stipulation. The Debtor is preparing a motion to approve the settlement with the PBGC and allowing the PBGC Claim in the reduced amount.

## V.      Stipulation With DASNY Regarding Bid Procedures Motion

DASNY loaned Victory Memorial Hospital  the sum of $36,417,104 prior to the Petition

Date ("Prepetition Loan") and to evidence its obligations under Prepetition Loan, Victory

Memorial Hospital executed and/or delivered an FHA Insured Note and Mortgage (the "FHA

Insured Mortgage Loan").

On February 6, 2008, the Debtor and the Other Debtors filed a motion for Orders (I)(A)

Approving Bid Procedures Related to the Sale of Certain of the Debtor's Assets, (B) Approving

Procedures Relating to Assumption and Assignment of Certain Contracts, and (C) Scheduling a

Sale Hearing; and (II) Approving (A) the Asset Purchase Agreement with Holy Family Home or

Such Other Purchaser Providing a Higher or Otherwise Better Offer, (B) the Sale of Certain of

the Debtors' Assets Free and Clear of All Liens, Claims, Interests or Encumbrances, and (C) the

Assumption and Assignment of Certain Contracts Filed (the "Bid Procedures Motion"). The Bid

Procedures Motion contemplates the Primary Asset Sale and the subsequent Primary Asset Sale

Closing taking place within six (6) months of the Court's approval of such sale.

On February 15, 2008, DASNY filed its statement in response to the Bid Procedures

Motion, in which DASNY noted that the Debtors' prepetition obligations required the Debtors to

immediately remit the proceeds of any Asset Sale in an amount sufficient to repay the FHA

Insured Mortgage Loan and redeem and defease the Victory Memorial Hospital FHA Insured

Mortgage Hospital Revenue Bonds, Series 1999 (the "Bonds").

On February 21, 2008 there was a hearing (the "Hearing") on the Bid Procedures Motion

and DASNY's response.  At the Hearing, the Committee objected to the inclusion in the order

approving the Bid Procedures of a provision requiring the repayment in full of the DASNY Bond

Debt at the closing of the Asset Sale.  Subsequent to the Hearing, DASNY asserted that it had no

further obligation to provide further funding under the DIP Agreement as a result of the lack of adequate assurance that the Asset Sale would comply and fulfill Debtors' pre-petition obligations to DASNY and Debtors' further obligations to DASNY under the DIP Agreement.

On March 11, 2008, the Court approved a stipulation between the Debtor, the Other Debtors, the Committee and DASNY that settled the disputes with respect to the Bid Procedures Motion and defeasing of the Bonds (the "DASNY Bond Stipulation").  Among other things, the DASNY Bond Stipulation provides that DASNY will continue to funding pursuant to the DASNY DIP and that any order entered approving the Primary Asset Sale will contain an ordered paragraph requiring the repayment in full of the Bonds at the closing of the Primary Asset Sale, except to the extent that the Bonds are fully repaid prior to the closing of the Primary Asset Sale with the HEAL IV Award.  The proposed sale order for the Primary Asset Sale contains such language.

**W.      The Qui Tam Litigation and Potential Settlement**

During April 2005, the office of the United States Attorney for the Eastern District of New York contacted the Debtor about alleged Medicare overpayments received by the Debtor in the aggregate principal amount of approximately $2.5 million on account of an apparent error in the cost-to-charges ratio reported by the Debtor in its 1996 and 1997 Medicare cost reports. Pursuant to an Order filed on January 17, 2007 in an action styled United States ex rel. Joseph B. Lee v. Victory Mem. Hosp., No. CV-04-3234 (E.D.N.Y.), in the United States District Court for the Eastern District of New York, a qui tam complaint was unsealed, which Complaint made similar allegations concerning the cost-to-charge ratio reported by the Debtor in its 1996 and 1997 cost reports, which it asserted amounted to false claims by the Debtor in 1996 and 1997 Medicare cost reports, as well as the 2000, 2001, and 2002 Medicare cost reports, which utilize

the 1996 statistics.  Pursuant to that same Order, a Notice of Partial Intervention and Complaint of the United States was also unsealed, revealing that the United States has asserted similar claims, but only with respect to the 1996 and 1997 cost reports, claiming a total overpayment of $2,789,101 as a result of the allegedly inflated cost to charge ratio.  The False Claims Act provides for liability of up to three times the amount of overpayment plus civil penalties for each false claim submitted to the government.

The Debtor is currently engaged in discussions with the Office of the United States Attorney for the Eastern District of New York and is very close to a settlement with the Government that would be favorable to the estate.  The potential gross amount of the Debtor's liability under the Complaint has been calculated in the Distribution Analysis.  Accordingly, any settlement of the Claim will benefit the estate by decreasing the Debtor's liability.  The Debtor's time to answer the Government's complaint has been adjourned to accommodate the continuing discussions.

There has been no substantive response on the relator's complaint and there have been no negotiations with the relator, who, by letter dated February 14, 2007 indicated through counsel that it was barred from prosecuting the action without leave from the Bankruptcy Court.  By request of the relator, which request was granted by the District Court presiding over the false claims action, relator has been relieved of the obligation to serve its complaint on the Debtor at this time.

### X. SUNY Downstate Lease

In or around July 2008, the Debtor entered into, subject to Court and regulatory approval, a lease (the "Downstate Lease") for 140,100 square foot of space at the Debtor's Main Campus with State University of New York – Downstate Medical Center ("SUNY Downstate").  The

leased premises (the "<u>Leased Premises</u>") includes: (1) 55,533 square feet on the portion of the Building known as the "Cellar"; (2) 40,462 square feet located on the first floor of the Building; (3) 12,360 square feet located on the second floor of the building; (4) 28,545 square feet and the third floor of the building; and (5) 2,900 square feet located on the fourth floor of the building. The "Base Rent" under the Downstate Lease is $25.00 per square foot ($291,875.00 per month).

SUNY Downstate intends to use the Leased Premises for an Urgent Care Center, an Ambulatory Surgery Center, a Treatment and Diagnostic Center, Out-Patient Clinics and a support/administrative office.  SUNY Downstate will use the Leased Premises in compliance with any relevant laws and regulations and will maintain all licenses, permits and/or other governmental or regulatory authorizations and approvals necessary or required by the New York City or NYDOH or similar health-related regulatory agency for the permitted use, and conduct its business in a high grade and reputable manner.  As currently contemplated, the SUNY Downstate Lease provides for termination pursuant to the Primary Asset Sale Closing Date or on sixty (60) days notice from the Debtor that the proposed lease does not comport with the Debtor's restructuring initiatives as provided in the Downstate Lease.  There shall be no liability imposed upon the Debtor's Estate in connection with the assumption or rejection of the SUNY Downstate Lease upon the Confirmation of the Plan or Primary Asset Sale Closing Date.

The Debtor believes that the current market value of square footage of the Main Campus is approximately $25.00 per square foot.  Given the volume, the proposed use of the Leased Premises and the totality of the circumstances, the Debtor further believe that $25.00 per square feet is indeed reasonable.

The Downstate Lease will generate additional income for the Debtor at a time when the

Debtors have significant cash needs and winding down their operations. In addition, pursuant to and consistent with Berger Recommendations, the Debtor is required to maintain ambulatory services, including but not limited to, urgent care and related clinics. As a result of the SUNY Downstate leasing the Leased Premises from the Debtors, SUNY Downstate will be providing these essential services required by the Berger Recommendations, allowing the Debtor to maintain compliance with the Berger Recommendations. In addition, because SUNY Downstate will be providing many of those services required by the Berger Recommendations, the Debtor will be able to substantially reduce its work force by 100 employees, resulting in significant savings to the Estate.

The Union's position is that the SUNY Downstate Lease discussed herein violates the subcontracting provisions of its CBAs with the Debtor, the National Labor Relations Act, and constitutes an impermissible unilateral modification of the CBAs under section 1113 of the Bankruptcy Code, and it will pursue all legal remedies available to it.

The motion to approve the Downstate Lease is currently before the Court.

**Y.** **Motion for Administrative Bar Date.**

The Debtor anticipates that the date establishing the last day for filing administrative Claims against the Debtor and its Estate will be set on or after the Primary Asset Sale Closing Date.

# IV.   THE PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.**

### A.   Classification and Treatment of Claims Under the Plan.

The Claims against the Debtor are divided into Classes according to their seniority and other criteria.  If the Plan is confirmed by the Court and then consummated:  (1) Allowed Secured Tax Claims shall receive Cash payments totaling at least the Allowed amount of the Claim; (2)  the Allowed DASNY Bond Claim shall be satisfied and paid; (3) Allowed Claims of the Debtor's Secured Creditors shall be satisfied by payment in Cash in full by the Debtor or the Plan Administrator; (4) Allowed Secured Claims against the Debtor will be satisfied; (5) Allowed Priority Claims shall be paid in full in Cash; (6) holders of Allowed Unsecured Claims shall be entitled to their pro rata share of Available Cash after the payment of (or after an adequate reserve having been made for the payment of) Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and the costs for administering the Plan (including all professional fees and expenses payable under the Plan). The Classes of Claims and the funds and other property to be distributed under the Plan are described more fully below.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTOR'S ASSETS.**

### B.   Treatment of Administrative Claims, Tax Claims and Trustee Fees.

Certain Claims need not be classified under a plan pursuant to the Bankruptcy Code, including Administrative Claims and Priority Tax Claims.

1.    DASNY DIP Claim. In full and final satisfaction, settlement, release, and discharge of, and in exchange for any Allowed Claim related to the DASNY DIP, DASNY will receive Cash equal to the amount due pursuant to the terms of the DASNY DIP on the Effective Date or as soon as practicable thereafter.  The Debtor estimates that the DASNY DIP Claim will be approximately $9,000,000 plus interest on the Effective Date.

2.    Administrative Claims.   The Plan defines Administrative Claims as any Claim for payment of an administrative expense in the Debtor's bankruptcy case of a kind specified in Bankruptcy Code section 503(b) and referenced in Bankruptcy Code sections 507(a)(1), 507(b) or 114(e)(2) including, without limitation, the actual, necessary costs and expenses of preserving these Estates and operating the business of the Debtor including payment of wages, salaries or commissions for services rendered after the commencement of these Chapter 11 Cases, taxes incurred by the Debtor's Estate and allowed as administrative expenses, compensation for legal and other services and reimbursement of expenses allowed or awarded under Bankruptcy Code sections 328, 330(a) and 331 and all fees and charges assessed against the Debtor under chapter 123 of title 28 of the United States Code.

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims have not been classified and are treated as described herein.  Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under the Plan, or by order of the Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim which has come due for payment under any applicable order or law, as soon as practicable after the later of:  (a) the third Business Day after the Effective Date; (b) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (c)

the date or dates when that Claim is payable by its terms, consistent with past practice and in accordance with past terms. Allowed Administrative Claims and payments for Allowed Fee Claims shall only be made in accordance with any Final Order of the Court.

There are two (2) different types of Allowed Administrative Claims, each of which receives treatment as follows:

a.     Liabilities or obligations incurred by the Debtor in the ordinary course of their business during these Cases to vendors or trade creditors, shall be paid or performed by the Debtor, in the ordinary course of business in accordance with the terms and conditions of any agreements, orders, or applicable law relating thereto; and

b.     Allowed Fee Claims of the retained Professionals, including those amounts held back pursuant to an Order of the Court, shall be paid in full in Cash on the Effective Date.

The aggregate amount of unpaid Allowed Administrative Claims as of the Effective Date will be approximately $22.8 million. This includes approximately $20 million in Administrative and Priority Claims as set forth in Note 14 of Exhibit 2 hereto plus approximately $2.8 million in Professional fees which are included in the operating losses referenced in Note 12 of Exhibit 2 hereto.

3.     <u>Priority Tax Claims</u>. The Plan defines Priority Tax Claims as Claims of governmental units entitled to priority under Bankruptcy Code section 507(a)(8). Any Allowed Priority Tax Claims of governmental units that are secured by valid liens are not included within Bankruptcy Code section 507(a)(8) and, under the Plan, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Plan Administrator in its sole discretion and in full satisfaction of such Claim: (a) payment in Cash in full on the later of the Effective Date or the date such Claim becomes an Allowed Claim; or (b) Cash over a period not exceeding six (6) years after date of assessment of such Claim, with interest at a rate equal to four percent (4%) per

year, payable monthly, in periodic payments, having the value of such Claim as of the Effective Date.

The Debtor estimates that, on the Effective Date of the Plan, there will be no Allowed Priority Tax Claims.

4.      Trustee Fees.  Trustee Fees include all fees and charges assessed against the Debtor and Other Debtors under chapter 1930 of title 28, United States Code.  All Trustee Fees will be paid in full by the Debtor or Plan Administrator, as the case may be, as they become due and owing.

### C.      Treatment of Classified Claims.

The Plan provides for certain Claims by Class, as provided in Bankruptcy Code sections 1122 and 1123(a)(1).  The Classes established by the Plan and the treatment of each Class are set forth below.  The Plan provides for certain general treatment provisions that, in addition to other generally applicable provisions (including distribution provisions described supra), apply to the treatment of all Claims under the Plan.

The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.  Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim, the payment of which has been assumed by a third party.

Class 1 – Secured Tax Claims.  This Class consists of all Allowed Secured Tax Claims for federal, state and local taxes.  Each Allowed Claim in this Class shall be in a separate subclass.  Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Claim in this Class shall receive Cash payments totaling the Allowed Claim on

the later of (a) the third (3rd) Business Day after the Effective Date; or (b) the date on which there is a Final Order allowing such Claim. The Debtor estimates that there will be no Allowed Class 1 Claims on the Effective Date.

Class 2 – DASNY Bond Claim. This Class consists of the amount of the Allowed DASNY Bond Claim as of the DASNY Payoff Date. On the DASNY Payoff Date, the Allowed DASNY Bond Claim shall be satisfied and paid in Cash in full by the Debtor or the Plan Administrator. The Debtor estimates that the Allowed DASNY Bond Claim will be approximately $21,000,000[10] on the Effective Date, unless such DASNY Bond Claim has been paid in Cash in full prior to the occurrence of the Effective Date.

Class 3 – Secured Lender Claims. This Class consists of all Allowed Secured Lender Claims, including, but not limited to, the Resmac Claim, MIMO Claim, PBGC Claim and Union/Funds Claims, to the extent they are Allowed as Secured Claims. Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Secured Lender Claim will be satisfied by payment in Cash in full by the Plan Administrator on the later of (a) the third (3rd) Business Day after the Effective Date; or (b) the date on which there is a Final Order allowing such Claim. The Debtor estimates that the Allowed Class 3 Claims will be approximately $12,650,000 on the Effective Date. Notwithstanding any of the forgoing, consistent with the definition of Secured Lender Claims, to the extent the DASNY DIP Claim is not paid in Cash in full on the Effective Date as an Administrative Claim, the DASNY DIP Claim will also constitute an Allowed Secured Lender Claim.

---

[10] The precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted.

Class 4 – Other Secured Claims.  This Class consists of all Allowed Secured Claims, other than Secured Lender Claims and DASNY DIP Claim, and includes, but is not limited to, obligations to capital equipment lessors or other holders of Secured Claims.  Each Allowed Claim in this Class shall be in a separate subclass.  Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Claim in this Class will be satisfied by: (a) the return of the property subject to the senior, perfected and indefeasible lien or security interest; or (b) the payment of any amounts owed by Dervaal as assignee pursuant to the Primary Asset Sale.  Any difference with respect to the amount of a Class 4 Claim and the fair market value of the equipment shall constitute an Unsecured Deficiency Claim, which Claim shall be classified as a Class 6 Claim.  The Debtor estimates that there will be approximately $0 in Allowed Claims in Class 4.

Class 5 – Unsecured Priority Claims.  This Class consists of all Allowed Unsecured Priority Claims that are specified as having priority in Bankruptcy Code sections 507(a)(4) and 507(a)(5), if any such Allowed Claims still exist as of the Effective Date.  Unless otherwise agreed by the holder of any Allowed Claim in this Class, each Allowed Claim under Bankruptcy Code sections 507(a)(4) and 507(a)(5), which has not been satisfied as of the Effective Date, shall be paid in full in Cash on the later of: (a) the third (3rd) Business Day after the Effective Date or such other date the Plan Administrator deems appropriate; or (b) the date on which there is a Final Order allowing such Claim.  The Debtor estimates that there will be a total of approximately of $200,000 of Allowed Claims in Class 5.

Class 6 – Unsecured Claims.  This Class consists of all Allowed Unsecured Claims, including, without limitation, Allowed Unsecured Claims arising from the rejection of executory contracts and unexpired leases and any Unsecured Deficiency Claims.  Unless

otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Unsecured Claim shall be entitled to receive Cash equal to such holder's pro rata share of Available Cash after the payment of (or after an adequate reserve having been made for the payment of) Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and the costs for administering the Plan (including all professional fees and expenses payable under the Plan), on the later of: (a) the third (3rd) Business Day after the Effective Date or as a soon as reasonably practicable thereafter as determined by the Plan Administrator; and (b) the date on which there is a Final Order allowing such Claim. The Debtor estimates that, after post-Effective Date settlement and liquidation of the Allowed Unsecured Claims, there will be approximately $49,768,000 in Allowed Claims in Class 6.

Class 7 - Subordinated Claims. This Class consists of subordinated Claims under Bankruptcy Code section 510 against the Debtor. Subordinated Claims holders under Bankruptcy Code section 510 shall receive no distribution on account of such claims. The Debtor estimates that there will be no Allowed Class 7 Claims on the Effective Date.

**D.** **Post-Effective Date Governance of Reorganized Debtor.**

On the Effective Date, the following shall occur: (a) management, control and operations of the Debtor's Estate shall become the exclusive responsibility of the Plan Administrator and current management shall be terminated; (b) the Plan Administrator shall be authorized to enter into all related and ancillary agreements, documents and instruments required or contemplated under the Plan without further order of the Court or corporate action. Except as otherwise provided for under the Plan, the Plan Administrator shall be exclusively entitled to act on behalf of the Debtor after the Effective Date. The Plan Administrator shall be appointed prior to the

Confirmation Hearing pursuant to the Plan and will be deemed appointed by the Debtor and Committee pursuant to the Confirmation Order.

E.   **Other Plan Provisions.**

1.   Avoidance and Other Actions.  On and after the Effective Date, the Plan Administrator and Committee shall have the exclusive right to commence and to continue the prosecution of all Avoidance and Other Actions; provided, however, that, notwithstanding anything to the contrary in the Plan, the Committee shall continue to prosecute the Resmac Adversary Proceeding.  The Plan Administrator and the Committee shall not prosecute the same Avoidance and Other Actions.  The Plan Administrator and the Committee shall coordinate their efforts with respect to the prosecution of Avoidance and Other Actions so as to avoid any duplication of effort.  Except as otherwise set forth in the Plan, all Avoidance and Other Actions shall survive confirmation and the commencement and/or prosecution of Avoidance and Other Actions shall not be barred or limited by any estopppel, whether judicial, equitable or otherwise. In reviewing the Disclosure Statement and the Plan, and in determining whether to vote for or against the Plan, Creditors (including parties that received payments or transfers from the Debtor within ninety (90) days prior to the Petition Date and insiders that received payments or transfers from the Debtor within one (1) year prior to the Petition Date) and other parties should consider that Avoidance and Other Actions may exist against them, that, except as otherwise set forth in the Plan, the Plan preserves all Avoidance and Other Actions, and that the Plan authorizes the Plan Administrator and the Committee to prosecute same.

2.   Corporate Documents, Employment Related Agreements and Compensation Programs.

<u>Agreements, Instruments, and Documents</u>.  All organizational agreements, charter documents, instruments, and documents required under the Plan to be executed or implemented, together with such others as may be necessary, useful or appropriate in order to effectuate the Plan shall be executed on or before the Effective Date or as soon thereafter as is practicable.

<u>Prepetition Employment Agreements and Compensation Programs</u>.  As of the Effective Date, with the exception of the CBAs, all employment, severance, retirement, indemnification, employee benefit, profit-sharing and related plans or agreements, whether or not qualified under ERISA, health care plans, disability plans and incentive plans, that were in effect on the Petition Date and that have not previously been terminated or superseded shall be terminated and deemed rejected.  All employees currently employed by the Debtor under such agreements as of the Effective Date shall be terminated thereon.

<u>Corporate Action</u>.  All matters provided under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further action by directors of the Debtor.

3.    <u>Plan Distributions</u>.  All Cash necessary for the Plan Administrator to make payments pursuant to the Plan shall be obtained from the Primary Asset Sale, the sale of the Ancillary Real Estate, Available Cash, the HEAL IV Award and the remaining Assets.

4.    <u>Preservation of Avoidance and Other Actions</u>.  Except as otherwise provided in the Plan, the Plan Administrator and Committee shall retain and hold all rights on

behalf of the Debtor, the Estate, and post-confirmation Estate, to any and all Avoidance and Other Actions, rights and causes of action that they or the Estate may hold against any entity or Person; provided, however, that, notwithstanding anything to the contrary in the Plan, the Committee shall continue to prosecute the Resmac Adversary Proceeding. The Plan Administrator and the Committee shall not prosecute the same Avoidance and Other Actions. The Plan Administrator and the Committee shall coordinate their efforts with respect to the prosecution of Avoidance and Other Actions so as to avoid any duplication of effort. Except as otherwise set forth in the Plan, all Avoidance and Other Actions shall survive confirmation and the commencement and/or prosecution of Avoidance and Other Actions shall not be barred or limited by any estopppel, whether judicial, equitable or otherwise.

     5.     Professional Fee Reserve. Two (2) Business Days after the Confirmation Date, each Professional shall provide the Debtor with estimates of all fees and disbursements that will be incurred by each Professional up to and including the Effective Date, which estimates shall be updated by an additional estimate provided to the Debtor one (1) Business Day prior to the Effective Date. The Debtor and/or Plan Administrator, as applicable, shall reserve, in an escrow account held by a reputable escrow agent, the aggregate amount of these estimates and no liens shall attach to said proceeds to the extent of unpaid Allowed Fee Claims of the Professionals, including, but not limited to, unpaid holdbacks until such fees are paid. The balance of the funds in the Professional Fee Reserve, after the payment of all final Allowed Fee Claims of the Professionals, shall be returned to the Debtor and shall constitute Available Cash and shall be distributed by the Plan Administrator in accordance with the Plan.

     6.     Bar Date for Certain Fee Claims. Each Person retained or requesting compensation in these Cases, pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b)

and/or 1103, must file with the Court an application for allowance of such Claims ("Fee Claims") within sixty (60) days after the Effective Date. All such Fee Claims for which an application is not timely filed shall be forever barred. Objections to each such application may be filed in accordance with the Bankruptcy Rules. The Court shall determine all such Fee Claims.

7.      Appointment of the Plan Administrator. The Confirmation Order shall provide for the appointment of the Plan Administrator. The Plan Administrator shall be responsible for the liquidation of the Debtor's remaining Assets, administration of the Plan and the wind-down of the Debtor and its Estate post-Effective Date. The Debtor shall file notice of appointment of the Plan Administrator and the Plan Administrator's hourly rate on or before August 1, 2008. The Plan Administrator shall be a third-party non-affiliate of the Debtor with sufficient expertise and experience liquidating a Chapter 11 case. The compensation of the Plan Administrator shall be at the Plan Administrator's customary hourly rate. The payment of the Plan Administrator's compensation shall be subject to the review and approval of the Committee. The Plan Administrator shall be deemed the Estate's representative in accordance with Bankruptcy Code section 1123 and shall have all powers, authority and responsibilities specified in the Plan, including, without limitation, the powers of a trustee under Bankruptcy Code sections 704 and 1106.

8.      Resignation, Death or Removal of the Plan Administrator. The Plan Administrator may resign at any time upon not less than thirty (30) days' written notice to the Debtor and the Committee. The Plan Administrator may be removed at any time by the Committee for cause upon application to the Court on five (5) days' written notice to the Plan Administrator. In the event of resignation, removal, death or incapacity of the Plan

Administrator and thereupon the successor Plan Administrator, without further act, shall become fully vested with all of the rights, powers, duties and obligations of his predecessor. No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors.

9. <u>Bar Date for Other Administrative Claims</u>. Unless the Plan or the Court fixes a different date, with the exception of Fee Claims, must be filed no later than thirty (30) days after the Effective Date. All such Claims not timely filed shall be forever barred. The Debtor, the Plan Administrator or any other party in interest may object to the allowance of any such Claim filed before, on, or after the Effective Date.

10. <u>Further Authorization</u>. The Plan Administrator shall be entitled to seek such orders, judgments, injunctions and rulings from the Court, in addition to those specifically listed in the Plan, as may be necessary to carry out the intentions and purposes, and to give full effect to the provisions of the Plan. The Court shall retain jurisdiction to enter such orders, judgments, injunctions and rulings.

11. <u>Satisfaction of Claims</u>. Holders of Claims shall receive the distributions provided for in the Plan, if any, in full settlement and satisfaction of all such Claims, and any interest accrued thereon.

12. <u>Abandoned Property</u>. Any and all property whose abandonment is or has been approved by the Court pursuant to the Bankruptcy Code shall remain abandoned forever; shall not thereafter be deemed to be property of the Debtor or the Plan Administrator; shall not at any time re-vest in the Debtor, and shall not otherwise, whether by conveyance or otherwise, ever become the property of the Debtor or its Estate.

13. <u>Post-Effective Date Effect of Evidences of Claims</u>. Notes, shareholder certificates, and other evidences of liens or Claims against the Debtor shall, effective upon the Effective Date, represent only the right to participate in the distributions or rights, if any, contemplated by the Plan.

14. <u>Term of Stays</u>. Except as otherwise provided in the Plan, all injunctions and the stay provided for in the Debtor's Chapter 11 case pursuant to Bankruptcy Code section 362, shall remain in full force and effect until the Debtor's Chapter 11 case is closed.

Except as otherwise provided in the Plan, upon entry of the Confirmation Order, all Persons or entities who have held, hold, or may hold Claims or membership or other interests in the Debtor are permanently enjoined, on and after the Effective Date, with respect to all Claims and membership and other interests in the Debtor from (a) commencing, conducting or continuing in any manner, directly or indirectly, any proceeding of any kind against or affecting the Debtor, the Plan Releasees, the Plan Administrator, or their property, (b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any means or manner, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Plan Releasees, the Plan Administrator, or their property, (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Plan Releasees, the Plan Administrator, or their property, (d) asserting any right of setoff, directly or indirectly, against any obligation due the Debtor, the Plan Releasees, the Plan Administrator, or their property, except as contemplated or allowed by the Plan, the Bankruptcy Code, or applicable law, (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, (f) commencing, continuing or asserting in any manner any action or other proceeding of

any kind with respect to any Claims and causes of action which are extinguished or released pursuant to the Plan, and (g) taking any action to interfere with the implementation and consummation of the Plan.

15.     Post-Confirmation Employment and Payment of Professionals.  The Plan Administrator is authorized, without further order of the Court, to employ such persons, including professionals (which may include the Debtor's Professionals), as the Plan Administrator may deem necessary to enable it to perform its functions hereunder, subject to the approval of the Committee.  Such persons, shall be compensated and reimbursed for their reasonable and necessary fees and out-of-pocket expenses on a monthly basis from the Debtor's estates without further notice, hearing or approval of the Court, subject to the approval of the Committee.

16.     Continuation of the Committee. Until all distributions have been made to holders of Allowed Unsecured Claims pursuant to the Plan and the entry of a final decree closing the Debtor's Chapter 11 case, the Committee shall continue to exist and shall continue to exercise all of the rights and powers conferred upon it by the Bankruptcy Code and the Plan. Upon all distributions to holders of Allowed Unsecured Claims having been made pursuant to the Plan and the entry of a final decree closing the Debtor's Chapter 11 case, the Committee shall be deemed dissolved and shall have no further duties, powers, rights or responsibilities. Notwithstanding anything to the contrary in the Plan, the Committee shall continue to prosecute the adversary proceeding that the Committee has commenced against Resmac 2 LLC, as assignee of Madison  Realty Capital, L.P.

17.     Dissolution of Certain Debtors.  The Debtor and the Other Debtors believe that there are approximately $300,000 in claims against the Other Debtors, primarily

representing tax claims against the Other Debtors. Upon review of such claims, the Debtor and the Other Debtors have determined these claims are invalid and should be disallowed. The Debtor and the Other Debtors intend to move to have these claims expunged and disallowed. By separate motion returnable upon the date of the Confirmation Hearing, the Debtor and the Other Debtors will request that the Court enter an order dissolving Victory Memorial Ambulance and Victory Memorial Pharmacy, and dismissing their respective Chapter 11 cases. Upon the dissolution of the Other Debtors, all remaining assets of the Other debtors shall be deemed transferred to the Debtor and shall be liquidated and distributed in accordance with the Plan.

18.    Retention of Jurisdiction.   Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Court will retain jurisdiction to the fullest extent permitted by law, including jurisdiction to enter any orders or to take any action specified in the Plan, and including, without limitation, the following:

a.    To determine any motion, adversary proceeding, avoidance action, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

b.    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

c.    To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

d.    To hear and determine objections to the allowance of Claims, whether Filed, asserted or made before or after the Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of disputed Claims, in whole or in part;

e.    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

f.    To enter, implement, or enforce such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

g.      To issue injunctions, enter and implement other Orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other Order of the Bankruptcy Court;

h.      To hear and determine any application to modify the Plan in accordance with Bankruptcy Code section 1127, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any Order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

i.      To hear and determine all Professional Fee Claims;

j.      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or any transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

k.      To take any action and issue such Orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth herein or in the Plan, or to maintain the integrity of the Plan following consummation;

l.      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

m.      To hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

n.      To enter a final decree closing the Debtor's Chapter 11 case;

o.      To recover all assets of the Debtor and property of the Estate, wherever located; and

p.      To hear and determine any other matters related hereto and not   inconsistent with the Bankruptcy Code, title 28 of the United States Code and other applicable law.

19.      <u>Executory Contracts and Unexpired Leases</u>.  With the exception of the collective bargaining agreements, the executory contracts and unexpired leases designated for

assumption pursuant to Bankruptcy Code section 365(a) by separate motion in connection with the Primary Asset Sale or the sale of the Ancillary Real Estate, each executory contract or unexpired lease of the Debtor that has not previously been rejected by the Debtor is deemed rejected as of the Confirmation Date, subject to the occurrence of the Effective Date, provided, however, in the event that either the Primary Asset Sale or the sale of the Ancillary Real Estate fail to close for any reason, the Debtor reserves its right to subsequently seek rejection of any executory contracts or unexpired leases previously designated for conditional assumption pursuant to either the Primary Asset Sale or the sale of the Ancillary Real Estate. Prior to the Effective Date, the Debtor shall provide the non-debtor parties to any executory contract or unexpired lease, or any transferee enumerated on the 3001(e) list of transferred Claims with respect thereto, notice that it intends to reject such executory contract or unexpired lease on the Effective Date.

Buyer or Operator (as defined in the APA) shall be responsible for the cure amounts related to their respective assigned contracts, if any, upon their respective closing date. Nothing in, any attachment thereto or any document executed or delivered in connection therewith, shall be deemed to create any obligation or liability with respect to any executory contract or unexpired lease on the part of the Debtor or other Person that is not presently liable thereon.

20. Claims Arising from Certain Judgments. A Claim that arises in favor of an entity as a result of a judgment entered against the Debtor after the Petition Date for the recovery of money or property must be filed within thirty (30) days after the later of (a) the date the judgment becomes final or (b) the mailing of the notice of Confirmation hearing.

21.  Objections to Claims.  The Plan Administrator and/or the Committee may object to the allowance of any Claim on or after the Effective Date of the Plan.  As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date, the Plan Administrator and/or the Committee may object to the allowance of any Claim.  The foregoing deadline may be extended by the Court upon request of the Plan Administrator or Committee upon notice to the Plan Administrator, the Committee, ASM, and such other parties as shall request such notice after the confirmation of the Plan.  Nothing contained herein, however, shall limit the right of the Plan Administrator or the Committee to object to Claims, if any, filed or amended after the Effective Date.

22.  Distributions Under the Plan.  Except as otherwise provided in the Plan, in the Confirmation Order, or in any Order of the Court in aid of consummation of the Plan, the following provisions shall govern distributions pursuant to the Plan:

Provisions for Distributions Pending Determination of Certain Claims for Income Taxes.  Notwithstanding any other provision of the Plan, and unless the Court orders otherwise, prior to making distributions on account of Allowed Claims other than Administrative Claims and Priority Tax Claims, the Plan Administrator shall make adequate provision for the satisfaction of Claims for income taxes entitled to treatment as administrative expenses; provided, however, that unless otherwise ordered by a court, the Plan Administrator shall have no obligation to withhold funds, designate reserves, or make other provisions for the payment of any Claims for taxes that have been disallowed by order of the Court.

No Distributions on Account of Claims That Have Not Become Allowed Claims.  Notwithstanding any other provision of the Plan, no payment or distribution shall

be made with respect to any Claim that has not become an Allowed Claim, except that the Plan Administrator may distribute consideration attributable to any undisputed portion of a Claim and withhold the remainder.

Reserves for Claims That Have Not Become Allowed Claims.  Distributions on account of Claims that have not become Allowed Claims shall be governed by the following provisions:

(a)                       Except as otherwise provided under the Plan, the Plan Administrator shall not be required to withhold funds or consideration, designate reserves, or make other provisions for the payment of any Claims that have been disallowed by a Final Order of the Court.

(b)                       Except as otherwise provided in the Plan, the Plan Administrator shall be required to reserve funds, designate reserves, or make other provisions for the payment of any Claims that have been disallowed by an order of the Court until such order becomes a Final Order.

(c)                       With respect to Claims that have not become Allowed Claims and that are not governed by subparagraph (1) or subparagraph (2) above, the Plan Administrator shall reserve sufficient funds to allow for a distribution in accordance with the terms of the Plan, on account of the distribution attributable to such holders' Claims or as otherwise provided pursuant to any order of the Court with respect to the amount, if any, to be reserved; provided, however, that the Plan Administrator shall distribute consideration attributable to any undisputed portion and shall withhold and reserve the remainder.  The Court may, after notice and a hearing (as defined in Bankruptcy Code section 102), fix a lesser amount than the distribution amount as the amount on account of which consideration shall be withheld.  In the case of Claims not stating an amount, the Plan Administrator or any holder of such Claims may request that the Court, after notice and a hearing (as defined in Bankruptcy Code section 102), determine an amount.    Cash withheld pursuant to this subparagraph will be held in a segregated, interest-bearing fund or funds.  Such Cash will be released when and if Claims are Allowed and disallowed and shall be distributed in accordance with the Plan.

Persons Responsible for Distribution of Plan Consideration.    The Plan Administrator shall disburse all consideration to be distributed under the Plan and shall act as a disbursing agent.

Unclaimed Cash.  If any Person entitled to receive Cash under the Plan cannot be located on the date a distribution under the Plan is due, such Cash will be set aside and held in a segregated, interest-bearing fund to be maintained by the Plan Administrator.  If such Person is located within one hundred and twenty (120) days of the date of distribution, such Cash, together with any interest earned thereon, will be paid to such Person.  If such Person cannot be located within one hundred and twenty (120) days of the date of distribution, any such Cash and accrued interest thereon shall be released to the Plan Administrator and distributed in accordance with the Plan.  Nothing contained in the Plan shall require the Plan Administrator to attempt to locate such Person.  It is the obligation of each Person claiming rights under the Plan to keep the Debtor and/or the Plan Administrator advised of their current address by sending written notice of any changes to the Plan Administrator.

Unnegotiated Distribution Checks.  Checks or drafts issued pursuant to the Plan, to Persons holding Allowed Claims and not presented for payment within one hundred and twenty (120) days following mailing thereof to the last known address of such Person shall be deemed nonnegotiable thereafter.

Fractional Dollars.  Any other provision of the Plan notwithstanding, no payments of fractional dollars will be made to any holder of an Allowed Claim.  Whenever any payment of a fraction of a dollar to any holder of an Allowed Claim would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest whole dollar (up or down).

Distribution Dates.  Whenever any distribution to be made under the Plan is due on a day other than a Business Day, such distribution will instead be made, without penalty or interest, on the next Business Day.  The Court shall retain power, after the Confirmation Date, to extend distribution dates for cause, upon motion and after notice and a hearing (as defined in Bankruptcy Code section 102) to affected parties.

Bankruptcy Code Sections 508, 509, and 510.  Distributions under the Plan will be governed by the provisions of Bankruptcy Code sections 508, 509 or 510 where applicable.

Distributions to be Applied First to Administrative and Priority Claims.  Any distribution under the Plan by the Plan Administrator on account of any Allowed Claim for which the Debtor is liable under any applicable law or order of the Court shall be applied by the recipient first to satisfy the DASNY Bond Claim, to the extent not already paid in Cash in full, and the DASNY DIP Claim, then to satisfy any Allowed Administrative Claims, Allowed Priority Tax Claims, or other Allowed Claims of the recipient against the Debtor which are entitled to priority under Bankruptcy Code sections 503 or 507 and, only after all such priority Claims are fully satisfied, to any Allowed Claims not entitled to such priority.

Orders Respecting Claims Distribution.  After confirmation of the Plan, the Court shall retain jurisdiction to enter orders in aid of consummation of the Plan with respect to distributions under the Plan and to resolve any disputes concerning distributions under the Plan.

Allocation.  To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued and unpaid interest thereon, such distribution shall be allocated first to the principal amount of such Claim and then, to the extent the consideration exceeds the principal amount of such Claim, to accrued and unpaid interest.

**F.  Conditions Precedent for Confirmation of the Plan.**

Confirmation of the Plan shall not occur and the Court shall not enter the Confirmation Order unless all of the requirements of the Bankruptcy Code for Confirmation of the Plan with respect to the Debtor shall have been satisfied.  If Confirmation shall not occur, the Plan shall be null and void and shall have no force nor effect, and the Plan shall be deemed withdrawn unless the Court shall have entered all orders (which may be orders included within the Confirmation Order) required to implement the Plan.

**G.  Waiver and Nonfulfillment of Conditions to Confirmation.**

In the event that the Debtor determines that the conditions to confirmation which it may waive cannot be satisfied and should not, in its sole discretion, be waived, the Debtor may propose a new plan, may modify the Plan as permitted by law, or may request other appropriate relief.

**H.  Confirmation Order Provisions for Pre-Effective Date Actions.**

The Confirmation Order shall empower and authorize the Debtor to take or cause to be taken, prior to the Effective Date, all actions which are necessary to enable it to implement the provisions of the Plan and satisfy all other conditions precedent to the effectiveness of the Plan.

I.        **Conditions to Effective Date.**

The Effective Date shall not occur unless: (a) the Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and the Committee, which shall have become a Final Order; (b) no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made and still be pending; (c) the Primary Asset Sale Closing Date shall have occurred; and (d) the sale of the Ancillary Real Estate shall have closed.

J.        **Nonfulfillment of Conditions to Effective Date.**

In the event that the Debtor determines that the conditions to the Effective Date set forth in the immediately foregoing paragraph of the Plan cannot be satisfied, the Debtor may propose a new plan, may modify the Plan as permitted by law, or may request other appropriate relief.

K.        **Effective Date Events.**

On the Effective Date, the following actions shall have taken place: (a) all payments to be made on the Effective Date and all other actions to be taken on or before the Effective Date pursuant to the Plan by the Debtor shall be made or taken or duly provided for; (b) any documents, including orders or agreements, necessary to implement the Plan as of the Effective Date must be executed; and (c) all other events and actions specified in the Plan to occur on the Effective Date.

L.        **Risk Factors in Connection with the Plan.**

The Debtor believes that there are certain risk factors in connection with confirmation of the Plan including: (a) the level of Allowed Claims and Allowed Administrative Claims may exceed the Debtor's estimates; (b) the Debtor may not be able to close the Primary Asset Sale or other asset transactions contemplated by the Plan; (c) the amount of the Claims reduced by the

Claims Objection process may be less than the Debtor's estimates, including with respect to the amount of Allowed Litigation Claims; and (d) the NYDOH may not approve the proposed Primary Asset Sale.

## V.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

The Plan must be approved by the Court after a confirmation hearing.

### A.  Elements of Confirmation.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Court determine that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and this Case. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtors will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

## B.    Best Interests of Creditors.

In order to confirm a Plan, the Court must determine that the Plan is in the best interests of all Creditors impaired by the Plan who have not accepted the Plan. The "best interests" test requires that the Court find either that all members of an impaired Class of Claims have accepted the Plan or that the Plan will provide each such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. To calculate what members of each impaired Class of Creditors would receive if the Debtor was liquidated, the Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if its Chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. The liquidation value of the Debtor's assets is indicated in the liquidation analysis ("Liquidation Analysis"), attached as **Exhibit 3** hereto.

This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a chapter 7 trustee. The liquidation value available to unsecured creditors would be reduced by the following factors: (a) the potential loss of the HEAL IV Award and any additional awards from the NYDOH, resulting in a net loss of at least $25 million for the Estates; (b) the costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred in the Debtor's Chapter 11 case (such as compensation of attorneys, accountants, and other professionals) that are allowed in the chapter 7 case, litigation costs, and Claims arising from the operations of the estate during the pendency of the Debtor's Chapter 11 case; (c) the liquidation itself could trigger certain priority Claims and would accelerate other priority payments that otherwise would be due in the ordinary course of

business; and (d) liquidation under chapter 7 of the Bankruptcy Code would likely prevent the Debtor from closing on either the Primary Asset Sale or sale of the Ancillary Real Estate and would result in sale of these assets at less favorable terms.

For the reasons stated above, the Debtor believes that the Plan is in the best interests of Creditors because it provides creditors with a greater recovery than if the Debtor was liquidated and the proceeds of such liquidation were used to pay Creditors. Please refer to the Liquidation Analysis for specific valuation and estimated recovery figures. Any liquidation or distribution analysis is, at best, highly speculative. To the extent that confirmation of the Plan requires the establishment of hypothetical amounts for the value of assets or Claims and funds available to pay Claims, the Court may make those rulings.

## C. Feasibility of the Plan.

In connection with confirmation of the Plan, the Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. The Plan liquidates the Debtor's remaining assets and distributes them to creditors pursuant to the Plan and Bankruptcy Code. Further, pursuant to the recommendations of the Berger Commission, the Debtor is currently required to have ceased acute care operations completely by June 30, 2008.

## D. Confirmation of the Plan if One or More Classes Do Not Accept.

Certain provisions of the Bankruptcy Code permit confirmation of a plan of reorganization even if a class or classes do not accept the plan so long as one impaired Class votes to accept the plan. These provisions, set forth in Bankruptcy Code section 1129(b), allow for the confirmation of the plan even though some classes vote to or are deemed to reject the

plan, provided that the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it.

A plan is fair and equitable as to a class of secured claims that rejects a plan if the plan provides either (1) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (2) receive, on account of such claims, deferred cash payments totaling at least the allowed amount of such claims, possessing a value as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (3) for the sale, subject to the Bankruptcy Code section 363(b), of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of the sale, and that such liens on proceeds will be treated in accordance with clause (a) of this subparagraph; or (4) for the realization by such holders of the indubitable equivalent of their claims.

A plan is fair and equitable to a class of unsecured claims that rejects or is deemed to have rejected the plan if the plan provides: (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

**IF NECESSARY, AND IF THE REQUIREMENTS OF 1129(b) OF THE BANKRUPTCY CODE HAVE BEEN SATISFIED, THE DEBTOR RESERVES ITS RIGHT TO ASK THE COURT TO RULE THAT THE PLAN MAY BE CONFIRMED**

**ON THE GROUND THAT THE REQUIREMENTS OF SECTION 1129(b) HAVE BEEN SATISFIED.**

The Bankruptcy Code provides that because holders of Subordinated Claims will not receive or retain any property under the Plan on account of their Claims against the Debtor, Class 7 is deemed not to have rejected the Plan and, accordingly, ballots for voting on the Plan will not be distributed to holders of Subordinated Claims. Notwithstanding this deemed rejection of the Plan, the Plan may still be confirmed as long as the Plan provides: (1) for each holder of an Claims included in the rejecting Class to receive or retain on account of that Claim property that has a value, as of the Effective Date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such Claim; or (2) that the holder of any Claim that is subordinated to the interest of such Class will not receive or retain under the Plan on account of such Subordinated Claim any property. Because no Subordinated Claims exist, the Debtors believe the Plan may be confirmed notwithstanding the deemed rejection of Class 7 Claims.

  E.  <u>Hearing on Confirmation of the Plan.</u>

At the time and place given in the notice served with this Disclosure Statement, the Court will hold a hearing to determine if the Plan has been accepted by a requisite number of Claims and whether the other requirements for Confirmation of the Plan have been satisfied.

**CREDITORS ARE NOT REQUIRED TO ATTEND THE HEARING ON CONFIRMATION UNLESS THEY HAVE EVIDENCE OR ARGUMENT TO PRESENT TO THE COURT CONCERNING THE MATTERS TO BE ADDRESSED AT THE HEARING ON CONFIRMATION.**

# VI.    CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

The following discussion summarizes certain of the material income tax consequences expected to result from the implementation of the Plan. The following summary does not address the federal income tax consequences to holders whose claims are entitled to payment in full in Cash under the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the IRS. There can be no assurance that the IRS will not take a contrary view, and no ruling from the IRS has been or will be sought.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to, among others, the Debtor, the Other Debtors and holders of Claims.

The following summary is for general information only. The federal income tax consequences of the Plan are complex and subject to significant uncertainties. This summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address all of the federal income tax consequences of the Plan. This summary also does not purport to address the federal income tax consequences of the Plan to taxpayers subject to special treatment under the federal income tax laws, such as broker-dealers, tax exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual funds, regulated investment companies, foreign corporations, and non-resident alien individuals.

**EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POTENTIAL FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN.**

IRS Circular 230 Notice: To ensure compliance with requirements imposed by the IRS in Circular 230, you are hereby informed that (i) any tax advice contained in this disclosure statement is not intended to written to be used, and cannot be used, for the purposes of avoiding penalties under the Internal Revenue Code, (ii) the advice in this disclosure statement, and (ii) each holder of a Claim should seek advice based on its particular circumstances from an independent tax advisor.

A.   <u>**Federal Income Tax Consequences to the Debtor**</u>

The Debtor is exempt from federal income tax pursuant to Section 501 of the Tax Code. Accordingly, the Debtor does not believe that the implementation of the Plan, including the extinguishment of the Debtor's outstanding indebtedness pursuant to the Plan, will result in any material tax liability to the Debtor.

B.   <u>**Federal Income Tax Consequences to Holders of Allowed Class 6 AND 7 Claims**</u>

1.   <u>Gain or Loss Recognition</u>.  Except with respect to a Claim (or portion thereof) for accrued but unpaid interest, for federal income tax purposes, each holder of an Allowed Class 6 and 7 Claim generally should recognize gain or loss as a result of receiving a Distribution pursuant to the Plan equal to the difference between (i) the sum of the amount of Cash received by such holder and (ii) the adjusted tax basis of such holder's Allowed Claim. The amount and timing of such gain or loss may be affected by the resolution of Disputed Claims.  The character of any gain or loss as long-term or short-term capital gain or loss or ordinary income or loss, will depend on a number of factors, including: (i) the nature and origin

of the Claim (e.g. Claims arising in the ordinary course of a trade or business or made for investment purposes); (ii) the tax status of the holder of the Claim; (ii) whether the Claim is a capital asset in the hands of the holders; (iv) whether the Claim has been held by the Holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a discount. For a discussion of the allocation of the consideration received by the holders of Allowed Class 6 and 7 Claims between principal and accrued but unpaid interest and the tax consequences associated with the Claim for accrued but unpaid interest, if any, see Section B.2. – "Receipt of Interest" below.

2.      Receipt of Interest. The Plan provides that the aggregate consideration to be distributed to holder will, to the extent relevant, first satisfy an amount equal to the stated principal amount of the Claim and any remaining consideration will be allocated to accrued but unpaid interest. Certain legislative history to the Bankruptcy Tax Act of 1980 suggests that such an agreed upon allocation should be respected. However, there can be no assurance that the IRS would respect this allocation of consideration under the Plan.

In general, to the extent that an amount of consideration received by a holder is received in satisfaction of accrued interest, or accrued original issue discount ("OID") during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. However, the IRS has privately rules that a holder of a security, in an otherwise tax-fee exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is unclear whether, by analogy, a holder of a claim in a taxable exchange with previously

included OID that is not paid in full would be required to characterize such loss based on the character of the underlying obligation.

Each holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest or accrued OID for tax purposes.

### C.    Federal Income Tax Consequences to Holders of Allowed Class 6 Claims

The Debtor and, after the Effective Date, the Plan Administrator will withhold all amounts required by law to be withheld from payments to holders of Allowed Claims. For example, under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding at the then applicable rate (currently 28%). Backup withholding generally applies only if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in overpayment of tax. Certain persons are exempt from backup withholding, including corporations and financial institutions.

Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including among other types of transactions, certain transactions that resulted in the taxpayer's claiming a loss in excess of specified thresholds. The types of transactions that require disclosure are very broad; however, there are numerous exceptions. Holders are urged to consult their advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES UNDER THE PLAN.

## VII.    EFFECTS OF PLAN CONFIRMATION

A confirmed plan leaves the holders of Claims with new rights as set forth in the confirmed plan. Therefore, in the event of a default after Confirmation, a holder of a Claim may pursue its remedies under the Plan. Some rights may remain with holders of Claims after the provisions of the confirmed Plan have been carried out. The automatic stay of Bankruptcy Code section 362(a) as to actions against the Debtor remains in effect until the Chapter 11 case is closed. Thereafter, all parties in interest will be enjoined from taking any action inconsistent with the Plan.

### A.    Vesting and Liens.

Except as otherwise expressly provided in the Plan or the Confirmation Order, property of the Estates will vest in the applicable post-Effective Date Debtor, free and clear of all Claims, liens, encumbrances, charges, membership interests and other interests.

### B.    Releases.

Except as otherwise specifically provided in the Plan, (a) the Debtor, together with its current and prior officers and directors and their respective agents, counsel and advisors (all in their respective capacities as such); and (b) the Committee, together with its current and prior members (solely in their capacity as members of the Committee), agents, counsel and advisors, and their respective employees, officers, directors, and their respective agents, advisors and counsel (all in their respective capacities as such) (collectively, the "Plan Releasees"), are

released and discharged from any and all claims, obligations, rights, causes of action and liabilities relating to the Debtor, the Other Debtors, these Cases, the formulation, negotiation, preparation, confirmation, implementation and administration of the Plan or any consent, action, omission, transaction or business dealing from and after the Petition Date and prior to the Effective Date; provided, however, that the Plan Releasees shall not be released from claims arising under (a) the Internal Revenue Code, or any state, city or municipal tax code; (b) the environmental laws of the United States, any state, city or municipality; (c) any criminal laws of the United States, any state, city or municipality; (d) the Plan; or (e) actions related to willful misconduct, gross negligence, misuse of confidential information that causes damages, breach of fiduciary duty and ultra vires acts.  Any of the foregoing parties in all respects shall be entitled to rely on the advice of counsel with respect to any of the foregoing.  With respect to Plan Releasees that are attorney Professionals, such Professionals shall not be released from any violations of the Code of Professional Responsibility.  From and after the Effective Date, except as otherwise provided under this section, all holders of Claims or membership and other interests in the Debtor shall be permanently enjoined from commencing or continuing in any manner any suit, action or other proceeding, on account of or respecting, any Claim or membership or other interest in the Debtor.

The United States Trustee and ASM Capital L.P., ASM Capital II L.P. and ASM Capital III L.P. (collectively, "ASM") have objected to the releases described in Sections VII. B. and C. of the Disclosure Statement and Article VII. 2. and 3. of the Plan. The objecting parties believe that the third party releases are overly broad in violation of Second Circuit case law, including In re Metromedia Fiber Network, Inc., 416 F.3d 136, 140 (2d Cir. 2005). The objecting parties also believe the releases of the professionals and Committee members are also overly broad in that

they release potential chapter 5 avoidance claims including preference claims with no investigation or explanation. The objecting parties object to the discharge of the debtor and assert that the discharge violates Bankruptcy Code section 1141(d)(3)(A). The objecting parties believe that the proposed releases make the plan unconfirmable. The Committee has also objected to the scope of the releases.

In the event such objections are sustained, the Debtor may submit a new plan of reorganization or, alternatively, modify such releases to conform to any order entered with respect thereto.

### C.     Releases By the Debtors and Holders of Claims.

Except as otherwise specifically provided by the Plan, for good and valuable consideration, including the services and agreements to facilitate the expeditious reorganization of the Debtor, the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Plan Releasees shall be deemed released by the Debtor, the Plan Administrator and holders of Claims and membership and other interests in the Debtor from any and all claims, obligations, rights, suits and causes of action whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, the Estate or such Person or entity would have been entitled to assert whether directly, indirectly, derivative or otherwise, based in whole or in part upon any action, omission, transaction, agreement, event, conduct or other occurrence taking place on or before the Effective Date in any way relating or pertaining to or dealings in connection with the Debtor, its officers (in their capacity as such), directors (in their capacity as such) and shareholders (in their capacity as such), the Estate or these Cases; provided, however, that nothing in this section shall constitute a release of any party from Claims arising under (a) the Internal Revenue Code, or any

state, city or municipal tax code; (b) the environmental laws of the United States, any state, city or municipality; (c) any criminal laws of the United States, any state, city or municipality; and (d) actions related to willful misconduct, gross negligence, misuse of confidential information that causes damages, breach of fiduciary duty and ultra vires acts.  With respect to releases of attorney professionals, such professionals shall not be released from any violations of the Code of Professional Responsibility.

### D.  Prior Directors and Officers.

Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall release any entity or Person who served prepetition in the capacity of director, officer or trustee of the Debtor and was removed, voluntarily resigned from or otherwise vacated their position as director, officer or trustee with Debtor within the six (6) months prior to the Petition Date from liability arising from any action or inaction in such capacity for any pending or potential cause of action, claim, obligation, right, suit and/or cause of action whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, the Committee, Plan Administrator, the Estate or such other Person or entity would be entitled to assert whether directly, indirectly, derivative or otherwise.

### E.  Limitation of Liability.

Without limiting any other provision or term hereunder, the Debtor and its directors, officers, trustees, employees and professionals (acting in such capacity) and the Committee and its members, agents and professionals, shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered

into, or any other act taken or omitted to be taken in connection with the Plan or these Cases; provided, however, that the foregoing provisions shall have no effect on the liability of any entity from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.   Liquidation Under Chapter 7.

If no Chapter 11 Plan can be confirmed, the Chapter 11 case may be converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals during such liquidation.

The Debtor, with the assistance of its professionals, have prepared a Liquidation Analysis, attached hereto as **Exhibit 3**.  The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case.  The Debtor has taken into account the nature, status and underlying value of its assets, the ultimate realizable value of its assets, and the extent to which such assets are subject to the liens and security interests.

The likely form of any liquidation would be the sale of the Debtor's individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtor's assets would produce less value for distribution to creditors than that recoverable under the Plan.  Among other things, a chapter 7 liquidation would jeopardize the Debtor's receipt of the Heal IV Award that is anticipated under the Plan.  In addition, a chapter 7 liquidation would prevent the Debtor from closing on either the Primary Asset Sale of sale of the Ancillary Real Estate and any

alternative sale of such assets would likely be on less favorable terms than are now contemplated under the Plan.  In the opinion of the Debtor, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as do the Plan.

**B.** **Alternative Plan of Reorganization.**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization.  During the course of negotiation of the Plan, the Debtor explored various other alternatives and concluded that the Plan represented the best alternative to protect the interests of creditors, patients and other parties in interest.  The Debtor has not changed their conclusions.

The Debtor filed the Plan on May 15, 2008, the last day of its exclusivity period.  The Debtor's exclusive period in which to solicit acceptance of the Plan expires on July 14, 2008.  Thus, it is possible that additional plans of reorganization may be submitted to the Court pursuant to the Bankruptcy Code.

The Debtor believes that the Plan enables the Debtors to protect its patients up to and through the complete cessation of operations pursuant to the Berger Recommendations and provide creditors with the highest recoveries under the circumstances.

## IX.    CONCLUSION AND RECOMMENDATIONS

The Debtor urges all creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by immediately returning their properly completed ballots to the appropriate voting agent as set forth on the ballots within the time stated in the notice served with this Disclosure Statement.

Dated: July 3, 2008
        New York, New York

                                    VICTORY MEMORIAL HOSPITAL, VICTORY
                                    MEMORIAL AMBULANCE SERVICES, INC.,
                                    AND VICTORY MEMORIAL PHARMACY
                                    SERVICES, INC.


                                    By:  _____/s/ Vincent J. Calamia_____
                                         Vincent J. Calamia, M.D.
                                         President and Chief Executive Officer

(this page has been intentionally left blank)

# **EXHIBIT 1**

## **Plan of Reorganization**

(this page has been intentionally left blank)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re: : Chapter 11
:
: Case Nos. 06-44387
VICTORY MEMORIAL HOSPITAL, et al., : 06-44388
: 06-44389
:
Debtors. : (Jointly Administered)
-------------------------------------------------------------X

## SECOND AMENDED PLAN OF REORGANIZATION
## OF VICTORY MEMORIAL HOSPITAL

### July 3, 2008

**DLA PIPER US LLP**
Timothy W. Walsh (TW-7409)
Jeremy R. Johnson (JJ-9269)
1251 Avenue of the Americas
New York, New York  10020-1104

Attorneys for Victory Memorial Hospital
Debtor and Debtor in Possession

(this page has been intentionally left blank)

Victory Memorial Hospital, debtor and debtor in possession (the "<u>Debtor</u>"), proposes the following second amended plan of reorganization (the "<u>Plan</u>") pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

The Debtor is the proponent of this Plan and accompanying disclosure statement within the meaning of Bankruptcy Code section 1129. All holders of Claims against the Debtor are encouraged to read this Plan and the Disclosure Statement with Respect to the Second Amended Plan of Reorganization of Victory Memorial Hospital, dated July 3, 2008 (the "<u>Disclosure Statement</u>") in their entirety before voting to accept or reject this Plan.

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ................................................................................................. 1

ARTICLE II       TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND TRUSTEE FEES ................................................................. 12

ARTICLE III      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................................................................................. 14

ARTICLE IV     MEANS FOR IMPLEMENTATION OF PLAN ......................................... 18

ARTICLE V      PLAN ADMINISTRATOR .......................................................................... 24

ARTICLE VI     CONDITIONS PRECEDENT ....................................................................... 27

ARTICLE VII    EFFECTS OF PLAN CONFIRMATION ...................................................... 28

ARTICLE VIII   MISCELLANEOUS PROVISIONS ............................................................. 36

# ARTICLE I

## DEFINITIONS

Unless this Plan expressly provides or the context requires otherwise, all capitalized terms used in this Plan shall have the meanings assigned to them in this Article I. Whenever the context requires, terms used herein shall include the plural as well as the singular. A term used but not defined herein has the meaning, if any, given in the Bankruptcy Code or the Bankruptcy Rules.

1. <u>Accounts Receivable</u>. "Accounts Receivable" means all of the Debtor's prepetition and postpetition accounts receivable, including, but not limited to, monies, credits, debts or any payment obligations from vendors, lessees, patients or any other party.

2. <u>Acquired Business</u>. "Acquired Business" means the Debtor's skilled nursing facility and long-term home health care programs businesses that are to be sold as part of the Primary Asset Sale.

3. <u>Administrative Claim</u>. "Administrative Claim" means a Claim for payment of an administrative expense or cost of a kind specified in Bankruptcy Code section 503(b) and referenced in Bankruptcy Code sections 507(a)(2), 507(b) or 1114(e)(2) including, without limitation, the actual, necessary costs and expenses of preserving the Estate and operating the business of the Debtor, including wages, taxes incurred by the Debtor's Estate and allowed as administrative expenses, salaries, or commissions for services rendered after the commencement of these Cases, compensation for legal and other services and reimbursement of expenses allowed or awarded under Bankruptcy Code sections 328, 330(a) or 331.

4. <u>Allowed Administrative Claim</u>. "Allowed Administrative Claim" means all or that portion of any Administrative Claim which either:  (a) has become allowed by a Final

Order; or (b) was incurred by the Debtor in the ordinary course of business during these Cases and is due and owing under the terms and conditions of any agreements or applicable law.

5. <u>Allowed</u>. "Allowed" means, with reference to any Claim other than an Allowed Administrative Claim, any Claim against the Debtor that: (a) was either (i) scheduled by the Debtor pursuant to the Bankruptcy Code, other than a Claim scheduled as disputed, contingent or unliquidated, or (ii) proof of which has been timely filed with the Court pursuant to the Bankruptcy Code and the Bar Date Order, or late filed with leave of the Court after notice and a hearing; and (b) either (i) no objection to the allowance of which has been filed within the relevant time period, if any, fixed by an order of the Court, (ii) any objection to the allowance of which has been overruled by a Final Order, or (iii) which has otherwise been allowed by a Final Order. "Allowed", with reference to any Claim, shall not include: (a) any Claim for prepayment premiums or penalties or interest attributable to default or penalty rates, except as expressly permitted by the Bankruptcy Code or this Plan; (b) unmatured or unearned interest as of the Petition Date, except as expressly permitted by the Bankruptcy Code or this Plan; (c) any amount in excess of an amount allowed by the Court pursuant to Bankruptcy Code section 502(c); (d) any Claim of any entity from which property is determined by the Court to be recoverable under Bankruptcy Code sections 542, 543, 550 or 553, or that is determined by the Court to be a transferee of a transfer avoidable under Bankruptcy Code sections 544, 545, 547, 548 or 549, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under Bankruptcy Code sections 542, 543, 544, 545, 547, 548, 549, 550 or 553; or (e) any Claim of any entity from which property was determined by the Court to be recoverable under Bankruptcy Code sections 542, 543, 550 or 553, or that was determined by the Court to be a transferee of a transfer avoidable under Bankruptcy Code

sections 544, 545, 547, 548 or 549, regardless of any applicable period of limitation, to the extent of the amount for which such entity would have been liable or required to pay or the value of the property which such entity would have been required to turn over or pay under Bankruptcy Code sections 542, 543, 544, 545, 547, 548, 549, 550 or 553.

6. <u>Allowed Priority Claim</u>. "Allowed Priority Claim" means all or the portion of any Priority Claim which is or has become an Allowed Claim.

7. <u>Allowed Priority Tax Claim</u>. "Allowed Priority Tax Claim" means all or that portion of any Priority Tax Claim which is or has become an Allowed Claim.

8. <u>Ancillary Real Estate</u>. "Ancillary Real Estate" means that certain real property owned by the Debtor located at: (a) 166 Battery Avenue, Brooklyn, NY 11209 (Block 6142, Lot No. 0050); (b) 9006 7th Avenue, Brooklyn, NY 11228 (Block 6094, Lot No. 0024); (c) 655 92nd Street, Brooklyn, NY 11228 (Block 6093, Lot No. 0045); (d) 640 92nd Street, Brooklyn, NY 11228 (Block 6142, Lot No. 0046); (e) 9002 7th Avenue, Brooklyn, NY 11228 (Block 6094, Lot No. 0022); (f) 95 Parrot Place, Brooklyn, NY 11228 (Block 6094, Lot No. 0013); (g) 9010 7th Avenue, Brooklyn, NY 11228 (Block 6094, Lot No. 0026); and (h) 670 92nd Street, Brooklyn, NY 11228 (Block 6143, Lot No. 0035). For purposes of Bankruptcy Code section 1146(a), any transfer, sale or disposition of the Ancillary Real Estate in these Chapter 11 Cases shall be deemed to have occurred in furtherance of, or in connection with this Plan and shall be exempt from all taxes as provided in such section 1146(a). It is anticipated that the closing of the sale of the Ancillary Real Estate will occur after confirmation of this Plan.

9. <u>APA</u>. "APA" means that certain Asset Purchase Agreement, dated as of April 18, 2008, by and between Victory Memorial Hospital, a New York not-for-profit

corporation and its subsidiaries, and Dervaal LLC, a Delaware limited liability company, on behalf of a new entity to be formed on behalf of the Leser Group, as amended from time to time.

10. <u>Assets.</u> "Assets" means all assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Estate pursuant to Bankruptcy Code section 541, Cash, Accounts Receivable, Avoidance and Other Actions, Commercial Tort Claims, the Ancillary Real Estate, the Heal IV Award, the assets being sold in the Primary Asset Sale, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing, including the proceeds of the Primary Asset Sale, the proceeds of the sale of the Ancillary Real Estate, and the proceeds of the sale of any other Assets. Assets shall include all remaining assets of the Other Debtors upon the dissolution of the Other Debtors.

11. <u>Available Cash</u>. "Available Cash" means the Debtor's "Cash on hand" as of the Effective Date and thereafter.

12. <u>Avoidance and Other Actions</u>. "Avoidance and Other Actions" means all Commercial Tort Claims as well as actions, causes of action, suits, choses in action, and claims of the Debtor and/or the Estate against any entity or Person, whether direct, indirect, derivative or otherwise arising under Bankruptcy Code section 510 or seeking to avoid a transfer of property or recover property pursuant to Bankruptcy Code sections 542 through 550 or applicable non-bankruptcy law.

13. <u>Bankruptcy Code</u>. "Bankruptcy Code" means chapter 11 of title 11 of the United States Code, as now in effect or hereafter applicable to these Cases.

14. <u>Bankruptcy Rules</u>. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Court, as applicable to these Cases.

15.     Bar Date Order.  "Bar Date Order" means the Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof, entered by the Court on May 31, 2007.

16.     Berger Recommendations.  "Berger Recommendations" means the mandates of the New York State Commission on Healthcare Facilities in the 21st Century Berger Commission Report.

17.     Business Day.  "Business Day" means any day except Saturday, Sunday or any other day on which commercial banks in New York are authorized by law to close.

18.     Cases.  "Cases" means these reorganization cases under Chapter 11 of the Bankruptcy Code commenced on the Petition Date, Case Nos. 06-44387, 06-44388, 06-44389.

19.     Cash.     "Cash" means cash and cash equivalents including, without limitation, checks and wire transfers.

20.     Chapter 11.  "Chapter 11" means Chapter 11 of the Bankruptcy Code.

21.     Chapter 11 Cases.  "Chapter 11 Cases" means the above-captioned cases.

22.     Claim.  "Claim" means a claim, as defined by Bankruptcy Code section 101(5), against the Debtor, whether or not asserted.

23.     Claims Bar Date.  "Bar Date" means July 20, 2007.

24.     Class.  "Class" means a class or category of Claims as classified and described in Article III of this Plan.

25.     Commercial Tort Claims.  "Commercial Tort Claims" means claims of the Debtor arising in tort that arose prior to the Petition Date in the course of the Debtor's business.

26.     Committee.  "Committee" means the Official Committee of Unsecured Creditors appointed in these Cases on November 28, 2006.

27. <u>Confirmation Date</u>. "Confirmation Date" means the date on which the clerk of the Court enters the Confirmation Order on the Court's docket.

28. <u>Confirmation Hearing</u>. "Confirmation Hearing" means the hearing on confirmation of this Plan pursuant to Bankruptcy Code section 1129.

29. <u>Confirmation Order</u>. "Confirmation Order" means the order entered by the Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

30. <u>Court</u>. "Court" means the United States Bankruptcy Court for the Eastern District of New York, the United States District Court for the Eastern District of New York and/or the Second Circuit Court of Appeals, as applicable.

31. <u>Creditor</u>. "Creditor" means a holder of a Claim.

32. <u>Debtor</u>. "Debtor" means Victory Memorial Hospital, debtor and debtor in possession, and includes the Estate, where appropriate.

33. <u>Dervaal</u>. "Dervaal" means Dervaal LLC, a Delaware limited liability company or their successors in interest.

34. <u>DASNY</u>. "DASNY" means the Dormitory Authority of the State of New York.

35. <u>DASNY Bond Claim</u>. "DASNY Bond Claim" means DASNY's secured claim, which has been allowed by order of this Court, related to DASNY Bonds and DASNY Prepetition Loan Obligations. For the avoidance of doubt, DASNY Bond Claim includes, but is not limited to, all principal, interest and redemption premium on the DASNY Bonds, all fees and costs of or incurred by DASNY in connection with defeasance and redemption of the DASNY Bonds and all other amounts due and payable to DASNY under the Prepetition Loan Agreement.

36. <u>DASNY Bonds</u>. "DASNY Bonds" means Victory Memorial Hospital FHA Insured Mortgage Hospital Revenue Bonds, Series 1999 and all of the obligations of Victory Memorial Hospital related to such bonds.

37. <u>DASNY DIP</u>. "DASNY DIP" means that certain Amended and Restated Loan and Reimbursement Agreement by and between DASNY and the Debtor and the Other Debtors, dated November 14, 2007, as amended, whereby DASNY agreed to provide up to $9,000,000 in debtor in possession financing to the Debtor and Other Debtors.

38. <u>DASNY DIP Claim</u>. "DASNY DIP Claim" means DASNY's postpetition secured and superpriority administrative claim related to the DASNY DIP as approved and allowed by orders of the Court.

39. <u>DASNY Payoff Date</u>. "DASNY Payoff Date" means the date on which the Debtor transfers, or causes to be transferred, proceeds to the Trustee for the DASNY Bonds sufficient to defease and redeem the DASNY Bonds and satisfy the DASNY Bond Claim, which date shall be the earlier of: (a) the Primary Asset Sale Closing Date; or (b) the Debtor's receipt of the HEAL IV Award.

40. <u>DASNY Prepetition Loan Agreement</u>. "DASNY Prepetition Loan Agreement" means, collectively, that certain loan agreement by and between DASNY and Victory Memorial Hospital, dated April 28, 1999, in the principal amount of $36,417,103.45 and the FHA Insured Note and Mortgage.

41. <u>DASNY Prepetition Loan Obligations</u>. "DASNY Prepetition Loan Obligations" means those certain prepetition secured obligations owed to DASNY pursuant to the DASNY Prepetition Loan Agreement less payments received by DASNY through the earlier of the Effective Date or the DASNY Payoff Date.

42. <u>Disallowed Claim</u>. "Disallowed Claim" means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

43. <u>Disclosure Statement</u>. "Disclosure Statement" means the Second Amended Disclosure Statement with Respect to the Second Amended Plan of Reorganization For Victory Memorial Hospital, dated July 3, 2008, which was approved by the Court pursuant to Bankruptcy Code section 1125 by order entered July 7, 2008.

44. <u>Effective Date</u>. "Effective Date" means a Business Day selected by the Debtors, which is, unless the Confirmation Order directs otherwise, five (5) Business Days after the date on which each of the conditions to this Plan's Effective Date set forth herein has either been satisfied or waived in accordance with this Plan.

45. <u>ERISA</u>. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

46. <u>Estate</u>. "Estate" means the estate of Victory Memorial Hospital created by Victory Memorial Hospital's Chapter 11 case pursuant to Bankruptcy Code section 541.

47. <u>Fee Claim</u>. "Fee Claim" has the meaning provided in Article IV of this Plan.

48. <u>Final Order</u>. "Final Order" means an order or judgment of the Court as to which: (a) any appeal or petition for review or rehearing that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal or petition for review or rehearing has been filed.

49. <u>Funds</u>. "Funds" means those jointly administered labor-management benefit trust funds, including, the 1199SEIU National Benefit Fund for Health and Human

Service Employees; 1199SEIU Healthcare Employees Pension Fund; League1199SEIU Training and Upgrading Fund; 1199SEIU/Employer Child Care Fund; and the 1199SEIU/League Job Security Fund.

50. <u>Heal IV Award</u>. "Heal IV Award" means that certain grant awarded, but not yet provided to Victory Memorial Hospital by the NYDOH in the amount of $25 million.

51. <u>Main Campus</u>. "Main Campus" means that certain medical facility owned by the Debtor located at 699 92nd Street (Tax Block 6094 Lot 1) in Brooklyn, NY.

52. <u>MIMO Claim</u>. "MIMO Claim" refers to the alleged Secured Claim asserted by Maimonides Medical Center in the amount of $5,250,000.

53. <u>NYDOH</u>. "NYDOH" means the New York State Department of Health.

54. <u>Other Debtors</u>. "Other Debtors" means both Victory Memorial Pharmacy Services, Inc. and Victory Memorial Ambulances Services, Inc.

55. <u>PBGC Claim</u>. "PBGC Claim" means that Claim asserted by the Pension Benefit Guaranty Corporation which will be allowed pursuant to this Plan in the amount of $5.8 million upon the Court's approval of the settlement reached by the Debtor, the Other Debtors and the Pension Benefit Guaranty Corporation.

56. <u>Person</u>. "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtor and the Other Debtors.

57. <u>Petition Date</u>. "Petition Date" means November 15, 2006.

58.     Plan.  "Plan" means this Plan of Reorganization of Victory Memorial Hospital, dated May 15, 2008, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

59.     Plan Administrator.  "Plan Administrator" means the Person designated by the Debtor and the Committee, as the representative of the Debtor and the Estate for purposes of administering and consummating this Plan.

60.     Primary Asset Sale.  "Primary Asset Sale" means the Debtor's sale of the Main Campus and Acquired Business, which sale was approved by order of the Court entered July 2, 2008, and, for purposes of Bankruptcy Code section 1146(a), was made and entered into, in furtherance of under, or in connection with this Plan.

61.     Primary Asset Sale Closing Date.  "Primary Asset Sale Closing Date" means the date on which the Debtor closes the Primary Asset Sale, which will be after confirmation of the Plan.

62.     Priority Claim.  "Priority Claim" means a Claim entitled to priority under Bankruptcy Code sections 507(a)(4) and 507(a)(5), if Allowed.

63.     Priority Tax Claim.  "Priority Tax Claim" means a Claim of a governmental unit of a kind entitled to priority under Bankruptcy Code section 507(a)(8), if Allowed.

64.     Professional Fee Reserve.  "Professional Fee Reserve" shall mean that reserve created on the Effective Date by the Debtor and held by an escrow agent representing Cash designated for the payment of Professionals and Allowed Fee Claims only.

65.     Professionals.  "Professionals" means all professionals employed in these Cases pursuant to Bankruptcy Code sections 327 and 1103.

66. <u>Resmac Adversary Proceeding</u>. "Resmac Adversary Proceeding" shall mean the adversary proceeding the Committee commenced against Resmac 2 LLC, as assignee of Madison Realty Capital, L.P.

67. <u>Resmac Claim</u>. "Resmac Claim" means the alleged Secured Claim of Resmac 2 LLC, as assignee of Madison Realty Capital, L.P., which Claim is disputed by the Debtor and the Committee and which Claim is the subject of the Resmac Adversary Proceeding that will continue to be prosecuted by the Committee after the Effective Date.

68. <u>Secured Claim</u>. "Secured Claim" means a Claim of a Creditor that is secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in Bankruptcy Code section 506(a). Secured Claim also means a Claim of a creditor that is subject to setoff under Bankruptcy Code section 553, to the extent of the amount subject to setoff, as provided in Bankruptcy Code section 506(a).

69. <u>Secured Lender Claim</u>. "Secured Lender Claim" means the Secured Claim of any prepetition lender including the Resmac Claim, MIMO Claim, PBGC Claim and Union/Funds Claims, and any other mortgage-related claim other than the DASNY Bond Claim. Notwithstanding any of forgoing, to the extent that DASNY DIP Claim is not paid in Cash in full on the Effective Date as an Administrative Claim, DASNY DIP Claim will also constitute an Allowed Secured Lender Claim.

70. <u>State</u>. "State" means the State of New York.

71. <u>Subordinated Claim</u>. "Subordinated Claim" means a Claim subordinated under Bankruptcy Code Section 510.

72.    Trustee Fees.  "Trustee Fees" means all fees and charges assessed against the Estate of the Debtor under 28 U.S.C. § 1930 of the United States Code.

73.    Unsecured Claim.  "Unsecured Claim" means a Claim that is not secured by property of the Estate or otherwise entitled to treatment as a secured Claim under Bankruptcy Code section 506, is not an Administrative Claim, Secured Claim, Priority Claim or a Priority Tax Claim, and is not otherwise entitled to priority under Bankruptcy Code sections 503 or 507.

74.    Victory Memorial Ambulance.  "Victory Memorial Ambulance" means Victory Memorial Ambulance Services, Inc.

75.    Victory Memorial Pharmacy.   "Victory Memorial Pharmacy" means Victory Memorial Pharmacy Services, Inc.

76.    Union.  "Union" means 1199SEIU United Healthcare Workers East.

77.    Union/Funds Claims.  "Union/Funds Claims" means those Claims asserted in the approximate amount of $4.1 million asserted by the Union and/or Funds which Claims the Debtor is reviewing to determine possible defenses.

78.    Unsecured Deficiency Claim.  "Unsecured Deficiency Claim" means any portion of a Claim to the extent that the value of the Estate's interest in any property securing the Claim is less than the amount of the Claim, or to the extent that the amount of any such Claim subject to setoff is less than the amount of such Claim, as determined pursuant to Bankruptcy Code section 506(a).

## ARTICLE II

## TREATMENT OF ADMINISTRATIVE CLAIMS,
## PRIORITY TAX CLAIMS, AND TRUSTEE FEES

1.    DASNY DIP Claim.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for any Allowed Claim related to the DASNY DIP, DASNY will

receive Cash equal to the amount due pursuant to the terms of the DASNY DIP on the Effective Date or as soon as practicable thereafter. The Debtor estimates that the DASNY DIP Claim will be approximately $9,000,000 plus interest on the Effective Date.

2. **Administrative Claims**. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims have not been classified and are treated as described herein. Except as otherwise provided in this Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under this Plan, or by order of the Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim which has come due for payment under any applicable order or law, as soon as practicable after the later of: (a) the third Business Day after the Effective Date; (b) the date on which such Person becomes the holder of such an Allowed Administrative Claim; or (c) the date or dates when that Claim is payable by its terms, consistent with past practice and in accordance with past terms. Allowed Administrative Claims and payments for Allowed Fee Claims shall only be made in accordance with any Final Order of the Court.

3. **Priority Tax Claims**. In accordance with Bankruptcy Code section 1123(a)(1), Priority Tax Claims have not been classified and are treated as described in this Section of this Plan. Allowed Priority Tax Claims shall be paid by the Debtor. Unless otherwise agreed by the holders of the Allowed Priority Tax Claims, any Person holding an Allowed Priority Tax Claim will receive, as determined by the Plan Administrator in its sole discretion and in full satisfaction of such Claim: (a) payment in Cash in full on the later of the Effective Date or the date such Claim becomes an Allowed Claim; or (b) Cash over a period not exceeding six (6) years after date of assessment of such Claim, with interest at a rate equal to

four percent (4%) per year, payable monthly, in periodic payments, having the value of such Claim as of the Effective Date.

        4.    <u>Trustee Fees</u>.  Trustee Fees include all fees and charges assessed against the Debtor and the Other Debtors under chapter 1930 of title 28, United States Code.  All Trustee Fees will be paid in full by the Debtor or Plan Administrator, as the case may be, as they become due and owing.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

        1.    <u>Classification and Specification of Treatment of Claims</u>.  All Claims, except those described in Article II, are placed in the following Classes of Claims, pursuant to Bankruptcy Code section 1123(a)(1), which section specifies the treatment of such Classes of Claims and of their impaired or unimpaired status, pursuant to Bankruptcy Code sections 1123(a)(2) and 1123(a)(3).  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan.  Unless this Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.

        Subject to all other applicable provisions of this Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below.  This Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date,

including, without limitation, payments by third parties. Except as specifically provided in this Plan, this Plan will not provide any distributions on account of a Claim, the payment of which has been assumed by a third party. Except as otherwise specifically provided in this Plan or by further order of the Court, all treatment, allowances, or payments of Claims which have been specified or otherwise fixed or required by order of the Court shall not be impaired by this Plan, the rights of the holders of such Claims as provided in such orders shall not be altered by this Plan. Any holder of any Claim in any Class may agree, pursuant to Bankruptcy Code section 1123(a)(4), to a treatment of such Claim that is less favorable (but not more favorable) than any other Claim in such Class.

Classes of Claims

Class 1 – Secured Tax Claims. This Class consists of all Allowed Secured Tax Claims for federal, state and local taxes. Each Allowed Claim in this Class shall be in a separate subclass. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Claim in this Class shall receive Cash payments totaling the Allowed Claim on the later of (a) the third (3rd) Business Day after the Effective Date; or (b) the date on which there is a Final Order allowing such Claim. The Debtor estimates that there will be no Allowed Class 1 Claims on the Effective Date.

Class 2 – DASNY Bond Claim. This Class consists of the amount of the Allowed DASNY Bond Claim as of the DASNY Payoff Date. On the DASNY Payoff Date, the Allowed DASNY Bond Claim shall be satisfied and paid in Cash in full by the Debtor or the Plan Administrator, as the case may be. The Debtor estimates that the Allowed DASNY Bond Claim

will be approximately $21,000,000 [1] on the Effective Date, unless such DASNY Bond Claim has been paid in Cash in full prior to the occurrence of the Effective Date.

Class 3 – Secured Lender Claims.  This Class consists of all Allowed Secured Lender Claims, including, but not limited to, the Resmac Claim, MIMO Claim, PBGC Claim and Union/Funds Claims, to the extent they are Allowed as Secured Claims.  Each Allowed Claim in this Class shall be in a separate subclass.  Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Secured Lender Claim will be satisfied by payment in Cash in full by the Plan Administrator on the later of (a) the third (3rd) Business Day after the Effective Date; or (b) the date on which there is a Final Order allowing such Claim.  The Debtor estimates that the Allowed Class 3 Claims will be approximately $12,650,000 on the Effective Date.  Notwithstanding any of the forgoing, consistent with the definition of Secured Lender Claims, to the extent the DASNY DIP Claim is not paid in Cash in full on the Effective Date as an Administrative Claim, the DASNY DIP Claim will also constitute an Allowed Secured Lender Claim.

Class 4 – Other Secured Claims.  This Class consists of all Allowed Secured Claims, other than Secured Lender Claims and the DASNY DIP Claim, and includes, but is not limited to, obligations to capital equipment lessors or other holders of Secured Claims.  Each Allowed Claim in this Class shall be in a separate subclass.  Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Claim in this Class will be satisfied by: (a) the return of the property subject to the senior, perfected and indefeasible lien or security interest; or (b) the payment of any amounts owed by Dervaal as assignee pursuant to the Primary Asset Sale.  Any difference with respect to the amount of a Class 4 Claim and the fair

---

[1] The precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted.

market value of the equipment shall constitute an Unsecured Deficiency Claim, which Claim shall be classified as a Class 6 Claim. The Debtor estimates that there will be approximately $0 in Allowed Claims in Class 4.

Class 5 – Unsecured Priority Claims. This Class consists of all Allowed Unsecured Priority Claims that are specified as having priority in Bankruptcy Code sections 507(a)(4) and 507(a)(5), if any such Claims still exist as of the Effective Date. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each Allowed Claim under Bankruptcy Code sections 507(a)(4) and 507(a)(5), which has not been satisfied as of the Effective Date, shall be paid in full in Cash on the later of: (a) the third (3rd) Business Day after the Effective Date or such other date the Plan Administrator deems appropriate; or (b) the date on which there is a Final Order allowing such Claim. The Debtor estimates that there will be approximately a total of $200,000 of Allowed Claims in Class 5.

Class 6 – Unsecured Claims. This Class consists of all Allowed Unsecured Claims, including, without limitation, Allowed Unsecured Claims arising from the rejection of executory contracts and unexpired leases and any Unsecured Deficiency Claims. Unless otherwise agreed by the holder of any Allowed Claim in this Class, each holder of an Allowed Unsecured Claim shall be entitled to receive Cash equal to such holder's pro rata share of Available Cash after the payment of (or after an adequate reserve having been made for the payment of) Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and the costs for administering the Plan (including all professional fees and expenses payable under the Plan), on the later of: (a) the third (3rd) Business Day after the Effective Date or as a soon as reasonably practicable thereafter as determined by the Plan Administrator; and (b) the date on which there is a Final Order allowing

such Claim. The Debtor estimates that, after post-Effective Date settlement and liquidation of the Allowed Unsecured Claims, there will be approximately $49,768,000 in Allowed Claims in Class 6.

Class 7 – Subordinated Claims. This Class consists of subordinated Claims under Bankruptcy Code section 510 against the Debtor. Subordinated Claims holders under Bankruptcy Code section 510 shall receive no distribution on account of such claims. The Debtor estimates that there will be no Allowed Class 7 Claims on the Effective Date.

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF PLAN

1.      Implementation. This Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in this Plan and the Confirmation Order.

2.      Funding for this Plan. This Plan will be funded from the proceeds of the Assets, including, but not limited to, the proceeds from the Primary Asset Sale, the proceeds of the sale of the Ancillary Real Estate, and the proceeds of the liquidation of any other Assets. With respect to the Assets that have not been converted to Cash, the Debtor or the Plan Administrator shall liquidate and convert into Cash the Assets (other than those Assets abandoned) and such Cash shall be distributed by the Plan Administrator in accordance with this Plan.

3.      Vesting of Assets in the Debtor. As of the Effective Date, pursuant to the provisions of Bankruptcy Code section 1141(b) and (c), all Assets shall vest in the post-Effective Date Debtor free and clear of all Claims, liens, encumbrances, charges, membership interests and other interests, except as otherwise expressly provided in this Plan or the Confirmation Order, and subject to the terms and conditions of this Plan and the Confirmation Order.

4.    Continuing Existence.  From and after the Effective Date, the Debtor shall continue in existence for the purposes of (i) winding up its affairs as expeditiously as reasonably possible, (ii) liquidating, by conversion to Cash, or other methods, all remaining Assets, as expeditiously as reasonably possible, (iii) enforcing and prosecuting claims, interests, rights and privileges of the Debtor, including, without limitation, the prosecution of Avoidance and Other Actions, (iv) resolving disputed Claims, (v) administering this Plan and (vi) filing appropriate tax returns.  All of the foregoing actions shall be taken by the Plan Administrator on behalf of the Debtor.

5.    Closing of the Debtor's Chapter 11 case.  When all disputed Claims filed against the Debtor have become Allowed Claims or have been disallowed, and all Assets have been liquidated and converted into Cash (other than those Assets abandoned), and such Cash has been distributed in accordance with this Plan, or at such earlier time as the Plan Administrator deems appropriate, the Plan Administrator shall seek authority from the Court to close the Debtor's Chapter 11 case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

6.    Corporate Action.    This Plan will be administered by the Plan Administrator and all actions taken under this Plan in the name of the Debtor shall be taken through the Plan Administrator.  Upon the distribution of all Assets pursuant to this Plan and the filing by the Plan Administrator of a certification to that effect with the Court (which may be included in the application for the entry of the final decree), the Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of Debtor or payments to be made in connection therewith, provided, however, that the Debtor may take appropriate action to dissolve under applicable law and provide for the appropriate disposition of any restricted charitable donations.  From and after the Effective Date,

the Debtor shall not be required to file any document, or take any action, to withdraw its business operations from any states where the Debtor previously conducted business.

7.  <u>Winding Up Affairs</u>.  Following the Effective Date, the post-Effective Date Debtor shall not engage in any business activities or take any actions, except those necessary to consummate this Plan and wind up the affairs of the Debtor.

8.  <u>Powers and Duties of the Plan Administrator</u>.  The Plan Administrator will act for the Debtor in a fiduciary capacity as applicable to a board of directors and shall be responsible for the liquidation of the Debtor's remaining Assets, administration of the Plan and wind-down of the Debtor and its Estate post-Effective Date, subject to the provisions of this Plan.  The powers and duties of the Plan Administrator shall include:

(i)  the power to invest Cash in accordance with Bankruptcy Code section 345, and withdraw and make distributions of Cash to holders of Allowed Claims and pay taxes and other obligations owed by the Debtor or incurred by the Plan Administrator in connection with the wind-down of the Estate, from Available Cash in accordance with this Plan;

(ii)  subject to the approval of the Committee (which approval shall not be unreasonably withheld), the power to engage attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities;

(iii)  the authority to pay the fees and expenses of the attorneys, consultants, agents, employees and professional persons engaged by the Plan Administrator and the Committee and to pay all other expenses for winding down the affairs of the Debtor in each case in accordance with a wind-down budget, or as otherwise agreed to by the Plan Administrator or determined by the Court, and subject to the approval of the Committee (which approval shall not be unreasonably withheld);

(iv)  subject to the approval of the Committee (which approval shall not be unreasonably withheld), the power to dispose of, and deliver title to others of, or otherwise realize the maximum value of all the remaining Assets;

(v)  subject to the approval of the Committee (which approval shall not be unreasonably withheld), the power to object to, compromise (subject to the approval of the Court) and settle (subject to the approval of the Court) Claims;

(vi)  the authority to act on behalf of the Debtor in all adversary proceedings and contested matters (including, without limitation, any Avoidance and Other

Actions), then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and, subject to the approval of the Committee (which approval shall not be unreasonably withheld), to settle (subject to the approval of the Court), retain, dispute or enforce any claim and otherwise pursue actions involving Assets of the Debtor that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise waived or relinquished in this Plan;

(vii)    the power to implement and/or enforce all provisions of this Plan; and

(viii)    such other powers as may be vested in or assumed by the Plan Administrator pursuant to this Plan or Court Order or as may be necessary and proper to carry out the provisions of this Plan.

9.    Avoidance and Other Actions.  On and after the Effective Date, the Plan Administrator and Committee shall have the exclusive right to commence and to continue the prosecution of all Avoidance and Other Actions; provided, however, that, notwithstanding anything to the contrary in this Plan, the Committee shall continue to prosecute the Resmac Adversary Proceeding.  The Plan Administrator and the Committee shall not prosecute the same Avoidance and Other Actions.  The Plan Administrator and the Committee shall coordinate their efforts with respect to the prosecution of Avoidance and Other Actions so as to avoid any duplication of effort.  Except as otherwise set forth in this Plan, all Avoidance and Other Actions shall survive confirmation and the commencement and/or prosecution of Avoidance and Other Actions shall not be barred or limited by any estopppel, whether judicial, equitable or otherwise. In reviewing the Disclosure Statement and this Plan, and in determining whether to vote for or against this Plan, Creditors (including parties that received payments or transfers from the Debtor within ninety (90) days prior to the Petition Date and insiders that received payments or transfers from the Debtor within one (1) year prior to the Petition Date) and other parties should consider that Avoidance and Other Actions may exist against them, that, except as otherwise set forth in this Plan, this Plan preserves all Avoidance and Other Actions, and that this Plan authorizes the Plan Administrator and the Committee to prosecute same.

10.    Corporate Documents, Employment Related Agreements and Compensation Programs.

Agreements, Instruments, and Documents.    All organizational agreements, charter documents, instruments, and documents required under this Plan to be executed or implemented, together with such others as may be necessary, useful or appropriate in order to effectuate this Plan shall be executed on or before the Effective Date or as soon thereafter as is practicable.

Prepetition Employment Agreements and Compensation Programs.    As of the Effective Date, with the exception of the collective bargaining agreements, all employment, severance, retirement, indemnification, employee benefit, profit-sharing and related plans or agreements, whether or not qualified under ERISA, health care plans, disability plans and incentive plans, that were in effect on the Petition Date and that have not previously been terminated or superseded shall be terminated and deemed rejected.    All employees currently employed by the Debtor under such agreements as of the Effective Date shall be terminated thereon.

Corporate Action.    All matters provided under this Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further action by directors of the Debtor.

11.    Plan Distributions.    All Cash necessary for the Plan Administrator to make payments pursuant to this Plan shall be obtained from the Primary Asset Sale, the sale of the Ancillary Real Estate, Available Cash, the HEAL IV Award and the remaining Assets.

12.     Preservation of Avoidance and Other Actions.   Except as otherwise provided in this Plan, the Plan Administrator and Committee shall retain and hold all rights on behalf of the Debtor, the Estate, and post-confirmation Estate, to any and all Avoidance and Other Actions, rights and causes of action that they or the Estate may hold against any entity or Person; provided, however, that, notwithstanding anything to the contrary in this Plan, the Committee shall continue to prosecute the Resmac Adversary Proceeding.   The Plan Administrator and the Committee shall not prosecute the same Avoidance and Other Actions. The Plan Administrator and the Committee shall coordinate their efforts with respect to the prosecution of Avoidance and Other Actions so as to avoid any duplication of effort.  Except as otherwise set forth in this Plan, all Avoidance and Other Actions shall survive confirmation and the commencement and/or prosecution of Avoidance and Other Actions shall not be barred or limited by any estopppel, whether judicial, equitable or otherwise.

13.     Bar Date for Certain Fee Claims.   Each Person retained or requesting compensation in these Cases, pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and/or 1103, must file with the Court an application for allowance of such Claims ("Fee Claims") within sixty (60) days after the Effective Date.  All such Fee Claims for which an application is not timely filed shall be forever barred.  Objections to each such application may be filed in accordance with the Bankruptcy Rules.  The Court shall determine all such Fee Claims.

14.     Professional Fee Reserve.  Two (2) Business Days after the Confirmation Date, each Professional shall provide the Debtor with estimates of all fees and disbursements that will be incurred by each Professional up to and including the Effective Date, which estimates shall be updated by an additional estimate provided to the Debtor one (1) Business Day prior to

the Effective Date. The Debtor and Plan Administrator, as applicable, shall reserve, in an escrow account held by a reputable escrow agent, the aggregate amount of these estimates and no liens shall attach to said proceeds to the extent of unpaid Allowed Fee Claims of the Professionals, including, but not limited to, unpaid holdbacks until such fees are paid. The balance of the funds in the Professional Fee Reserve, after the payment of all final Allowed Fee Claims of the Professionals, shall be returned to the Debtor and shall constitute Available Cash and shall be distributed by the Plan Administrator in accordance with this Plan.

15. <u>Bar Date for Other Administrative Claims</u>. Unless this Plan or the Court fixes a different date, with the exception of Fee Claims, must be filed no later than thirty (30) days after the Effective Date. All such Claims not timely filed shall be forever barred. The Debtor, the Plan Administrator or any other party in interest may object to the allowance of any such Claim filed before, on, or after the Effective Date.

16. <u>Further Authorization</u>. The Debtor or the Plan Administrator shall be entitled to seek such orders, judgments, injunctions and rulings from the Court, in addition to those specifically listed in this Plan, as may be necessary to carry out the intentions and purposes, and to give full effect to the provisions of this Plan. The Court shall retain jurisdiction to enter such orders, judgments, injunctions and rulings.

**ARTICLE V**

**PLAN ADMINISTRATOR**

1. <u>Appointment of the Plan Administrator</u>. The Confirmation Order shall provide for the appointment of the Plan Administrator. The Plan Administrator shall be responsible for the liquidation of the Debtor's remaining Assets, administration of the Plan and the wind-down of the Debtor and its Estate post-Effective Date. The Debtor shall file notice of appointment of the Plan Administrator and the Plan Administrator's hourly rate on or before

August 1, 2008.  The Plan Administrator shall be a third-party non-affiliate of the Debtor with sufficient expertise and experience liquidating a Chapter 11 case.  The compensation of the Plan Administrator shall be at the Plan Administrator's customary hourly rate.  The payment of the Plan Administrator's compensation shall be subject to the review and approval of the Committee. The Plan Administrator shall be deemed the Estate's representative in accordance with Bankruptcy Code section 1123 and shall have all powers, authority and responsibilities specified in this Plan, including, without limitation, the powers of a trustee under Bankruptcy Code sections 704 and 1106.

2. <u>Employment of Professionals</u>.  The Plan Administrator is authorized, without further order of the Court, but subject to the approval of the Committee, to employ such Persons, including Professionals, as the Plan Administrator may deem necessary to enable it to perform its functions hereunder.  Such Persons shall be compensated and reimbursed for their reasonable and necessary fees and out-of-pocket expenses on a monthly basis from the Debtor's Estate without further notice, hearing or approval of the Court, subject to the approval of the Committee.

3. <u>Exemption from Certain Taxes</u>.  Pursuant to Bankruptcy Code section 1146(a), all transactions, including the transfers described herein, and the delivery and recordation of any instrument, under, in furtherance of, or in connection with this Plan shall not be subject to any stamp tax, real estate transfer tax or similar transfer fee or tax.

4. <u>Resignation, Death or Removal of the Plan Administrator</u>.  The Plan Administrator may resign at any time upon not less than thirty (30) days' written notice to the Debtor and the Committee.  The Plan Administrator may be removed at any time by the Committee for cause upon application to the Court on five (5) days' written notice to the Plan

Administrator. In the event of resignation, removal, death or incapacity of the Plan Administrator and thereupon the successor Plan Administrator, without further act, shall become fully vested with all of the rights, powers, duties and obligations of his predecessor. No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors.

5.     No Agency Relationship. The Plan Administrator shall not be deemed to be the agent of any of the holders of Claims in connection with the funds held or distributed pursuant to this Plan. The Plan Administrator shall not be liable for any mistake of fact or law or error in judgment or any act or omission of any kind unless it constitutes gross negligence or willful misconduct or breach of fiduciary duty on the part of the Plan Administrator. The Plan Administrator shall be indemnified and held harmless, including the cost of defending such claims and attorneys' fees in seeking indemnification, by the Estate against any and all claims arising out of his duties under the Plan, except to the extent his actions constituted gross negligence or willful misconduct or breach of fiduciary duty. The Plan Administrator may conclusively rely, and shall be fully protected personally in acting upon any statement, instrument, opinion, report, notice, request, consent, order, or other instrument or document which he believes to be genuine and to have been signed or presented by the proper party or parties. The Plan Administrator may rely upon information previously generated by the Debtor and such additional information provided to him by former employees of the Debtor.

6.     Plan Administrator's Bond. The Plan Administrator shall obtain a bond in an amount equal to 110% of Available Cash.

# ARTICLE VI

# CONDITIONS PRECEDENT

1.      Conditions to Confirmation.  Confirmation of this Plan shall not occur and the Court shall not enter the Confirmation Order unless all of the requirements of the Bankruptcy Code for Confirmation of this Plan with respect to the Debtor shall have been satisfied.  If Confirmation shall not occur, this Plan shall be null and void and shall have no force nor effect, and this Plan shall be deemed withdrawn unless the Court shall have entered all orders (which may be orders included within the Confirmation Order) required to implement this Plan.

2.      Waiver and Nonfulfillment of Conditions to Confirmation.  In the event that the Debtor determines that the conditions to confirmation which it may waive cannot be satisfied and should not, in its sole discretion, be waived, the Debtor may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

3.      Confirmation Order Provisions for Pre-Effective Date Actions.  The Confirmation Order shall empower and authorize the Debtor to take or cause to be taken, prior to the Effective Date, all actions which are necessary to enable it to implement the provisions of this Plan and satisfy all other conditions precedent to the effectiveness of this Plan.

4.      Conditions to Effective Date.  The Effective Date shall not occur unless: (a) the Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and the Committee, which shall have become a Final Order; (b) no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made and still be pending; (c) the Primary Asset Sale Closing Date shall have occurred; and (d) the sale of the Ancillary Real Estate shall have closed.

5.      Nonfulfillment of Conditions to Effective Date.  In the event that the Debtor determines that the conditions to the Effective Date set forth in the immediately

foregoing paragraph of this Plan cannot be satisfied, the Debtor may propose a new plan, may modify this Plan as permitted by law, or may request other appropriate relief.

6.      Effective Date Events.  On the Effective Date, the following actions shall have taken place: (a) all payments to be made on the Effective Date and all other actions to be taken on or before the Effective Date pursuant to this Plan by the Debtor shall be made or taken or duly provided for; (b) any documents, including orders or agreements, necessary to implement this Plan as of the Effective Date must be executed; and (c) all other events and actions specified in this Plan to occur on the Effective Date.

## ARTICLE VII

## EFFECTS OF PLAN CONFIRMATION

1.      Satisfaction of Claims.  Holders of Claims shall receive the distributions provided for in this Plan, if any, in full settlement and satisfaction of all such Claims, and any interest accrued thereon.

2.      Releases.  Except as otherwise specifically provided in this Plan, (a) the Debtor, together with its current and prior officers and directors and their respective agents, counsel and advisors (all in their respective capacities as such); and (b) the Committee, together with its current and prior members (solely in their capacity as members of the Committee), agents, counsel and advisors, and their respective employees, officers, directors, and their respective agents, advisors and counsel (all in their respective capacities as such) (collectively, the "Plan Releasees"), are released and discharged from any and all claims, obligations, rights, causes of action and liabilities relating to the Debtor, the Other Debtors, these Chapter 11 Cases, the formulation, negotiation, preparation, confirmation, implementation and administration of this Plan or any consent, action, omission, transaction or business dealing from and after the Petition Date and prior to the Effective Date; provided, however, that this Plan Releasees shall

not be released from claims arising under (a) the Internal Revenue Code, or any state, city or municipal tax code; (b) the environmental laws of the United States, any state, city or municipality; (c) any criminal laws of the United States, any state, city or municipality; (d) this Plan; or (e) actions related to willful misconduct, gross negligence, misuse of confidential information that causes damages, breach of fiduciary duty and ultra vires acts. Any of the foregoing parties in all respects shall be entitled to rely on the advice of counsel with respect to any of the foregoing. With respect to Plan Releasees that are attorney Professionals, such Professionals shall not be released from any violations of the Code of Professional Responsibility. From and after the Effective Date, except as otherwise provided under this section, all holders of Claims or membership and other interests in the Debtor shall be permanently enjoined from commencing or continuing in any manner any suit, action or other proceeding, on account of or respecting, any Claim or membership or other interest in the Debtor.

3. <u>Releases By the Debtors and Holders of Claims</u>. Except as otherwise specifically provided by this Plan, for good and valuable consideration, including the services and agreements to facilitate the expeditious reorganization of the Debtor, the implementation of the restructuring contemplated by this Plan, on and after the Effective Date, this Plan Releasees shall be deemed released by the Debtor, the Plan Administrator and holders of Claims and membership and other interests in the Debtor from any and all claims, obligations, rights, suits and causes of action whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, the Estate or such Person or entity would have been entitled to assert whether directly, indirectly, derivative or otherwise, based in whole or in part upon any action, omission, transaction, agreement, event, conduct or other

occurrence taking place on or before the Effective Date in any way relating or pertaining to or dealings in connection with the Debtor, its officers (in their capacity as such), directors (in their capacity as such) and shareholders (in their capacity as such), the Estate or these Cases; provided, however, that nothing in this section shall constitute a release of any party from Claims arising under (a) the Internal Revenue Code, or any state, city or municipal tax code; (b) the environmental laws of the United States, any state, city or municipality; (c) any criminal laws of the United States, any state, city or municipality; and (d) actions related to willful misconduct, gross negligence, misuse of confidential information that causes damages, breach of fiduciary duty and ultra vires acts.  With respect to releases of attorney professionals, such professionals shall not be released from any violations of the Code of Professional Responsibility.

        4.     <u>Prior Directors and Officers</u>.  Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall release any entity or Person who served prepetition in the capacity of director, officer or trustee of the Debtor and was removed, voluntarily resigned from or otherwise vacated their position as director, officer or trustee with Debtor within the six (6) months prior to the Petition Date from liability arising from any action or inaction in such capacity for any pending or potential cause of action, claim, obligation, right, suit and/or cause of action whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtor, the Committee, Plan Administrator, the Estate or such other Person or entity would be entitled to assert whether directly, indirectly, derivative or otherwise.

        5.     <u>Abandoned Property</u>.  Any and all property whose abandonment is or has been approved by the Court pursuant to the Bankruptcy Code shall remain abandoned forever; shall not thereafter be deemed to be property of the Debtor or the Plan Administrator; shall not at

any time re-vest in the Debtor, and shall not otherwise, whether by conveyance or otherwise, ever become the property of the Debtor or its Estate.

6.      <u>Post-Effective Date Effect of Evidences of Claims</u>.  Notes, shareholder certificates, and other evidences of liens or Claims against the Debtor shall, effective upon the Effective Date, represent only the right to participate in the distributions or rights, if any, contemplated by this Plan.

7.      <u>Surrender of Instruments and Release of Liens</u>.  Except as otherwise provided in this Plan or the Confirmation Order, each holder of an instrument evidencing a Claim against the Debtor or any of the property of the Debtor shall surrender such instrument to the Debtor or Plan Administrator, as applicable, and the Debtor or Plan Administrator shall distribute to the holder thereof the distributions provided for in this Plan.  No distribution under this Plan shall be made to or on behalf of any holder of such Claim unless and until such instrument is received or the non-availability of such instrument is established to the satisfaction of the Debtor or Plan Administrator, <u>provided</u>, <u>however</u>, that DASNY shall release its liens in accordance with the terms and conditions set forth in the DASNY Prepetition Loan Agreement. Each Person who is to receive distributions under this Plan in complete satisfaction of a Secured Claim shall not receive such distributions until such creditor executes the release of its liens (in recordable form if requested by the Plan Administrator) and delivers the release to the Plan Administrator.  Any such Person who fails to surrender such instrument or satisfactorily explain its non-availability or execute and deliver such release of liens within ten (10) days of the date such surrender, explanation, execution, or delivery as requested by the Plan Administrator shall be deemed to have no further Claim against the Debtor or property of the Debtor, shall not participate in any distribution under this Plan, and in such event upon motion of the Debtor

and/or the Plan Administrator accompanied by appropriate evidence of such failure by affidavit or otherwise, the Court may enter an order requiring the act to be done at the cost of such Person by the Debtor and providing that such act when so done shall have like effect as if done by such Person or any other appropriate order.

8.      Term of Stays.  Except as otherwise provided in this Plan, all injunctions and the stay provided for in the Debtor's Chapter 11 case pursuant to Bankruptcy Code section 362, shall remain in full force and effect until the Debtor's Chapter 11 case is closed.

Except as otherwise provided in this Plan, upon entry of the Confirmation Order, all Persons or entities who have held, hold, or may hold Claims or membership or other interests in the Debtor are permanently enjoined, on and after the Effective Date, with respect to all Claims and membership and other interests in the Debtor from (a) commencing, conducting or continuing in any manner, directly or indirectly, any proceeding of any kind against or affecting the Debtor, the Plan Releasees, the Plan Administrator, or their property, (b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any means or manner, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Plan Releasees, the Plan Administrator, or their property, (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Plan Releasees, the Plan Administrator, or their property, (d) asserting any right of setoff, directly or indirectly, against any obligation due the Debtor, the Plan Releasees, the Plan Administrator, or their property, except as contemplated or allowed by this Plan, the Bankruptcy Code, or applicable law, (e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan, (f) commencing, continuing or asserting in any manner any action or other proceeding of

any kind with respect to any Claims and causes of action which are extinguished or released pursuant to this Plan, and (g) taking any action to interfere with the implementation and consummation of this Plan.

9. <u>Post-Confirmation Date Employment and Payment of Professionals</u>. The Plan Administrator is authorized, without further order of the Court, to employ such persons, including professionals (which may include the Debtor's Professionals), as the Plan Administrator may deem necessary to enable it to perform its functions hereunder, subject to the approval of the Committee. Such persons, shall be compensated and reimbursed for their reasonable and necessary fees and out-of-pocket expenses on a monthly basis from the Debtor's estates without further notice, hearing or approval of the Court, subject to approval of the Committee.

10. <u>Retention of Jurisdiction</u>. Notwithstanding entry of the Confirmation Order or the Effective Date having occurred, the Court will retain jurisdiction to the fullest extent permitted by law, including jurisdiction to enter any orders or to take any action specified in this Plan, and including, without limitation, the following:

      (a)    To determine any motion, adversary proceeding, avoidance action, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

      (b)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

      (c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided in this Plan;

      (d)    To hear and determine objections to the allowance of Claims, whether Filed, asserted or made before or after the Effective Date, including, without limitation, to hear and determine objections to the classification of Claims and the allowance or disallowance of disputed Claims, in whole or in part;

(e)       To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)       To enter, implement, or enforce such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)       To issue injunctions, enter and implement other Orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order or any other Order of the Bankruptcy Court;

(h)       To hear and determine any application to modify this Plan in accordance with Bankruptcy Code section 1127, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any Order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)       To hear and determine all Professional Fee Claims;

(j)       To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, or any transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)       To take any action and issue such Orders as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein or in this Plan, or to maintain the integrity of this Plan following consummation;

(l)       To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)       To hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(n)       To enter a final decree closing the Debtor's Chapter 11 case;

(o)       To recover all assets of the Debtor and property of the Estate, wherever located; and

(p)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code, title 28 of the United States Code and other applicable law.

11.     <u>Continuation of the Committee</u>.  Until all distributions have been made to holders of Allowed Unsecured Claims pursuant to this Plan and the entry of a final decree closing the Debtor's Chapter 11 case, the Committee shall continue to exist and shall continue to exercise all of the rights and powers conferred upon it by the Bankruptcy Code and this Plan. Upon all distributions to holders of Allowed Unsecured Claims having been made pursuant to this Plan and the entry of a final decree closing the Debtor's Chapter 11 case, the Committee shall be deemed dissolved and shall have no further duties, powers, rights or responsibilities. Notwithstanding anything to the contrary in this Plan, the Committee shall continue to prosecute the Resmac Adversary Proceding.

12.     <u>Resignation and Vacancy on the Committee</u>.  If any creditor represented on the Committee shall assign its Claim or release the Debtor from the payment of the balance of its Claim, the member of the Committee representing that creditor shall be deemed to have resigned from the Committee.  In the event that a vacancy occurs on the Committee by reason of the death or resignation of a member, then with respect to any vacancy thereby created, the remaining members of the Committee may (i) fill the vacancy with the representative of another holder of an Allowed Unsecured Claim or (ii) reduce the size of the Committee to the number of the remaining Committee members.  If the Committee members elect the latter, then no Committee vacancy shall be deemed to exist.  The Committee shall function whether or not a vacancy exists.  In any event, no Person may be designated to serve on the Committee without notice having been given to the Plan Administrator.

13.     <u>Committee's Professionals</u>.     Subsequent to the Effective Date, the Committee shall have the power and authority to utilize the services of its counsel and financial

advisor as necessary to perform the duties of the Committee and to authorize and direct such Persons to act on behalf of the Committee in connection with any matter requiring its attention or action. The Debtor and its Estate shall be responsible for the payment of all reasonable and necessary fees and expenses of such counsel and financial advisor. The Plan Administrator shall pay the reasonable and necessary fees and expenses of the Committee's counsel and financial advisor without the need for Court approval.

14. <u>Dismissal and Dissolution of the Other Debtors</u>. The Debtor and the Other Debtors believe that there are approximately $300,000 in claims against the Other Debtors, primarily representing tax claims against the Other Debtors. Upon review of such claims, the Debtor and the Other Debtors have determined these claims are invalid and should be disallowed. The Debtor and the Other Debtors intend to move to have these claims expunged and disallowed. By separate motion returnable upon the date of the Confirmation Hearing, the Debtor and the Other Debtors will request that the Court enter an order dissolving Victory Memorial Ambulance and Victory Memorial Pharmacy, and dismissing their respective Chapter 11 cases. Upon the dissolution of the Other Debtors, all remaining assets of the Other Debtors shall be deemed transferred to the Debtor and shall be liquidated and distributed in accordance with this Plan.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

1. <u>Executory Contracts and Unexpired Leases</u>. With the exception of the collective bargaining agreements, the executory contracts and unexpired leases designated for assumption pursuant to Bankruptcy Code section 365(a) by separate motion in connection with the Primary Asset Sale or the sale of the Ancillary Real Estate, each executory contract or unexpired lease of the Debtor that has not previously been rejected by the Debtor is deemed

rejected as of the Confirmation Date, subject to the occurrence of the Effective Date, <u>provided</u>, <u>however</u>, in the event that either the Primary Asset Sale or the sale of the Ancillary Real Estate fail to close for any reason, the Debtor reserves its right to subsequently seek rejection of any executory contracts or unexpired leases previously designated for conditional assumption pursuant to either the Primary Asset Sale or the sale of the Ancillary Real Estate. Prior to the Effective Date, the Debtor shall provide the non-debtor parties to any executory contract or unexpired lease, or any transferee enumerated on the 3001(e) list of transferred Claims with respect thereto, notice that it intends to reject such executory contract or unexpired lease on the Effective Date.

Buyer or Operator (as defined in the APA) shall be responsible for the cure amounts related to their respective assigned contracts, if any, upon their respective closing date. Nothing in any attachment thereto or any document executed or delivered in connection therewith, shall be deemed to create any obligation or liability with respect to any executory contract or unexpired lease on the part of the Debtor or other Person that is not presently liable thereon.

2.      <u>Rejection Damages</u>.  Any Claim for damages arising from the rejection of an executory contract or unexpired lease under this Plan, must be filed with the Court and served upon the Debtor within thirty (30) days after the mailing of notice of entry of the Confirmation Order or such other deadline established by the Court. Any Claim arising from the rejection of an executory contract or unexpired lease not filed within such time will be forever barred from receiving any distribution under this Plan or asserting any Claims against the Debtor, the Estate or the Plan Administrator.

3. <u>Claims Arising from Certain Judgments</u>. A Claim that arises in favor of an entity as a result of a judgment entered against the Debtor after the Petition Date for the recovery of money or property must be filed within thirty (30) days after the later of (a) the date the judgment becomes final or (b) the mailing of the notice of Confirmation hearing.

4. <u>Objections to Claims</u>. The Plan Administrator and/or the Committee may object to the allowance of any Claim on or after the Effective Date of this Plan. As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date, the Plan Administrator and/or the Committee may object to the allowance of any Claim. The foregoing deadline may be extended by the Court upon request of the Plan Administrator or Committee upon notice to the Plan Administrator, the Committee, ASM, and such other parties as shall request such notice after the confirmation of this Plan. Nothing contained herein, however, shall limit the right of the Plan Administrator or the Committee to object to Claims, if any, filed or amended after the Effective Date.

5. <u>Distributions Under this Plan</u>. Except as otherwise provided in this Plan, in the Confirmation Order, or in any Order of the Court in aid of consummation of this Plan, the following provisions shall govern distributions pursuant to this Plan:

<u>Provisions for Distributions Pending Determination of Certain Claims for Income Taxes</u>. Notwithstanding any other provision of this Plan, and unless the Court orders otherwise, prior to making distributions on account of Allowed Claims other than Administrative Claims and Priority Tax Claims, the Plan Administrator shall make adequate provision for the satisfaction of Claims for income taxes entitled to treatment as administrative expenses; <u>provided</u>, <u>however</u>, that unless otherwise ordered by a court, the Plan Administrator shall have no obligation to withhold funds, designate reserves, or make

other provisions for the payment of any Claims for taxes that have been disallowed by order of the Court.

No Distributions on Account of Claims That Have Not Become Allowed Claims. Notwithstanding any other provision of this Plan, no payment or distribution shall be made with respect to any Claim that has not become an Allowed Claim, except that the Plan Administrator may distribute consideration attributable to any undisputed portion of a Claim and withhold the remainder.

Reserves for Claims That Have Not Become Allowed Claims. Distributions on account of Claims that have not become Allowed Claims shall be governed by the following provisions:

(i) Except as otherwise provided under this Plan, the Debtor shall not be required to withhold funds or consideration, designate reserves, or make other provisions for the payment of any Claims that have been disallowed by a Final Order of the Court.

(ii) Except as otherwise provided in this Plan, the Debtor, or the Plan Administrator, as applicable, shall be required to reserve funds, designate reserves, or make other provisions for the payment of any Claims that have been disallowed by an order of the Court until such order becomes a Final Order.

(iii) With respect to Claims that have not become Allowed Claims and that are not governed by subparagraph (1) or subparagraph (2) above, the Plan Administrator, as applicable, shall reserve sufficient funds to allow for a distribution in accordance with the terms of this Plan, on account of the distribution attributable to such holders' Claims or as otherwise provided pursuant to any order of the Court with respect to the amount, if any, to be reserved; provided, however, that the Plan Administrator, as applicable, shall distribute consideration attributable to any undisputed portion and shall withhold and reserve the remainder. The Court may, after notice and a hearing (as defined in Bankruptcy Code section 102), fix a lesser amount than the distribution amount as the amount on account of which consideration shall be withheld. In the case of Claims not stating an amount, the Plan Administrator, or any holder of such Claims may request that the Court, after notice and a hearing (as defined in Bankruptcy Code section 102), determine an amount. Cash withheld pursuant to this subparagraph will be held in a segregated, interest-bearing fund or funds. Such Cash will be released when and if Claims are Allowed and disallowed and shall be distributed in accordance with this Plan.

<u>Persons Responsible for Distribution of Plan Consideration</u>.  The Plan Administrator shall disburse all consideration to be distributed under this Plan and shall act as a disbursing agent.

<u>Unclaimed Cash</u>.  If any Person entitled to receive Cash under this Plan cannot be located on the date a distribution under this Plan is due, such Cash will be set aside and held in a segregated, interest-bearing fund to be maintained by the Plan Administrator.  If such Person is located within one hundred and twenty (120) days of the date of distribution, such Cash, together with any interest earned thereon, will be paid to such Person.  If such Person cannot be located within one hundred and twenty (120) days of the date of distribution, any such Cash and accrued interest thereon shall be released to the Plan Administrator and distributed in accordance with this Plan.  Nothing contained in this Plan shall require the Plan Administrator to attempt to locate such Person.  It is the obligation of each Person claiming rights under this Plan to keep the Plan Administrator advised of their current address by sending written notice of any changes to the Plan Administrator.

<u>Unnegotiated Distribution Checks</u>.  Checks or drafts issued pursuant to this Plan to Persons holding Allowed Claims and not presented for payment within one hundred and twenty (120) days following mailing thereof to the last known address of such Person shall be deemed nonnegotiable thereafter.

<u>Fractional Dollars</u>.  Any other provision of this Plan notwithstanding, no payments of fractional dollars will be made to any holder of an Allowed Claim.  Whenever any payment of a fraction of a dollar to any holder of an Allowed Claim would otherwise be

called for, the actual payment made will reflect a rounding of such fraction to the nearest whole dollar (up or down).

Distribution Dates.  Whenever any distribution to be made under this Plan is due on a day other than a Business Day, such distribution will instead be made, without penalty or interest, on the next Business Day.  The Court shall retain power, after the Confirmation Date, to extend distribution dates for cause, upon motion and after notice and a hearing (as defined in Bankruptcy Code section 102) to affected parties.

Bankruptcy Code Sections 508, 509, and 510.  Distributions under this Plan will be governed by the provisions of Bankruptcy Code sections 508, 509 or 510 where applicable.

Distributions to be Applied First to Administrative and Priority Claims.  Any distribution under this Plan by the Plan Administrator on account of any Allowed Claim for which the Debtor is liable under any applicable law or order of the Court shall be applied by the recipient first to satisfy the DASNY Bond Claim, to the extent not already paid in Cash in full, and the DASNY DIP Claim, then to satisfy any Allowed Administrative Claims, Allowed Priority Tax Claims, or other Allowed Claims of the recipient against the Debtor which are entitled to priority under Bankruptcy Code sections 503 or 507 and, only after all such priority Claims are fully satisfied, to any Allowed Claims not entitled to such priority.

Orders Respecting Claims Distribution.  After confirmation of this Plan, the Court shall retain jurisdiction to enter orders in aid of consummation of this Plan with respect to distributions under this Plan and to resolve any disputes concerning distributions under this Plan.

Allocation. To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued and unpaid interest thereon, such distribution shall be allocated first to the principal amount of such Claim and then, to the extent the consideration exceeds the principal amount of such Claim, to accrued and unpaid interest.

6.      Setoffs. The Plan Administrator may, pursuant to and in accordance with Bankruptcy Code section 553 or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Claim, the claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim, provided that the Plan Administrator gives the holder of such Allowed Claim notice of the proposed setoff and the holder of such Allowed Claim does not object to the proposed setoff within thirty (30) days; provided further, however, if the holder of such Allowed Claim timely objects to the proposed setoff, the setoff may not be effectuated without prior approval of the Court; provided further, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Plan Administrator of any such claims, rights and causes of action that the Debtor may possess against such holder.

7.      Exemption from Transfer Taxes. Pursuant to Bankruptcy Code section 1146(a), the issuance, transfer or exchange of notes or equity securities under this Plan, the creation or amendment of any mortgage, deed of trust or other security interest, the making or assignment of any lease or the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with this Plan, and any sale of the Assets pursuant

thereto or in furtherance of or in connection therewith, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

8. <u>Limitation of Liability</u>.  Without limiting any other provision or term hereunder, the Debtor and its directors, officers, trustees, employees and professionals (acting in such capacity) and the Committee and its members, agents and professionals, shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of this Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken in connection with this Plan or these Chapter 11 Cases; <u>provided</u>, <u>however</u>, that the foregoing provisions shall have no effect on the liability of any entity from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

9. <u>Modification of Plan</u>.  The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify this Plan.

10. <u>Revocation of this Plan</u>.  The Debtor reserves the right to revoke or withdraw this Plan, prior to the Confirmation Date, for any reason deemed appropriate by the Debtors.  If the Debtor revokes or withdraws this Plan, or if confirmation does not occur, then this Plan shall be null and void in all respects and nothing contained in this Plan shall constitute a waiver or release of any claims by or against, the Debtor, or prejudice in any manner the rights of the Debtor.

11.    Successors and Assigns.    The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

12.    Notices.    All notices or requests in connection with this Plan shall be in writing and given by mail addressed to:

Victory Memorial Hospital
699 92nd Street
Brooklyn, NY  11228
Attn:   Vincent J. Calamia, M.D.

with copies to:

DLA Piper US LLP
1251 Avenue of the Americas
New York, NY  10020
Attn:   Timothy W. Walsh, Esq.

If to the Committee:

Alston & Bird LLP
90 Park Avenue
New York, NY 10016
Attn:   Martin G. Bunin, Esq.
        Craig E. Freeman, Esq.

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in these Cases.  Any such holder of a Claim may designate in writing any other address for purposes of this Section, which designation will be effective upon receipt by the Debtor.

13.    Headings.    The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

14.    Severability.    If, prior to confirmation, any term or provision of this Plan is held by the Court to be invalid, void or unenforceable, the Court shall have the power to alter and

interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

15. <u>Validity and Enforceability</u>.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Should any provision in this Plan be determined by the Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

16. <u>Plan Supplement</u>.  Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtor hereby reserves the right to file such a Plan Supplement.

17. <u>Governing Law</u>.  Unless a rule of law or procedure by federal law (including the Bankruptcy Code and Bankruptcy Rules) governs, or except if an exhibit, schedule or document in this Plan Supplement provides otherwise, the rights, duties and obligations under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State without giving effect to the principles of conflict of law thereof.

18.    Request for Confirmation Pursuant to Bankruptcy Code Sections 1129(a)

and 1129(b).  The Debtor requests entry of a Confirmation Order under Bankruptcy Code section

1129(a) and, to the extent necessary, Bankruptcy Code section 1129(b).


Dated:    July 3, 2008
          Brooklyn, New York

                              Respectfully submitted,

                              **VICTORY MEMORIAL HOSPITAL**

                              By:    /s/ Vincent J. Calamia
                                     Vincent J. Calamia, M.D.
                                     Chief Executive Officer

# EXHIBIT 2

## Distribution Analysis

(this page has been intentionally left blank)

**Victory Memorial Hospital and Subsidiaries**
**Analysis of Assets Available for Distribution** [1]
*($000's omitted)*

| | NOTES | April 30, 2008 [2] | High Recovery % | High Recovery $ | Low Recovery % | Low Recovery $ |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash & cash equivalents | | $3,043 | 100% | $3,043 | 100% | $3,043 |
| Cash held in Trust-Agency accounts patient trust funds | 3 | 181 | 100% | 181 | 100% | 181 |
| Cash held in Trust-Agency accounts medical department trust funds | 3 | 36 | 100% | 36 | 100% | 36 |
| Assets, whose use is limited, Current: | | | | | | |
| Medical malpractice self-insurance trust fund | 3 | 210 | 100% | 210 | 100% | 210 |
| | | 3,470 | | 3,470 | | 3,470 |
| Accounts receivable, net | | | | | | |
| Patient care receivables, net | 4 | 11,901 | 70% | 8,331 | 40% | 4,761 |
| Third-party payor receivables | 5 | 2,450 | 0% | | 0% | |
| Inventories of materials & supplies | 6 | 1,064 | 30% | 319 | 20% | 213 |
| Prepaid expenses & other assets | 7 | 919 | 0% | | 0% | |
| Total current assets | | 19,805 | | 12,121 | | 8,444 |
| Assets limited as to use, noncurrent: | | | | | | |
| Depreciation reserve fund | 8 | 411 | 0% | | 0% | |
| Property, buildings and equipment, net | | | | | | |
| Land/Building-Main Hospital, SNF & LTHHC Licenses | | | 100% | 44,900 | 100% | 44,900 |
| Land/Building-Ancillary Real Estate | | | 75% | 7,100 | 75% | 5,200 |
| Total Proceeds from Sale of Property | | | | 52,000 | | 50,100 |
| Holy Family break-up fee | | | | (400) | | (400) |
| CIT broker fee | | | | (525) | | (497) |
| Owned Equipment (Other than SNF Related) | | | | 500 | | - |
| Total property, buildings and equipment, net | 9 | 17,772 | | 51,575 | | 49,204 |
| HEAL Grant - Awarded | 10 | | | 25,000 | | 21,000 |
| Avoidance Actions | 11 | | | TBD | | TBD |
| **Total Assets** | | **$37,988** | | **$88,696** | | **$78,647** |
| Estimated costs to wind down | 12 | | | 10,710 | | 13,130 |
| **Net Assets Available for Distribution** | | | | **77,986** | | **65,517** |
| Secured Claims | 13 | | | 42,650 | | 52,021 |
| **Balance for Administrative and Priority Claims** | | | | **35,336** | | **13,496** |
| Administrative and Priority Claims | 14 | | | 12,058 | | 12,505 |
| **Balance Available for Unsecured Creditors** | | | | **23,277** | | **991** |
| Unsecured Nonpriority Claims | 15 | | | 49,768 | | 47,228 |
| **Estimated Realization % to Unsecured Creditors** | | | | 47% | | 2% |

**Victory Memorial Hospital and Subsidiaries**
**Analysis of Assets Available for Distribution** [1]
**Notes and Assumptions:**
*($000's omitted)*

The High and Low Scenario values of the Debtors' liabilities, costs and expenses are estimates, they are not binding on the Debtors or the Committee, the Debtors may change them at any time and the Committee may take the position that the amounts are lower or higher than stated at any time.

1   This analysis assumes that the property sale closing and sale and transfer of SNF and LTHHCP operations occur on September 30, 2008.

2   Recoveries based on Debtors' books and records as reported at April 30, 2008.

3   Assets held in trust may be offset by the liability on the Debtors' books and records.  At April 30, 2008, the total reported assets and liabilities were $427.

4   Accounts receivable amounts are assumed to be net of any estimated uncollectible amounts and reserves.  Collectible values are determined by payor types, aging and history with payor and are net of estimated collection costs.

5   Estimated amounts due from Third Parties represent balances due from Medicare/Medicaid pertaining to prior periods and consist primarily of Disproportionate Share Payments, prospective adjustments and other items.
    Third party receivables are offset against the unsecured third party payable liabilities.

6   Inventory recovery value is estimated to be 20% to 30% of book value.

7   Prepaid expenses and other assets consist of vendor and utility deposits and are assumed to be offset against claims.

8   The Depreciation Reserve Fund is assumed to be netted against the DASNY Bond Claim obligation, decreasing the secured claim.

9   Real property values are based on the following:

    The existing signed Asset Purchase Agreement with Dervusal includes the $44,900 purchase price for the main campus and acquired business.
    An immaterial amount of the purchase price is attributable to certain equipment used in connection with the SNF and LTHHC programs.  If leased equipment is not assumed by
    Dervual, then the leases will be rejected and rejection claims will be unsecured.
    There is no discount applied in the Low Scenario, however, if the sale to Dervual does not close as planned the ultimate sale price realized could be significantly lower.
    Estimated realization values of the Ancillary Real Estate are estimated to be $7,100 in the High Scenario.
    Break-up fees due to Holy Family are $400.  Assuming a September 2008 closing date, projected broker fees due to CIT are $525 and $328, in the High and Low Scenario, respectively.

10  The $25,000 HEAL grant to the Debtor has been approved.  The contract awarding the grant has not been finalized.
    The Low Scenario assumes that the HEAL grant is reduced to just the amount required to defease the DASNY Bond Claim estimated at $21.0M based on recent statements by the New York State Department of Health.
    The debtor and creditor committee contend that the full amount of the $25M HEAL Grant award is due.

11  Potential recoveries from avoidance actions have not been determined at this time.
    Gross potential preference actions total approximately $14,000.
    Therefore, the estimated available assets in this analysis exclude potential recoveries from avoidance actions.

**Victory Memorial Hospital and Subsidiaries**
**Analysis of Assets Available for Distribution** [1]
**Notes and Assumptions:**
**($000's omitted)**

12  The wind down of hospital operations commenced on September 1, 2007, with all hospital patients being fully discharged by June 30, 2008.  To the extent that approvals from the New York State Department of Health ("NYSDOH") are not timely received, or NYSDOH requires a longer time frame in which to wind down operations, the wind down period would be prolonged and the related costs would increase.  The sale of the Debtors' main campus and transfer of the SNF and LTHHCP operations is assumed to be completed by September 30, 2008.  Costs are comprised of the following:

| | High Recovery | Low Recovery |
|---|---|---|
| **Estimated Wind Down Costs** | | |
| Operating Losses | 6,379 (a) | 6,379 (a) |
| Restructuring Fees and Costs | 1,000 (b) | 1,500 (c) |
| Trustee Fees (3% of distributable assets) | - (d) | - (d) |
| Severance Costs | 2,331 (e) | 2,331 (e) |
| Medical Records Retention | 1,000 (f) | 1,000 (f) |
| Unemployment | - (g) | 1,920 (h) |
| **Net Wind Down Costs** | **$10,710** | **$13,130** |

(a)  Projected operating losses for the five months ended September 30, 2008, including professional fees of approximately $2,800.
(b)  Assumes payment of US Trustee and professional fees incurred post-confirmation.
(c)  Increase in Low Scenario due to potential delay in wind-down completion and confirmation.
(d)  Trustee costs not applicable in Chapter 11 liquidation.
(e)  Assumes severance paid out to all employees.  Subject to court approval.
(f)  Amount assumed for storage of all hospital records.
(g)  Assumes that Debtors are not responsible for unemployment insurance payments.
(h)  Assumes payment of $400 or 400 employees for 12 weeks.

13  Secured Claims reflect obligations at April 30, 2008.  All debt payments assumed in operating cash loss in wind down calculation.  Secured claims are estimated as follows:

| | High Recovery | Low Recovery |
|---|---|---|
| DASNY Bond Claim | $21,000 (a) | $21,000 (a) |
| DASNY DIP Loan | 9,000 (b) | 9,000 (b) |
| Madison Realty | - (c) | 6,861 (d) |
| Maimonides | 4,250 (d) | 5,250 |
| PBGC Note | 5,800 (e) | 5,800 (e) |
| 1199 | 2,600 (f) | 4,110 (f) |
| **Total Secured Claims** | **$42,650** | **$52,021** |

(a)  As of April 30, 2008 the estimated amount of the DASNY Mortgage is $19,846.  However, while the precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted, the DASNY Bond Claim may be as high as $21,000.
(b)  Projected DASNY DIP loan obligation.
(c)  Secured status subject to dispute.  If not secured, then it will be unsecured.
(d)  Interest expense estimated based on assumed 24% interest rate in low recovery scenario.
(e)  A settlement agreement with PBGC has been reached in the amount of $5.8M, which is subject to bankruptcy court approval.
(f)  Debtors may have certain defenses to all or part of this claim as well as to the status as a secured creditor.

**Victory Memorial Hospital and Subsidiaries**
**Analysis of Assets Available for Distribution** [1]
**Notes and Assumptions:**
*($000's omitted)*

14  Administrative and Priority Claims have been estimated as follows:

| | High Recovery | Low Recovery |
|---|---|---|
| Accounts payable and accrued expenses | $6,626 (a) | $6,626 (a) |
| Less: Prepaid Asset Offset | (459) (b) | (230) (b) |
| Net Accounts payable and accrued expenses | 6,167 | 6,396 |
| Accrued salaries and expenses | 1,768 (a) | 1,768 (a) |
| Accrued benefits | 2,279 (a) | 2,279 (a) |
| Estimated liability for medical malpractice claims | 1,845 (a) | 1,845 (a) |
| Patient Trust Funds | - (c) | 181 (d) |
| Medical Department Trust Funds | - (c) | 36 (d) |
| **Total Administrative and Priority Claims** | **$12,058** | **$12,505** |

(a)  As reported by the Debtors at April 30, 2008.
(b)  Assumes offset of 50% of Prepaids in High Scenario, 25% in Low Scenario, with the balances being applied to Unsecured Nonpriority Claims.
(c)  Assumes valid claims for trust funds do not exist.
(d)  Assumes valid claims for trust funds do exist.
(e)  Assumes filed Priority status denied.  If not Priority, then it will be an Unsecured Nonpriority Claim.

15  Unsecured Nonpriority Claims have been estimated as follows:

| | High Recovery | Low Recovery |
|---|---|---|
| Prepetition A/P (Trade / Other) | $24,848 (a) | $24,848 (a) |
| Less: Prepaid Asset Off-set | (459) (b) | (689) (b) |
| Net Prepetition A/P (Trade / Other) | 24,389 | 24,159 |
| Madison Realty | 5,977 (c) | - |
| Medical Malpractice | 5,642 (d) | 5,642 (d) |
| Third Party Liabilities | 6,710 (d) | 8,010 (e) |
| Less: Due from Third Parties | (2,450) | (2,450) |
| Third Party Liabilities, net | 4,260 | 5,560 |
| Employee | (g) | 3,705 |
| Other (First Hrs., Modern Med., J&J, etc.) | 2,026 (h) | 2,026 (h) |
| DASNY Note - Restr. Pool | 1,860 | 1,860 |
| Maimonides | 2,070 | 1,070 |
| 1199 | 2,507 (f) | 997 |
| Accrued benefits, unsecured | 800 | 800 |
| Capital Leases | 238 | 238 |
| Capital Lease Rejection Claims | - | 1,172 |
| **Total Unsecured Nonpriority Claims** | **$49,768** (i) | **$47,228** (i) |

(a)  As filed and/or scheduled.
(b)  Assumes balance of Prepaids not being offset against Administrative and Priority Claims
(c)  Interest expense estimated based on assumed 12% interest rate in high recovery scenario
(d)  As reported at April 30, 2008
(e)  Assumes mid-point of books and records and filed claims
(f)  Amount assumes $1,510 secured claim and $997 priority claim are deemed unsecured
(g)  Former senior management severance claims, which may be subordinated.
(h)  As filed
(i)  Claims are currently subject to reconciliation and possible claims objections.  As a result, the universe of Unsecured Nonpriority Claims may be reduced.

# EXHIBIT 3

# Liquidation Analysis

(this page has been intentionally left blank)

**Victory Memorial Hospital and Subsidiaries**
**Liquidation Analysis**[1]
*($000's omitted)*

| Assets | NOTES | April 30, 2008[2] | Liquidation Analysis % | $ |
|---|---|---|---|---|
| Cash & cash equivalents | | $3,043 | 100% | $3,043 |
| Cash held in Trust-Agency accounts patient trust funds | 3 | 181 | 100% | 181 |
| Cash held in Trust-Agency accounts medical department trust funds | 3 | 36 | 100% | 36 |
| Assets, whose use is limited, Current: | | | | |
| Medical malpractice self-insurance trust fund | 3 | 210 | 100% | 210 |
| | | 3,470 | | 3,470 |
| Accounts receivable, net | | | | |
| Patient care receivables, net | 4 | 11,901 | 40% | 4,761 |
| Third-party payor receivables | 5 | 2,450 | 0% | |
| Inventories of materials & supplies | 6 | 1,064 | 20% | 213 |
| Prepaid expenses & other assets | 7 | 919 | 0% | |
| Total current assets | | 19,805 | | 8,444 |
| Assets limited as to use, noncurrent: | | | | |
| Depreciation reserve fund | 8 | 411 | 0% | |
| Property, buildings and equipment, net | | | | |
| Land/Building-Main Hospital, SNF & LTHHC Licenses | | | | 33,675 |
| Land/Building-Ancillary Real Estate | | | | 5,200 |
| Total Proceeds from Sale of Property | | | | 38,875 |
| Holy Family break-up fee | | | | (400) |
| CIT broker fee | | | | (328) |
| Owned Equipment (Other than SNF Related) | | | | - |
| Total property, buildings and equipment, net | 9 | 17,772 | | 38,147 |
| HEAL Grant - Awarded | 10 | | | - |
| Avoidance Actions | 11 | | | TBD |
| **Total Assets** | | **$37,988** | | **$46,591** |
| Estimated costs to wind down | 12 | | | 14,528 |
| **Net Assets Available for Distribution** | | | | **32,063** |
| Secured Claims | 13 | | | 74,721 |
| **Balance for Administrative and Priority Claims** | | | | **(42,658)** |
| Administrative and Priority Claims | 14 | | | 12,735 |
| **Balance Available for Unsecured Creditors** | | | | **(55,393)** |
| Unsecured Nonpriority Claims | 15 | | | 50,390 |
| **Estimated Realization % to Unsecured Creditors** | | | | **0%** |

**Victory Memorial Hospital and Subsidiaries**
**Liquidation Analysis**
**Notes and Assumptions:**
**($000's omitted)**

The High and Low Scenario values of the Debtors' liabilities, costs and expenses are estimates, they are not binding on the Debtors or the Committee, the Debtors may change them at any time and the Committee may take the position that the amounts are lower or higher than stated at any time.

1  This analysis assumes that the property sale closing and sale and transfer of SNF and LTHCP operations occur on September 30, 2008.

2  Recoveries based on Debtors' books and records as reported at April 30, 2008.

3  Assets held in trust may be offset by the liability on the Debtors' books and records.  At April 30, 2008, the total reported assets and liabilities were $427.

4  Accounts receivable amounts are assumed to be net of any estimated uncollectible amounts and reserves.  Collectible values are determined by payor types, aging and history with payor and are net of estimated collection costs.

5  Estimated amounts due from Third Parties represent balances due from Medicare/Medicaid pertaining to prior periods and consist primarily of Disproportionate Share Payments, prospective adjustments and other items.
   Third party receivables are offset against the unsecured third party payable liabilities.

6  Inventory recovery value is estimated to be 20% of book value.

7  Prepaid expenses and other assets have no net realizable value to the Estate in a liquidation.

8  The Depreciation Reserve Fund is assumed to be netted against the DASNY Bond Claim obligation, decreasing the secured claim.

9  Real property values are based on the following:

   The existing signed Asset Purchase Agreement includes the $44,900 purchase price for the main campus and acquired business.
   An immaterial amount of the purchase price is attributable to certain equipment used in connection with the SNF and LTHHC programs.  If leased equipment is not assumed by
   Dervcall, then the leases will be rejected and rejection claims will be unsecured.
   A 25% discount is applied to conservatively estimate a sales price in the event the currently approved sale does not close as planned.
   Estimated realization values of the Ancillary Real Estate are estimated to be $5,200.
   Break-up fees due to Holy Family are $400.  Assuming a September 2008 closing date, projected broker fees due to CIT are $328.

10  The $25,000 HEAL grant to the Debtor has been approved.  The contract awarding the grant has not been finalized.

11  Potential recoveries from avoidance actions have not been determined at this time.
    Gross potential preference actions total approximately $14,000.
    Therefore, the estimated available assets in this analysis exclude potential recoveries from avoidance actions

**Victory Memorial Hospital and Subsidiaries**
**Liquidation Analysis**
**Notes and Assumptions:**
**($000's omitted)**

12  The wind down of hospital operations commenced on September 1, 2007, with all hospital patients being fully discharged by June 30, 2008.  To the extent that approvals from the New York State Department of Health ("NYSDOH") are not timely received, or NYSDOH requires a longer time frame in which to wind down operations, the wind down period would be prolonged and the related costs would increase.  The sale of the Debtors' main campus and transfer of the SNF and LTHCP operations is assumed to be completed by September 30, 2008.  Costs are comprised of the following:

|  | Liquidation |
| --- | --- |
| **Estimated Wind Down Costs** | |
| Operating Losses | 6,379 (a) |
| Restructuring Fees and Costs | 1,500 (b)(c) |
| Trustee Fees (3% of distributable assets) | 1,398 (d) |
| Severance Costs | 2,331 (e) |
| Medical Records Retention | 1,000 (f) |
| Unemployment | 1,920 (g) |
| **Net Wind Down Costs** | **$14,528** |

(a)  Projected operating losses for the five months ended September 30, 2008, including professional fees of approximately $2,800.

(b)  Assumes payment of US Trustee and professional fees incurred post-confirmation.

(c)  Increase in Liquidation due to potential delay in wind-down completion and confirmation.

(d)  In Chapter 7 liquidation, trustee fees are incurred in the amount of approximately 3% of total distributable assets.

(e)  Assumes severance paid out to all employees.  Subject to court approval.

(f)  Amount assumed for storage of all hospital records.

(g)  Assumes payment of $400 for 400 employees for 12 weeks.

13  Secured Claims reflect obligations at April 30, 2008.  All debt payments assumed in operating cash loss in wind down calculation.  Secured claims are estimated as follows:

|  | Liquidation |
| --- | --- |
| DASNY Bond Claim | $21,000 (a) |
| DASNY DIP Loan | 9,000 (b) |
| Madison Realty | 6,861 (c) |
| Maimonides | 5,250 |
| PBGC Note | 28,500 (d) |
| 1199 | 4,110 (e) |
| **Total Secured Claims** | **$74,721** |

(a)  As of April 30, 2008 the estimated amount of the DASNY Mortgage was $19,846.  However, while the precise amount of the DASNY Bond Claim cannot be determined until on or about the DASNY Payoff Date and a reconciliation of what is required to fully defease and redeem the DASNY Bonds is conducted, the DASNY Bond Claim may be as high as $21,000.

(b)  Projected DASNY DIP loan obligation.

(c)  Interest expense estimated based on assumed 24% interest rate in liquidation scenario.

(d)  A settlement agreement with PBGC has been reached in the amount of $5.8M, which is subject to bankruptcy court approval.

(e)  As filed.

**Victory Memorial Hospital and Subsidiaries**
**Liquidation Analysis**
*Notes and Assumptions:*
*($000's omitted)*

14  Administrative and Priority Claims have been estimated as follows:

|                                                    | Liquidation |
| -------------------------------------------------- | ----------- |
| Accounts payable and accrued expenses              | $6,626 (a)  |
| Accrued salaries and expenses                      | 1,768 (a)   |
| Accrued benefits                                   | 2,279 (a)   |
| Estimated liability for medical malpractice claims | 1,845 (a)   |
| Patient Trust Funds                                | 181 (b)     |
| Medical Department Trust Funds                     | 36 (b)      |
| **Total Administrative and Priority Claims**       | **$12,735** |

    (a) As reported by the Debtors at April 30, 2008.
    (b) Assumes valid claims for trust funds do not exist.

15  Unsecured Nonpriority Claims have been estimated as follows:
    A detailed reconciliation to the Debtors' books and records has yet to be performed.

|                                               | Liquidation |
| --------------------------------------------- | ----------- |
| Prepetition A/P (Trade / Other)               | $24,848 (a) |
| Medical Malpractice                           | 5,642 (b)   |
| Third Party Liabilities                       | 9,311 (a)   |
| Less:  Due from Third Parties                 | (2,450)     |
| Third Party Liabilities, net                  | 6,860       |
| Employee                                      | 3,705       |
| Other (First Ins., Modern Med., J&J, etc.)    | 2,026 (a)   |
| DASNY Note - Restr. Pool                      | 1,860       |
| Maimonides                                    | 1,070       |
| 1199                                          | 997         |
| Accrued benefits, unsecured                   | 800         |
| Capital Leases                                | 238         |
| Capital Lease Rejection Claims                | 2,344       |
| **Total Unsecured Nonpriority Claims**        | **$50,390 (c)** |

    (a) As filed and/or scheduled.
    (b) As reported at April 30, 2008.
    (c) Claims are currently subject to reconciliation and possible claims objections.  As a result, the universe of Unsecured Nonpriority Claims may be reduced.

# **EXHIBIT 4**

## **Potential Preference Action List**

(this page has been intentionally left blank)

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| | |
| **CARDINAL DISTRIBUTION** | $850,868.38 |
| **Prudential Huntodebits** | $840,422.35 |
| **TGS HEALTHCARE SOL** | $595,748.00 |
| **DRF(Reverve Fund)Loan Payback** | $500,000.00 |
| **CARDINAL HEALTHCARE** | $454,679.48 |
| **SPECIAL TOUCH HOME CR** | $375,400.75 |
| **RELIABLE COMMUNITY CARE** | $363,714.86 |
| **CALIGOR PHYS & HOSP SUP** | $301,947.67 |
| **HEALTH NET OF CONNECTICUT** | $256,868.95 |
| **ROYAL CARE INC** | $248,589.00 |
| **GE Capital** | $238,997.43 |
| **MILLENNIUM LITHOTRIPSY** | $227,700.00 |
| **DLA/USLLP-LEGAL** | $213,493.00 |
| **KEYSPAN ENERGY DELIVERY** | $209,830.48 |
| **NEW YORK HEALTH CARE** | $200,430.21 |
| **NEW YORK BLOOD CENTER  A/CS REC'** | $193,852.10 |
| **U.S. FOODSERVICE, INC** | $193,316.37 |
| **HEALTH FACILITY ASSMNT FUND** | $190,599.00 |
| **LOCAL 1199 CONFESSION OF JUDGEME** | $165,000.00 |
| **MARTIN, CLEARWATER & BELL** | $151,049.61 |
| **MEDWELL WOMEN'S SERVICS** | $135,080.00 |
| **FIRST INSURANCE FUNDING** | $122,176.00 |
| **METROPOLITAN LIFE** | $121,552.89 |
| **MEDICAL LIABILITY MUTUAL** | $119,127.00 |
| **1199 SEIU DUES-** | $119,087.62 |
| **STERLING & STERLING. INC** | $117,898.00 |
| **CHILDRENS MEDICAL SERVICE** | $114,999.99 |
| **QUEST DIAGNOSTICS** | $113,972.97 |
| **STATEWIDE POOLS** | $111,285.00 |
| **CON EDISON-L** | $106,915.56 |
| **MEDTRONIC INC** | $104,755.82 |
| **BAY RIDGE ASSISTING** | $103,516.60 |
| **JOHNSON & JOHNSON HEALTH CARE SY** | $101,362.75 |
| **Downpayment Dyker Mgmt Realty** | $100,000.00 |
| **DRF(Reverve Fund)** | $100,000.00 |
| **Pension(Finance Frozen Pension - PBGC** | $100,000.00 |
| **CADWALADER, WICKERSHAM** | $98,361.42 |
| **PROFESSIONAL SERVICES** | $97,658.13 |
| **B. BRAUN MEDICAL INC** | $90,104.80 |
| **ABBOTT LABORATORIES** | $89,846.25 |
| **ANGELICA TEXTILE SVCS** | $87,156.38 |
| **ALLEN HEALTH CARE SERVICES** | $86,723.52 |
| **NATIONWIDE LIFE INS** | $85,493.75 |
| **J.Y. PROFESSIONAL RADIOLOGY** | $83,082.79 |
| **VALUCARE, INC** | $82,950.10 |
| **C.R. BARD (MEDICAL/UROL.)** | $82,863.93 |
| **JMB NURSING SERVICES P.C.** | $81,104.80 |
| **TRAVELERS LIFE & ANNUITY** | $79,036.30 |
| **PHYSICIANS RECIPROCAL** | $78,963.00 |
| **ALCON LABORATORIES INC** | $78,794.77 |
| **BROOK ISLAND MED ASSOC.** | $75,000.00 |
| **UNITED MED ASSO P.L.L.C.** | $75,000.00 |
| **PATIENT CARE** | $73,722.50 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| **AMERICAN SKANDIA** | $72,329.63 |
| **BIOTRONIK INC** | $67,905.00 |
| **ACCORDIS INC.** | $66,492.74 |
| **GE HEALTHCARE** | $65,997.70 |
| **INAMED** | $61,155.00 |
| **BECKMAN COULTER** | $60,752.95 |
| **DORMITORY AUTHORITY STATE OF NY** | $60,000.00 |
| **MODERN MEDICAL SPECIALTIES** | $59,400.00 |
| **LOEB & TROPER** | $58,675.84 |
| **EMDEON BUSINESS** | $57,415.92 |
| **BEST CHOICE HHC INC** | $54,213.00 |
| **ECLIPSYS CORP** | $53,704.95 |
| **GROOM LAW CHARTERED** | $52,879.77 |
| **BOSTON SCIENTIFIC CORPORATION** | $51,755.79 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| GUARANTEED PRINCIPLE | $50,000.00 |
| HEALTH/ROI | $50,000.00 |
| JH Cohn, LLP | $50,000.00 |
| PETROCELLI & CHRISTY | $49,883.55 |
| MARY BORDAY VANCHIERI | $49,805.00 |
| ISLAND REHABILITATIVE | $48,340.00 |
| NYC WATER BOARD | $48,158.07 |
| AFLAC NEW YORK | $45,461.02 |
| MISYS HEALTHCARE SYSTEMS | $44,724.76 |
| GUIDANCE MEDICAL PERSONNEL | $43,633.50 |
| 1199 SEIU CREDIT UNION | $43,305.00 |
| UNITED STATES SURGICAL | $41,987.69 |
| ANESTHESIA ASSOC | $41,942.50 |
| OMEGA HOME HEALTH SERVICE | $41,576.25 |
| MAIMONIDES MED. CENTER | $41,485.00 |
| HOME HELPER AGENCY | $41,089.25 |
| AUSA/ DIVERSIFIED INV ADV | $39,854.62 |
| SEVENTH AVE PERFORMANCE CENTER I | $39,633.63 |
| B&G PLASTIC BAGS CORP | $39,316.00 |
| SIDHAL INDUSTRIES LLC | $39,282.30 |
| ONTARIO CREDIT CORP | $37,232.57 |
| LOVING HOME CARE | $36,977.25 |
| LINCOLN LIFE | $36,591.90 |
| MICHAEL SCHUHKNECHT, MD | $36,564.98 |
| CICERO CONSULTING ASSOC | $35,671.66 |
| MAIA TSIGNADZE | $35,000.00 |
| OLYMPUS FINANCIAL SERVICES | $34,282.08 |
| KEYSPAN ENERGY DEL. | $34,259.81 |
| HOSPIRA WORLDWIDE, INC | $31,823.14 |
| MUTUAL OF AMERICA LIFE INS | $31,054.29 |
| MISDU | $30,877.49 |
| SOURCEONE HEALTHCARE TECH | $30,669.35 |
| OCEANVIEW MEDICAL PLAZA INC | $30,291.00 |
| ALLIED WASTE SERVICES #273 | $29,681.72 |
| BIO-RAD LABORATORIES | $28,789.23 |
| STRYKER HOWMEDICA OSTEO. | $28,048.30 |
| FUJI MED SYSTEM INC | $27,490.94 |
| STERIS | $26,660.57 |
| BROOK ISLAND MEDICAL | $26,410.79 |
| VERIZON | $26,387.92 |
| LINDE GAS LLC | $26,285.70 |
| ADEZA BIOMEDICAL | $26,168.23 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| **DAV-MAR MEDICAL** | $25,984.25 |
| **AMABILE & ERMAN** | $25,854.22 |
| **RENAISSANCE HOME HEALTH CARE** | $25,743.75 |
| **WIESLAW MARUT** | $25,000.00 |
| **JOBCO INCORPORATED** | $24,400.00 |
| **QUEENSBORO FARMS** | $24,295.94 |
| **AIRWORKS SYSTEMS INC.** | $23,417.00 |
| **VICTORY EMERGENCY PHYSICIANS** | $23,301.30 |
| **FARMINGTON COMPANY** | $21,848.84 |
| **EZELL GROUP LIMITED** | $21,666.64 |
| **Olympus American Info Lease** | $20,821.38 |
| **HILL ROM** | $20,484.07 |
| **DIALYSIS CLINIC # 205** | $20,400.00 |
| **CON EDISON** | $20,016.71 |
| **INK-WELL** | $19,888.58 |
| **ORTHO-CLINICAL DI   J& J** | $19,862.63 |
| **GARFUNKEL, WILD & TRAV.** | $19,638.57 |
| **HYPERTYPE INC.** | $19,368.75 |
| **PETRO COMMERCIAL SERVICES** | $19,051.56 |
| **BRACCO** | $18,831.11 |
| **DR. WAGDY F. GIRGIS, MD** | $18,750.00 |
| **BROADWAY PERSONNEL** | $18,609.75 |
| **OTIS ELEVATOR COMPANY** | $18,568.14 |
| **Soverign Bank Lease Pymt** | $18,232.38 |
| **J&M BAKERY PRODUCTS** | $17,851.20 |
| **DR. MEENA LACORTE** | $17,708.35 |
| **RELIABLE MECHANICAL CO.** | $17,645.00 |
| **Ceridian Corp** | $17,448.24 |
| **A.M.E.R.S.** | $16,987.00 |
| **COOK MEDICAL INCORPORATED** | $16,964.98 |
| **DR. PERRY DRUCKER** | $16,666.66 |
| **KARL STORZ ENDOSCOPY-AMER INC** | $16,554.10 |
| **1199/SEIU TRAINING** | $16,511.50 |
| **3M HEALTH INFORMATION** | $15,984.28 |
| **BORDA PRODUCTS** | $15,793.25 |
| **SUNSET PARK SECURITY TRAINING SC** | $15,700.00 |
| **XEROX CORP** | $15,498.51 |
| **STERICYCLE, INC - BIO SYSTEMS** | $15,108.00 |
| **PHYLLIS LITKE** | $15,000.00 |
| **RESERVE ACCOUNT** | $15,000.00 |
| **NORTH SHORE FORMS & LABELS INC** | $14,104.40 |
| **DADE BEHRING** | $14,080.74 |
| **SPECIAL CARE HOSPITAL** | $14,000.00 |
| **DELTA DENTAL OF NEW YORK** | $13,897.90 |
| **VGM FINANCIAL SERV** | $13,685.91 |
| **STAPLES** | $13,398.81 |
| **NEW YORK DAILY NEWS** | $13,302.00 |
| **FUTURE CARE HEALTH SERVICES,INC** | $13,224.00 |
| **NATIONWIDE LIFE INS CO** | $13,144.56 |
| **PHILIPS MEDICAL SYSTEMS** | $12,964.76 |
| **PUBLIC GOODS POOL(SW)** | $12,477.00 |
| **MUSCULOSKELETAL TRANSPLANT FOUND** | $12,063.65 |
| **UNITED BUSINESS SYSTEMS** | $11,700.00 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| NEW YORK STATE PROCESSING CENTER | $11,438.78 |
| Johnson and John Lease Payment | $11,431.08 |
| All Points Capital Lease | $11,415.48 |
| INSTRUMENTATION LAB | $11,414.26 |
| GE MEDICAL SYSTEMS | $11,199.32 |
| SMITH & NEPHEW ENDOSCOPY | $11,097.14 |
| LIBERTY DOORWORKS | $11,003.00 |
| GREATER NEW YORK HOSP ASSOC | $10,815.59 |
| 1199 SEIU- | $10,770.76 |
| MICHAEL ABBOUD OBGYN PC | $10,675.00 |
| BECKMAN COULTER CAPITAL | $10,472.12 |
| MARIA S. REINIS, M.D. | $10,416.65 |
| VIKTORIYA BAKCHEVA PC | $10,300.00 |
| NORTH ATLANTIC CAP CORP | $10,286.77 |
| AMERICAN EXPRESS | $10,216.79 |
| DR LEONARD EMMA | $10,012.50 |
| LENDING UNIVERSE | $10,000.00 |
| ST PATRICK'S R.C. CHURCH | $10,000.00 |
| THE MOLINARI GROUP | $10,000.00 |
| STEVEN E. NEWMAN M.D. | $9,900.00 |
| DR. BENJAMIN WU. | $9,720.00 |
| DR. MICHAEL F. CABBAD | $9,639.39 |
| DIGESTIVE DISEASE ASSOC, P.C | $9,340.00 |
| FIRST RELIANCE STANDARD LIFE | $9,051.34 |
| DR. ANMING LUO | $8,860.00 |
| NYS DEPT HEALTH | $8,827.67 |
| ARTHREX INC | $8,740.00 |
| RICHARD KAPLIN | $8,606.25 |
| ARTHROCARE CORP. | $8,406.00 |
| BARCLAY WATER MANAGEMENT, INC | $8,375.00 |
| RIQUELME & ASSOCIATES | $8,325.00 |
| NATUS MEDICAL INC | $8,300.38 |
| KENDALL HEALTHCARE PRODUCTS COMP | $8,297.95 |
| FIRE DEPT CITY OF NY | $8,280.81 |
| AKTINA MEDICAL PHYSICS | $8,000.00 |
| METROCARD SALES | $8,000.00 |
| STERGIOU AND GRUBER RISK CONSULT | $8,000.00 |
| G.I. LIVER DIAGNOSTICS | $7,909.25 |
| Lakeland Bank - Lease Rent | $7,873.50 |
| ARJO INC. | $7,739.24 |
| ORTHO-CLINICAL DIAGNOSTICS | $7,724.20 |
| MALLINCKRODT | $7,676.68 |
| SYNOVIS SURGICAL INNOVATIONS | $7,520.00 |
| MEDTRONIC SOFAMOR DANEK USA | $7,503.04 |
| DR. LALIT SETH | $7,291.65 |
| DR NICHOLAS ROUSSIS | $7,200.00 |
| KCI | $7,162.53 |
| PC MALL | $7,117.63 |
| NATIONAL BENEFIT LIFE NBL | $7,100.50 |
| TOTOWA SYSTEMS INC | $7,055.50 |
| MJCL | $6,902.52 |
| Irwin Business Finance - Lease Pymt | $6,636.00 |
| ACCTG STATISTICS | $6,600.00 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| **NATIONAL HEALTHCARE STAFFING** | $6,489.60 |
| **SYNTHES LTD** | $6,223.75 |
| **MONICA W. INC.** | $6,087.58 |
| **KAMCO SUPPLY CORP** | $5,922.60 |
| **RICHARD WILLIAMS** | $5,910.00 |
| **MITCHELL / MARTIN INC.** | $5,870.50 |
| **DR PETER PASQUA JR** | $5,850.00 |
| **MEDICAL & SURGICAL EYE** | $5,833.33 |
| **UNITED COMPUTER SYSTEMS** | $5,786.00 |
| **ARIZANT HEALTHCARE INC** | $5,654.60 |
| **IRA HAMMER** | $5,625.00 |
| **GEORGE N. ZACHAROPOULOS** | $5,600.00 |
| **DR. BALMIKI** | $5,581.10 |
| **DEPUY MITEK  J& J** | $5,536.00 |
| **DR. ARKADY PINKHAS** | $5,520.00 |
| **MEDFARE INC** | $5,427.04 |
| **Equipment Leasing Lease** | $5,424.33 |
| **MICHELLE SPECTOR** | $5,320.00 |
| **BALLARD MEDICAL** | $5,298.20 |
| **MENTOR AESTHETIC PRODUCTS** | $5,288.75 |
| **MISYS HEALTH CARE SYSTEMS** | $5,266.00 |
| **STERICYCLE INC** | $5,251.22 |
| **CUSTOM ULTRASONICS, INC** | $5,246.55 |
| **FEDEX** | $5,240.73 |
| **MEDICAL WAREHOUSE, INC.** | $5,233.82 |
| **BAUSCH & LOMB SURGICAL** | $5,212.25 |
| **Bank is still investigating this** | $5,010.47 |
| **BILL ADAM/WA HEALTHCARE** | $5,000.00 |
| **DR. AARON NAGELBLATT D.D.S.** | $5,000.00 |
| **DR. MUKUND PATEL** | $5,000.00 |
| **ST. JUDE MEDICAL** | $5,000.00 |
| **UB FOUNDATION ACTIVITIES, INC** | $5,000.00 |
| **BIO MERIEUX** | $4,996.64 |
| **STRYKER INSTRUMENTS** | $4,919.79 |
| **NYC DEPT FINANCE** | $4,903.34 |
| **AKIVA BERGMAN, M.D.** | $4,861.10 |
| **DR. FREDERIC SHERMAN** | $4,861.10 |
| **TRINITY WORKPLACE LEARNING** | $4,821.00 |
| **MARK BASILE** | $4,742.50 |
| **SASCO BUILDERS INC.** | $4,680.00 |
| **NORTH AMERICAN CO** | $4,615.38 |
| **DR. DEL CASTILLO** | $4,500.00 |
| **ACMI** | $4,433.00 |
| **EYE BANK FOR SIGHT REST** | $4,360.00 |
| **I FLOW** | $4,325.00 |
| **JUNE ELECTRIC CORP** | $4,228.50 |
| **TRI-ANIM HEALTH SERVICES, INC** | $4,076.01 |
| **NYS DEPT OF TAXATION** | $4,010.22 |
| **VIASYS MEDSYSTEMS** | $4,006.32 |
| **ZIMMER U.S.A.** | $4,005.08 |
| **DR. SEPKOWITZ** | $4,000.00 |
| **ENDOCARE, INC.** | $4,000.00 |
| **YULIYA SHALAMBERIDZE-** | $4,000.00 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| **PRIORITY HEALTHCARE** | $3,980.00 |
| **SYNERGETICS INC** | $3,945.60 |
| **SUSANNA KOGAN** | $3,940.00 |
| **DORNIER MEDICAL SYSTEMS, INC.** | $3,937.50 |
| **B&L MEDICAL** | $3,896.25 |
| **FLEET SERVICES** | $3,887.09 |
| **UNITED STATES TREASURY** | $3,885.10 |
| **MIDBROOK REHAB SERV** | $3,835.00 |
| **MED PART** | $3,831.65 |
| **OBGYN DIRECT.COM** | $3,816.00 |
| **PATRICK LEBLANC, MD** | $3,780.00 |
| **BLACKLER AIR COMPR** | $3,757.00 |
| **DR. LEVINE** | $3,720.00 |
| **ABCO REF** | $3,696.84 |
| **TAP FINANCE, INC** | $3,591.00 |
| **TAUB'S FLOOR COVERING OF S.I.** | $3,550.37 |
| **VERIZON X** | $3,508.87 |
| **CONMED** | $3,502.18 |
| **HPSC,INC** | $3,499.65 |
| **AMIT KOLECI** | $3,476.98 |
| **NEW YORK STATE SALES TAX** | $3,437.50 |
| **DR. BORRIS MAZAROV** | $3,340.00 |
| **ALI-MED, INC.** | $3,335.24 |
| **BYRON/AESTHETIC LASER** | $3,329.64 |
| **JANE DUGGAN CCS** | $3,230.00 |
| **SMITH MEDICAL** | $3,171.21 |
| **JERRY G. KAPLAN,M.D,P.C** | $3,150.00 |
| **SUNSHORE LEASING CORP** | $3,123.00 |
| **SEXAUER** | $3,059.03 |
| **AKA PEST CONTROL INC.** | $3,050.00 |
| **FORD CREDIT** | $3,028.92 |
| **FIRE AND NURSES CALL SYSTEMS, IN** | $3,025.00 |
| **NEW JERSEY FAMILY SUPP.PYMT.CTR.** | $3,020.00 |
| **ABRAHAM EISEN** | $3,000.00 |
| **PRINT MAIL SYSTEMS** | $2,986.92 |
| **PETTY CASH - VMH** | $2,931.92 |
| **KAREN FARID** | $2,922.50 |
| **MD MARK MICHNIK** | $2,887.50 |
| **DR. WILEN** | $2,861.31 |
| **SAFEGUARD DOCUMENT DESTRUCTION** | $2,850.00 |
| **WINSTON ADVERTISING** | $2,771.46 |
| **HOLLISTER** | $2,697.81 |
| **S&B ELECTRICAL SUPPLY CORP** | $2,664.00 |
| **DIAMOND REPORTING INC** | $2,615.95 |
| **PREST-O-SALES & SERVICE INC** | $2,608.60 |
| **HOME DEPOT CRC** | $2,575.39 |
| **Citicorp Debit** | $2,569.41 |
| **GLOBE TOBACCO CO** | $2,553.01 |
| **FRANKLIN & GRINGER PC** | $2,550.00 |
| **CALMARK CORP** | $2,522.42 |
| **DR JOHN C. LUKE** | $2,512.50 |
| **NYS ENVIRONMENTAL CONSERVATION R** | $2,460.00 |
| **CALIP DAIRIES, INC** | $2,450.17 |

| Victory Memorial Hospital | |
| --- | --- |
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| HIMANSHU PANDYA, MD | $2,430.55 |
| AUTOMATIC FIRE SPRINKLER | $2,425.00 |
| RESPIRONICS | $2,373.58 |
| CYRACOM INTERNATIONAL, INC | $2,368.22 |
| NYS UNEMPLOYMENT INS | $2,316.97 |
| WILLIAM HIRD + CO | $2,307.50 |
| MANIFEST FUNDING SERV | $2,278.50 |
| DR. SIMON SAADA | $2,274.34 |
| AQUA-EEZ, INC | $2,231.72 |
| VITAL SIGNS | $2,231.48 |
| SUPPORT PAYMENT CLEARINGHOUSE | $2,220.72 |
| DR SUMIT DHARIA | $2,220.00 |
| METROPOLITAN DATA SOLUTIONS LTD | $2,205.00 |
| SAMMONS PRESTON ROLYAN | $2,170.27 |
| DIANE SPROSTY | $2,166.00 |
| P.C. RICHARD & SON | $2,135.74 |
| HI TECH EQUIPMENT LEASE | $2,105.50 |
| JAY NADELBACH, ESQ | $2,100.00 |
| JACQUELYN-R CODING COMPLIANCE CO | $2,090.00 |
| STATE OF THE ART MEDICAL  PRODUC | $2,090.00 |
| WL GORE ASSOCIATES | $2,080.00 |
| BAXTER HEALTHCARE (I.V.SYST.) | $2,076.39 |
| PRESTIGE PRINTING | $2,061.05 |
| DR. JAHANGIR | $2,040.00 |
| VANGUARD COMPUTERS | $1,960.06 |
| KATENA PRODUCTS INC | $1,959.55 |
| ALPRO SERVICE CO | $1,943.22 |
| STATE OF THE ARTS | $1,933.00 |
| FISCARE | $1,917.52 |
| KIRANPREET PARMAR MD | $1,890.00 |
| RIDGE IRON WORKS, INC. | $1,875.00 |
| RUSS BERRIE U.S. GIFT, INC | $1,853.58 |
| LONG'S DISCOUNT WINES & LIQ | $1,847.83 |
| EMB BEVERAGE CORP. | $1,821.70 |
| VERIZON ACCESS | $1,812.59 |
| WAMPOLE LABORATORIES | $1,811.76 |
| BRIGGS CORP | $1,806.32 |
| CORY SOCHINSKY | $1,800.00 |
| BRIDGEVIEW LOCKSMITH | $1,794.55 |
| MARJAM SUPPLY CO. | $1,789.50 |
| HYDRO TECH ENVIRONMENTL | $1,750.00 |
| DER BLATT | $1,715.00 |
| JOHNSON & ROUNTREE | $1,673.32 |
| FRITO-LAY | $1,657.59 |
| MED ONE CAPITAL, INC. | $1,653.00 |
| THE TRIO CO | $1,627.28 |
| BSN MEDICAL, INC | $1,612.44 |
| INSTRAMED | $1,546.45 |
| DR. CHERIAN ALEXANDER | $1,540.00 |
| ROSS PRODUCTS DIVISION | $1,510.10 |
| A & L AUTO REPAIR, INC | $1,507.00 |
| CYBERONICS | $1,500.00 |
| MARIA ZOTOS | $1,487.60 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| **COMMISSIONER OF TAXATION & FI** | $1,483.40 |
| **T-MOBILE** | $1,462.06 |
| **SOFTWAREOUTLET.COM** | $1,457.85 |
| **DR. M PAHUJA** | $1,440.00 |
| **B.H.PLUMBING & HEATING CORP** | $1,417.00 |
| **EDWARDS LIFESCIENCES** | $1,398.20 |
| **PREFERRED COOKIES INC** | $1,389.54 |
| **G.A.L. HANA CAR & LIMO SERVICE I** | $1,382.00 |
| **DR. PETER ROUVELEAS** | $1,380.00 |
| **NATUZZI BROS.ICE CO, INC** | $1,380.00 |
| **SKYTEL** | $1,369.86 |
| **VERIZON WIRELESS** | $1,335.93 |
| **DE LAGE LANDEN FINANCIAL** | $1,323.22 |
| **CATHEDRAL MARBLE & TILE** | $1,250.00 |
| **PAUL FORTUNATO** | $1,220.52 |
| **RELIGIOUS & KITCHEN SUPERVISION** | $1,200.00 |
| **SOTA MEDICAL PRODUCTS** | $1,194.75 |
| **DOLORES MORAN** | $1,172.88 |
| **NEW YORK UNIVERSITY** | $1,150.00 |
| **MEDELA INC** | $1,136.20 |
| **HEALTH CARE LOGISTICS** | $1,119.32 |
| **DR MIROSLAWA KUDEJ** | $1,110.00 |
| **B&K MEDICAL SYSTEMS INC** | $1,097.00 |
| **SCIENTIFIC FIRE PREVENTION CO.** | $1,095.60 |
| **JLP ROZZ, INC** | $1,075.00 |
| **SLOAN CORPORATION** | $1,068.00 |
| **US LEC CORP** | $1,063.13 |
| **TRANS VIDEO COMMUNICATIONS INC** | $1,050.00 |
| **HOME REPORTER INC** | $1,017.00 |
| **IVANS** | $1,015.80 |
| **GRAYBAR ELECTRIC CO.** | $1,009.66 |
| **E. FOUGERA & CO** | $993.00 |
| **ASPEN SURGICAL PRODUCTS** | $971.66 |
| **ZURICH DEDUCTABLE** | $965.40 |
| **ARMSTRONG MEDICAL IND.** | $960.00 |
| **HCPRO** | $953.00 |
| **T & G INDUSTRIES** | $937.50 |
| **GENZYME GENETICS** | $935.00 |
| **FISHER HEALTHCARE** | $930.39 |
| **AMERICAN MEDICAL ASSOCIATION** | $905.25 |
| **SMITH & NEPHEW ORTHOPAEDIC** | $892.80 |
| **AMICI, INC.** | $888.30 |
| **JAMES P REGAN** | $885.00 |
| **E M ADAMS CO** | $859.20 |
| **URESIL, L.P.** | $854.40 |
| **VERMED, INC.** | $841.50 |
| **B & R ENTERPRISES** | $839.45 |
| **AMERIDERM** | $828.00 |
| **ALPHA COMMUNICATIONS** | $825.00 |
| **INGENIX** | $824.51 |
| **GETINGE CASTLE** | $802.79 |
| **LEGAL LANGUAGE SERV** | $800.25 |
| **ACOEM** | $775.00 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| MARTIN A. BIENSTOCK | $766.20 |
| ACTIVE ALARM SYSTEMS | $765.00 |
| HK SURGICAL INC. | $763.92 |
| CASTLE CLOTHES | $753.00 |
| MEDI DRAPES | $750.00 |
| NATIONAL HOSPITAL PACKAGING | $741.92 |
| MICRINS, INC | $728.00 |
| OLYMPIC MEDICAL | $723.90 |
| FOLLETT CORP | $720.85 |
| QUARTERMASTER | $720.00 |
| THE MCS GROUP INC | $709.00 |
| AMAVAN INDUSTRIAL SALES | $680.00 |
| ST. JOHN RECORD | $674.71 |
| LEMAITRE VASCULAR INC | $670.50 |
| DELUXE BUSINESS FORMS | $666.20 |
| INTEGRATED MEDICAL SYSTEMS INTER | $660.00 |
| MICHAEL TWOMEY | $650.00 |
| U.S. DEPT OF EDU | $647.23 |
| DYNAMIC MEDICAL SYS | $645.00 |
| OLYMPUS | $636.30 |
| OLYMPUS AMERICA | $632.92 |
| SHIPPERT MEDICAL TECHNOLOGIES CO | $624.00 |
| HENRY DALEY CITY MASHALL | $618.84 |
| NEW YORK SCU | $614.65 |
| EILEEN WINSLOW | $608.00 |
| ELLEN MARTIN | $600.00 |
| SURGIPATH | $585.92 |
| ATRIUM MEDICAL CORP | $576.24 |
| DIRECT SUPPLY HEALTHCARE | $575.83 |
| SANDEL MEDICAL INDUSTRIES, LLC | $572.61 |
| DE LUCA LANDSCAPING INC | $550.00 |
| NYC DEPT OF FINANCE PARKING VIOL | $550.00 |
| MEDI-LAB + LABE | $541.25 |
| CHRISTIE OVERHEAD DOOR | $540.00 |
| DR. KELLY CHIN | $540.00 |
| GENERAL DICTATING MACHINES | $540.00 |
| HEMOCUE INC | $540.00 |
| SECURE CARE PRODUCTS INC | $539.80 |
| DATASCOPE CORP | $536.00 |
| N.Y.S. COMMISSIONER OF | $520.00 |
| TY INC | $518.40 |
| TRI-STATE HOSP SUPPLY CORP | $517.70 |
| HEALTH CARE WASTE SERVICES | $517.48 |
| MOBILE DIAGNOSTIC TEST | $511.53 |
| ARTHROCARE CORP | $502.04 |
| BAM POWER EQUIPMENT | $500.00 |
| DR. JAMES SAPALA | $500.00 |
| HOLY FAMILY HOME | $500.00 |
| LEE PERRY GROSS MUSIC INC | $500.00 |
| NCI | $500.00 |
| R&D BATTERIES, INC. | $498.21 |
| MROCC INITAL CERT | $495.00 |
| MOSS TUBES INC | $490.00 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| J CAPUTO | $481.00 |
| DR SUNIL H PATEL | $480.00 |
| MED-PAT INC | $477.60 |
| THE MIKE FEINBERG COMPANY, INC | $470.00 |
| 1199 HOME MORTAGE | $450.96 |
| ARON GERSHMAN | $450.00 |
| DR. EISENSTEIN | $450.00 |
| MAHMOUD RATEB, MD | $450.00 |
| O C TANNER | $426.92 |
| JOHN MAYES | $422.00 |
| DR. BHANSALI | $420.00 |
| DR. TAVOULAREAS | $420.00 |
| DUTCH OPHTHALMIC, USA | $417.00 |
| RICHMOND SCU | $414.34 |
| QUEENS SCU | $408.00 |
| ELLMAN INTER. | $405.80 |
| POSITIVE PROMOTIONS | $404.25 |
| THE RUHOF CORPORATION | $403.44 |
| MED-STOR | $396.00 |
| ROSALIE DAUM | $393.26 |
| BABYLAB | $380.00 |
| STEFANIE FUCHS | $380.00 |
| DESIGN VERONIQUE | $379.50 |
| UNITED PARCEL SERVICE | $375.04 |
| DATABASE | $375.00 |
| INTEGRA LIFESCIENCES | $364.50 |
| GAYMAR INDUS. | $355.20 |
| BENJAMIN RAHANAER | $350.00 |
| MDI / PALL MEDICAL | $350.00 |
| DAILY NEWS | $348.13 |
| TIME FOR A QUICK ONE | $345.00 |
| MICROTEK MEDICAL INC | $334.22 |
| AESCULAP INST | $332.31 |
| FLUKE ELECTRONICS | $331.12 |
| POLY SCIENTIFIC | $318.67 |
| SONOTECH, INC | $314.48 |
| CHARLES SOLANA & SONS | $310.00 |
| SARSTEDT INC | $307.78 |
| DARBY INSTITUTIONAL SALES | $307.30 |
| PARTS SOURCE , LLC | $305.00 |
| ACTIVE TRANSPORT | $301.65 |
| VBM MEDICAL INC | $301.11 |
| AMERICAN ARBITRATION | $300.00 |
| DR. MANISCALCO | $300.00 |
| GEORGIY SHAKHNEVICH | $300.00 |
| JOHN L HUGHES | $300.00 |
| PMIC | $299.80 |
| Deluxe Check Check | $296.50 |
| STAT-TECH SURGICAL SUPPLY CO. IN | $290.20 |
| MICHAEL DIAMOND | $286.56 |
| DERMA SCIENCES INC | $285.74 |
| KINGS SUPPORT COLL UNIT | $280.73 |
| ACME CASH REGISTER | $272.60 |

| Victory Memorial Hospital | |
|---|---|
| **90 Day Payments to Vendors** | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| DR. NICOLETTA | $270.00 |
| 4TH AVE BURNER | $267.08 |
| PARKWAY FLORIST | $262.00 |
| G.A.SERVICE | $259.41 |
| PASSY-MUIR INC. | $257.00 |
| ST ANSELM SCHOOL | $250.00 |
| WESTERN MEDICAL LTD / DERMA SCIE | $241.78 |
| CONE INST | $232.00 |
| MC KNIGHT SALES CO. INC | $228.05 |
| EDWIN CORREA | $225.00 |
| COMMISSIONER OF MOTOR VEHICLES | $224.00 |
| THE BIG GREEN BOX | $220.00 |
| RNA MEDICAL-002 | $216.00 |
| LAB SAFETY SUPPLY INC | $214.60 |
| EXPRESS IT ADVERTISING | $210.00 |
| Check Number 70091 | $203.00 |
| ROBERT H. YOUNG MD | $200.00 |
| ZIMMET HEALTHCARE SERVICES | $200.00 |
| HOBBS MEDICAL, INC. | $197.50 |
| KRM INFORMATION SERVICE INC | $195.00 |
| BECTON DICKINSON MICROBIO SYS | $190.64 |
| JOHNSTONE SUPPLY | $183.04 |
| XO COMMUNICATION | $180.45 |
| USI, INC | $176.49 |
| MASS MUTUAL FINANCIAL GROUP | $173.76 |
| TERUMO MEDICAL CORP. | $160.50 |
| HOMEPRO MEDICAL SUPPLIES, LLC | $159.00 |
| CAPITAL PAINT | $154.06 |
| BRONX SUPPORT COLLECTION UNIT | $151.50 |
| GENNADY DROB | $150.00 |
| PROFESSIONAL EDUCATION | $149.00 |
| JEDMED INSTRUMENT CO | $139.00 |
| L&S WHOLESALE BALLOON DISTRIBUTO | $136.50 |
| CHANNEL PUBLISHING LTD | $129.80 |
| NATIONAL FEDERATION OF | $125.00 |
| UNITED AD LABEL | $124.47 |
| BIRCHWOOD LABS | $123.70 |
| BEJENARU MIRCEA | $120.00 |
| DR KAYALVIZHI SAMBANDAM, | $120.00 |
| DR. PACE | $120.00 |
| VICTOR CORNELIUS INC | $117.60 |
| DEMAGGIO & DEMAGGIO, LLP | $116.00 |
| YP.Com | $115.80 |
| PATRICIA HAMILTON | $113.13 |
| AT&T STARTERLINE | $103.16 |
| CATHY LECCESE | $100.00 |
| SYLVIA ZRAICK | $100.00 |
| LEVINES | $99.69 |
| EAGLE LABS. | $98.90 |
| NAHSHAL SAMEER | $98.00 |
| MERIT MEDICAL SYSTEMS, INC | $97.33 |
| NYC PARKING VIOLATIONS | $90.00 |
| MICRO ESSENTIAL LABORATORY INC | $89.02 |

| Victory Memorial Hospital | |
|---|---|
| 90 Day Payments to Vendors | |
| | |
| Filing Date | 11/15/2006 |
| Cutoff Date | 8/17/2006 |
| | |
| **VENDOR** | **AMOUNT** |
| TOP BULB | $85.89 |
| ACCUTOME, INC | $85.50 |
| POLAND SPRING WATER | $80.71 |
| KEY SURGICAL INC | $79.00 |
| ALPHA SOURCE INC. | $77.70 |
| OLGA MONACHINO | $69.00 |
| NYC DEPT. OF BLDG. | $60.00 |
| SHARON BOYER | $60.00 |
| MODERN HEALTHCARE | $59.00 |
| LHASA OMS, INC | $58.00 |
| AT A GLANCE CALENDARS | $52.64 |
| AHIMA SEMINARS | $50.00 |
| NEW YORK TEMPORARY | $50.00 |
| PHILIPS MEDICAL SYSTEM  FORMERLY | $49.00 |
| AT&T | $46.74 |
| ABATE GIULIA | $45.06 |
| N.Y.S. DEPT HEALTH | $40.00 |
| BAY RIDGE COUNCIL | $25.00 |
| AT&T LONG DISTANCE | $17.60 |
| MCI | $13.02 |
| KARINA SADKOVETS | $10.00 |
| MARGARET SMITH | $10.00 |
| NY COLLEGE OF PODIATRIC MEDICINE | $10.00 |
| AMER. ACADEMY OF PEDIATRICS | $4.00 |
| | |
| TOTAL PAYMENTS | $14,496,693.65 |
| | |